**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DONTAY BATTLE, NECOAS** | ) | |
| **WILSON, DAVID UNDERWOOD,** | ) | |
| **MAURCELIA BLANCHETT, by and** | ) | |
| **through her conservator, Marcia** | ) | |
| **Blanchett, CHRISTAL HELTON,** | ) | |
| **PATRICK DOWNS, by and through his** | ) | |
| **conservator, Ashlee Kovalik,** | ) | |
| **DISABILITY RIGHTS** | ) | **Judge Aleta Trauger** |
| **TENNESSEE, in its associational** | ) | **Civil Action No.: 3:22-cv-00022** |
| **capacity and in conjunction with** | ) | |
| **Plaintiffs Battle, Wilson, Underwood,** | ) | |
| **Blanchett, Helton, and Downs,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| *vs.* | ) | |
| | ) | |
| **STATE OF TENNESSEE; TENNESSEE** | ) | |
| **DEPARTMENT OF** | ) | |
| **DEVELOPMENTAL AND** | ) | |
| **INTELLECTUAL DISABILITIES;** | ) | |
| **and TENNESSEE DEPARTMENT** | ) | |
| **OF MENTAL HEALTH AND** | ) | |
| **SUBSTANCE ABUSE SERVICES,** | ) | |
| | ) | |
| **Defendants.** | | |

---

**PLAINTIFFS' SECOND AMENDED AND SUPPLMENTAL COMPLAINT**

---

Plaintiffs Dontay Battle, Necoas Wilson, David Underwood, Maurcelia Blanchett, by and

through her conservator, Marcia Blanchett, Christal Helton, Patrick Downs, by and through his

conservator, Ashlee Kovalik, and Disability Rights Tennessee ("DRT"), in its associational

capacity as the Protection & Advocacy System ("P&A") for the State of Tennessee, on behalf of

its constituents, and in conjunction with Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton,

1

and Downs (collectively referred to herein as "Plaintiffs"), by and through counsel, hereby file this Second Amended Complaint against the State of Tennessee ("the State"), the Tennessee Department of Intellectual and Developmental Disabilities ("DIDD"), and the Tennessee Department of Mental Health and Substance Abuse Services ("DMHSAS"), collectively referred to herein as "Defendants."

## I.   <u>INTRODUCTION</u>

1.      This is an action for declaratory, injunctive, and compensatory relief pursuant to Title II of the Americans with Disabilities Act ("Title II of the ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq.

2.      Imagine you are Deaf[1], and you see people moving their mouths, and you know they are trying to communicate with you, but you hear and understand absolutely nothing.  They may write letters on a sticky note and hand it to you, but you still do not understand.  You can communicate by signing with your hands, but nobody makes an effort to understand your language.  You have problems making friends in your group home.  You cannot understand the rules of the house.  You see your roommates and staff laughing.  You desperately want to connect with them, but nobody understands your sign language.  They look at you puzzled and turn away.  You go to your yearly planning meeting, and you sit there, unable to hear what others are saying about your life, while they alone make plans about you and your future.  You are required to sit in daily mental health group therapy sessions.  You see your peers talking, crying,

_____

[1] Uppercase "D" Deaf typically refers to people who share a language—American Sign Language (ASL)—and culture with other Deaf people. In contrast, lowercase deaf typically refers to people who do not hear but are not participants in Deaf culture. For purposes of this lawsuit, uppercase "D" Deaf will refer to all d/Deaf individuals.  For additional information, see *Community and Culture—Frequently Asked Questions*, The National Association of the Deaf at https://www.nad.org/resources/american-sign-language/communityand-culture-frequently-asked-questions (last visited December 8, 2021).

and nodding their heads, but you do not understand what they are saying. You are unable to participate in these things without the services of someone who knows sign language.

3.     Your frustration grows, but nobody attempts to understand your language. You feel left out, isolated, confused, and are unable to fully participate in activities and programs in which your peers participate. You live in silence, and your world is shrinking around you because you have no way to communicate. You have been rendered silent and invisible. This is the reality of Deaf individuals living in DIDD or DMHSAS group homes who have no communication supports.

4.     This action features two sets of individual plaintiffs. The first set involves Plaintiffs Battle, Wilson, Underwood, and Blanchett, who receive services through and administered by DIDD. The second set involves Plaintiffs Helton and Downs, who receive services through and administered by DMHSAS. In addition, DRT joins this action as a Plaintiff in its associational capacity.

5.     The State funds public intellectual and developmental disability services, mental health services, and substance abuse services for the benefit of its citizens.

6.     DIDD is the State's agency with primary responsibility to administer statewide programs and services to Tennesseans with intellectual and developmental disabilities ("I/DD") using state and Federal funds.

7.     The State and DIDD have failed to ensure that Plaintiffs Battle, Wilson, Underwood, and Blanchett, who are Deaf and communicate primarily in American Sign Language ("ASL"), receive equal access and effective communication to DIDD's programs and services in direct violation of Title II of the ADA and Section 504.

8.     The State and DIDD administer a system of services for individuals with I/DD by:

a. providing direct services through the Tennessee START Assessment & Stabilization Teams ("TN START AST") and residential community Intermediate Care Facilities;

b. licensing service providers;

c. administering a regulatory framework; and

d. investigating allegations of abuse, neglect, and rights violations by persons served by DIDD licensees (also referred to as "service providers").

9.     DIDD's I/DD service providers are supposed to offer choices to persons supported[2] that are "person-centered" and address the entire spectrum of needs in an individual's life, including, but not limited to, supported living housing (referred to herein as "DIDD group homes"), communication, habilitative, employment, emotional, safety, and behavioral needs.

10.    However, the State and DIDD fail to administer and deliver their programs and services to Plaintiffs Battle, Wilson, Underwood, and Blanchett in their primary language of ASL, thereby making DIDD's programs and services inaccessible to them, as detailed more fully herein.

11.    As a result, Plaintiffs Battle, Wilson, Underwood, and Blanchett are subjected to discrimination by the State and DIDD by reason of their disability of deafness, and solely by reason of their disability of deafness, and are denied the benefits of DIDD's programs and services that are available to hearing individuals with I/DD.

12.    The impact of the State's and DIDD's failures on Plaintiffs Battle, Wilson, Underwood, and Blanchett has been devastating.  Without effective communication, Plaintiffs Battle, Wilson, Underwood, and Blanchett have lived in isolation for years, unable to socialize, express

---

[2]"Person Supported" means a service recipient defined under T.C.A. § 33-1-101(23) as a person who is receiving services, has applied for services, or for whom someone has applied for or proposed services because the person has intellectual and/or developmental disabilities.

concerns, or share how they are feeling. They are lonely and frustrated. They cannot access DIDD's I/DD services that would allow them to improve their quality of life. They have lost language and/or are at severe risk for losing language. This denial of effective communication and resulting loss of language also impedes the provision of effective treatment services.

13. DMHSAS is the State's agency with primary responsibility to administer statewide programs and services to Tennesseans with mental illness ("MI") and substance use disorders ("SUD") using state and Federal funds.

14. The State and DMHSAS have failed to ensure that Plaintiffs Helton and Downs, who are Deaf and communicate primarily in ASL, receive equal access and effective communication to DMHSAS's programs and services in direct violation of Title II of the ADA and Section 504.

15. The State and DMHSAS administer a system of services for individuals with MI and/or SUD by:

     a. providing direct services through their regional mental health institutes ("RMHIs");

     b. licensing service providers;

     c. administering a regulatory framework; and

     d. investigating allegations of abuse, neglect, and rights violations by persons served by DMHSAS licensees (also known as "service providers").

16. DMHSAS licenses Mental Health Adult Residential facilities and Mental Health Adult Supportive Residential facilities (referred to herein as "MI group homes") as well as other residential and community programs for people with MI, where the ultimate goal is recovery and transition to independent living.

17.     The State and DMHSAS fail to administer and deliver their programs and services to Plaintiffs Helton and Downs in their primary language of ASL, thereby making DMHSAS's programs and services inaccessible to them, as detailed more fully herein.

18.     As a result, Plaintiffs Helton and Downs are subjected to discrimination by reason of their disability of deafness, and solely by reason of their disability of deafness, and are denied the benefits of DMHSAS's programs and services that are available to hearing individuals with MI and/or SUD.

19.     The impact of the State and DHMSAS's failures on Plaintiffs Helton and Downs has been devastating.  Without the ability to effectively communicate, Plaintiffs Helton and Downs have lived in isolation for years, unable to socialize, express concerns, or share how they are feeling.  They cannot access DMHSAS's programs and services that would allow them to improve their quality of life.  They cannot participate in critical mental health treatment, and, therefore, are unable to meet their goals that would allow them to transition out of group housing to independent living.  They are lonely and desperately want to have someone with whom they can communicate.  They have lost language or are at severe risk of losing language.  This denial of effective communication and resulting loss of language also impedes the provision of effective treatment services and has resulted in re-institutionalization.

20.     This action is brought to enforce the Federal requirements that Defendants' public services be equally accessible to Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, and Downs, and DRT's deaf constituents; to ensure that Defendants administer their services, programs, and activities in a non-discriminatory manner and in the most integrated setting appropriate to Plaintiffs' needs; to ensure that Plaintiffs are not excluded from enjoyment of and use of the benefits, services, programs, and activities of Defendants by reason of their disabilities

6

or solely by reason of their disabilities; to ensure that Defendants give primary consideration to Plaintiffs' requests when considering the types of auxiliary aids and services necessary to provide effective communication to them; and to ensure Defendants provide Plaintiffs with effective communication so that they may have equal access to Defendants' programs and services.

## II.     JURISDICTION AND VENUE

21.     This action arises under the laws of the United States. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. sections 1331 and 1343.

22.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b)(1) because the State's, DIDD's, and DMHSAS's central offices are in the Middle District of Tennessee.

## III.     PARTIES

23.     The State is one of the fifty (50) states that comprise the United States of America, with its central offices in Nashville, Tennessee.

24.     The State receives Federal financial assistance as that term is used in Section 504.

25.     The State is responsible for the administration of DIDD and DMHSAS.

26.     The State has more than fifteen (15) employees.

27.     DIDD is a department of the State with its central office in Nashville, Tennessee.

28.     DIDD is the State's agency with primary responsibility to administer state and Federally funded services to individuals with I/DD.

29.     DIDD receives Federal financial assistance as that term is used in Section 504.

30.     DIDD has more than fifteen (15) employees.

31.     DMHSAS is a department of the State with its central office in Nashville, Tennessee.

32.     DMHSAS is the State's agency with primary responsibility to administer state and Federally funded services to individuals with MI and/or SUD.

7

33.     DMHSAS receives Federal financial assistance as that term is used in Section 504.

34.     DMHSAS has fifteen (15) or more employees.

35.     Plaintiff Patrick Downs is Deaf and has MI.  His primary language is ASL.  He is eligible for and receives services administered by the State and DMHSAS through a service provider—Alliance Healthcare Services, which is licensed by DMHSAS.  Prior to that, he received in-patient treatment at an RMHI.  He is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20).  He lives in a DMHSAS-licensed group home in Memphis, Tennessee.

36.      Plaintiff Christal Helton is Deaf and has MI.  Her primary language is ASL.  She is eligible for and receives services administered by DMHSAS through a service provider—Legends RTC Lockdown, which is licensed by DMHSAS.  She is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20).  She lives in a DMHSAS-licensed group home in Manchester, Tennessee.

37.     Plaintiff Dontay Battle is Deaf, has I/DD, and MI.  His primary language is ASL.  He is eligible for and receives services administered by DIDD through a service provider—Support Solutions of the Mid-South, LLC, which is licensed by DIDD.  He is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20).  He lives in a DIDD-licensed group home in Memphis, Tennessee.

38.     Plaintiff Necoas Wilson is Deaf, has I/DD, and MI.  His primary language is ASL.  He is eligible for and receives services administered by DIDD through a service provider—Loving

Arms, LLC, which is licensed by DIDD. He is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20). He lives in a DIDD-licensed group home in Jackson, Tennessee.

39.    Plaintiff David Underwood is Deaf, has I/DD, and MI. His primary language is ASL. He is eligible for and receives services administered by DIDD through a licensed service provider—Reaching Visions Today, LLC, which is licensed by DIDD. He is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20). He lives in a DIDD-licensed group home in Antioch, Tennessee.

40.    Plaintiff Maurcelia[3] Blanchett is Deaf, has I/DD, and MI. Her primary language is ASL. She is eligible and receives services administered by DIDD through a service provider—Encare, LLC., which is licensed by DIDD. She is a "qualified individual with a disability" and a person with a "disability" within the meaning of the applicable statutes and regulations, including 42 U.S.C. section 12131(2), 28 C.F.R. section 35.104, and 29 U.S.C. section 705(20). She lives in a DIDD-licensed group home in Jackson, Tennessee.

41.    Plaintiff DRT is a Tennessee nonprofit corporation with its principal place of business in Nashville, Tennessee. DRT maintains regional offices in Nashville, Memphis, and Knoxville, Tennessee. It serves individuals with disabilities in all ninety-five (95) counties in Tennessee.

42.    DRT is the Federally mandated P&A for the State. As such, DRT is authorized by multiple Federal statutes to, among other things, pursue administrative, legal, and other remedies

_____

[3] Plaintiff Blanchett also goes by the name "Raqual."

on behalf of people with disabilities, including but not limited to, Deaf constituents who primarily communicate in ASL or another form of sign language, who receive services from DIDD and DMHSAS, and whose Federally protected rights are being violated.[4]

43.     DRT joins this lawsuit separately in its associational capacity as Tennessee's P&A system, in conjunction with the other named Plaintiffs, and on behalf of and to vindicate the rights of its Deaf constituents who are being denied effective communication and equal access to DIDD's and DMHSAS's programs and services, in violation of Title II of the ADA and Section 504.

## IV.     FACTUAL BACKGROUND RELATING TO COMMUNICATING WITH DEAF INDIVIDUALS WHO HAVE I/DD OR MI

### ASL v. Written or Spoken English

44.     The most common form of sign language in the United States is ASL.

45.     ASL is a visual language. It is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body: "For example, English speakers may ask a question by raising the pitch of their voices and by adjusting word order; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward."[5]

46.     ASL is not English in gestures. It has grammar and syntax that are completely different from English. When Deaf people are raised using ASL as their first or primary language, written English is a foreign language and is often acquired—if at all— incompletely and imperfectly.

---

[4] *See generally* 42 U.S.C. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f).
[5] *American Sign Language*, National Institute on Deafness and Other Communication Disorders (NIDCD) (last visited December 8, 2021), https://www.nidcd.nih.gov/health/american-sign-language.

Deaf ASL users often struggle to understand spoken English and lack proficiency in written English.[6]

47.     Many Deaf individuals are educated exclusively in Deaf schools where ASL is the primary form of communication as opposed to spoken or written English.

### Lip Reading

48.     Lip reading is a technique of understanding speech by visually interpreting the movements of the lips, face, and tongue when normal sound is not available.

49.     Studies have shown that lip reading only yields 30% to 40% understanding under the best conditions, with issues such as poor lighting, facial hair, indirect line of sight, and masks making lip reading less effective.[7]

50.     Lip reading skills also require fluency in spoken English, which most Deaf individuals do not have.  Lip reading skills are lower for individuals who are born Deaf or who lose their hearing suddenly rather than progressively.[8]

51.     Deaf individuals may act as if they understand lip reading in order to avoid embarrassment or stigma.[9]

---

[6] Leslie Pertz, et al., *Addressing Mental Health Needs for Deaf Patients Through an Integrated Health Care Model*, 23 J. DEAF STUD. & DEAF EDUC. 240, 240 (2018).

[7] Kathleen J. Richardson, *Deaf Culture: Competencies and Best Practices*, 39 THE NURSE PRACTITIONER ISSUE 5, 20, 25 (May 12, 2014).

[8] Nicholas A. Altieri, et al., *Some Normative Data on Lip-Reading Skills (L)*, J. ACOUSTICAL SOC'Y AM., Jul. 2011, at 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3155585.

[9] Richardson, *supra* n.78 at 25.

11

### Written Communication with Deaf Individuals with I/DD

52.     Studies have shown that Deaf individuals with no cognitive impairments have on average only a fourth-grade median reading level in English.[10]  Deaf individuals with I/DD generally have a lower English reading level than their Deaf peers without I/DD.

53.     Using written English to communicate with Deaf individuals with I/DD is generally less effective than with other Deaf individuals without I/DD or with hearing individuals with I/DD.

### Written Communication with Deaf Individuals with MI

54.     Mental health treatment relies on interpersonal communication between the mental health service provider and the mental health patient to build a foundation of trust and understanding. Because of this, a communication-driven relationship is formed between a mental health provider and a mental health patient.[11]

55.     Mental health providers may try to communicate with Deaf individuals by having them write in English or read lips.[12]  This frequently requires Deaf individuals to function and attempt to communicate in a language—English—in which they are not competent and, thus, halts the development of a communication-driven relationship.[13]  Attempting to communicate in written

---

[10] Connie Mayer, *What Really Matters in the Early Literacy Development of Deaf Children*, 12 J. DEAF. STUD. & EDUC. 411 (2007).

[11] Pertz, *supra* n.67, at 245 ("Language concordance and cultural competency are key components to ensuring good patient-provider relationships...Effective communication is a crucial element in mental health care, not only for history gathering and accurate diagnosis but also to ensure good treatment adherence and to obtain desired treatment goals and outcomes (McKee, Moreland, et al., 2015). Furthermore, concordance is critical since this helps overcome potential medical mistrust. (Fellinger et al., 2012; Hauser, O' Hearn, McKee, Steider, & Thew, 2010; McKee, Schlehofer, & Thew, 2013; Moreland et al., 2015).").

[12] Michael John Gournaris, Ph.D, *et al.*, *Promising Practices of Statewide Mental Health Models Serving Consumers who are Deaf:  How to Advocate for Your Model in Your Home State*, 43 J. AM. DEAFNESS & REHABILITATION ASSOC. 151, 152 (Nov. 2019).

[13] Washington, DC:  National Association of State Mental Health Program Directors, *Persons Who Are Deaf and Mentally Ill*, adapted from Critchfield, A.B., *Meeting the Mental Health Needs of Persons Who Are Deaf*, 2 (2002).

English or lip reading during mental health treatment, during a mental health crisis, or group therapy prohibits the development of the communication-driven, therapeutic relationship and is not effective for Deaf individuals who primarily communicate in ASL.[14]

56.    Deaf individuals who communicate primarily in ASL require mental health services to be delivered by an ASL-fluent provider[15] or, in the alternative, through a sign language interpreter qualified in mental health interpreting (also known as a qualified mental health interpreter or "QMHI").

### Connection to Other Deaf Individuals and ASL Users

57.    It is imperative for Deaf individuals, including those with I/DD and MI, to maintain strong ties to the Deaf community and to individuals who communicate in ASL for socialization, and so that they can maintain their skills in ASL.[16]

58.    Because Deaf individuals often have hearing parents, Deaf people tend to look to peers and other social counterparts for societal learning and to feel connected to the world.[17]

59.    If individuals whose primary language is ASL do not communicate frequently in ASL with individuals who are also sign-fluent, their ability to communicate in ASL can diminish.

---

[14] *See* Neil Glickman, *Do You Hear Voices? Problems in Assessment of Mental Status in Deaf Persons With Severe Language Deprivation*, 12 J. DEAF STUD. & DEAF EDUC. 127, 129 (2007) ("The easiest and most glaring mistake [when performing mental health examinations of Deaf persons] is to draw conclusions about mental illness on the basis of the spoken or written language skills of the deaf person.").

[15] *See* Pertz, *supra* n.67, at 241 ("Deaf patients not only prefer direct access to ASL fluent mental health care providers, but fare better when given this opportunity (Landsberger et al., 2013; Pollard et al., 2014).").

[16] Many individuals who are Deaf and who use ASL consider themselves a part of Deaf Culture, which is a unique cultural and linguistic minority whose members use sign language as their primary language and share life experiences, including their everyday talk, their shared myths, their art, and the lessons they teach one another. *See* Critchfield, *People Who Are Deaf & Mentally Ill*, *supra* n.1344 at 1.

[17] *Id.* at 3.

Consequently, they will be at risk of losing their abilities to communicate in ASL and, therefore, be left without any language in which to effectively communicate.

60.     This inability to communicate can lead to feelings of isolation, frustration, and depression, as well as neglect, abuse, inadequate health care, and an exacerbation of existing MI symptoms.[18] It robs a Deaf person of their language and gradually and completely isolates them from the world around them.

## V.    FACTUAL BACKGROUND RELATING TO DIDD'S PROGRAMS AND SERVICES

### DIDD Operations

61.     The State has created an extensive, statewide program to provide services and support to people with I/DD. This program is administered by DIDD using state and Federal funds.

62.     The State has empowered DIDD, through its commissioner, to "have the authority to receive, administer, allocate, disburse and supervise any grants and funds from whatever sources, including, but not limited to, the federal, state, county and municipal governments on a state, regional, county or any other basis, with respect to any programs or responsibilities . . . assigned to the department of intellectual and developmental disabilities by law, regulation or order." Tenn. Code Ann. § 4-3-2707.

63.     The general functions of DIDD are to "coordinate, set standards for, plan for, monitor, and promote the development and provision of services and supports to meet the needs of persons with intellectual and developmental disabilities through the public and private sectors in this state…." Tenn. Code Ann. § 4-3-2701. "To this end, [DIDD], through its commissioner, shall have the authority, … to modify or rescind orders, rules and regulations, decisions or

---

[18] *See* K. Shepard & T. Badger, *The Lived Experience of Depression Among Culturally Deaf Adults*, 17 J. OF PSYCH. & MENT. HEALTH NURS. 783 (2010).

policies heretofore issued and to adopt, issue or promulgate new orders, rules and regulations, decisions or policies as may be necessary for the administration of the programs or functions herein transferred." Tenn. Code. Ann. § 4-3-2708.

64. DIDD's vision is to "Support all Tennesseans with intellectual and developmental disabilities to live the lives they envision for themselves."[19]

### DIDD's Administration of the State's I/DD Services and Programs and Oversight of Its Licensed Providers

65. DIDD is authorized to license facilities and services operated for the provision of I/DD services in the State. Tenn. Comp. R. & Reg. 0465-02-02-.01.

66. DIDD must ensure that its licensees comply with all federal, state, and local laws, ordinances, rules, and regulations, including the ADA and Section 504. Tenn. Comp. R. & Reg. 0465-02-06-.01(1).

67. DIDD must ensure that its licensed facilities and services are administered and operated in accordance with its written policies and procedures. Tenn. Comp. R. & Reg. 0465-02-06-.01(2).

68. DIDD **"must exercise general direction over the facility/services** and establish policies governing the operation of the facility/services and the welfare of the person supported." Tenn. Comp. R. & Reg. 0465-02-06-.01(3) (emphasis added).

69. DIDD must designate an individual responsible for the operation of the licensed facility/services. Tenn. Comp. R. & Reg. 0465-02-06-.01(4).

70. DIDD "must ensure that the licensee serves only persons whose placement will not cause a violation of its licensed status and capacity based on the distinct licensure category, the life

---

[19] *Department of Intellectual and Developmental Disabilities: About Us*, TN.GOV, https://www.tn.gov/didd/about.html (last visited December 8, 2021).

15

safety occupancy classification, and the required staffing ratios, if any." Tenn. Comp. R. & Reg. 0465-02-06-.01(5).

71.     DIDD investigates complaints of abuse and neglect in its licensed facilities and may take corrective action if abuse or neglect is substantiated.

72.     DIDD has the right to enter the premises of any licensee to make inspections, including unannounced inspections, and determine compliance with licensure laws and rules.  If any violations are found thereto, DIDD may take disciplinary action, including assessing civil penalties, and may deny, suspend, or revoke a licensee's license for, among other things, violating licensure rules or conduct, or for practice determinantal to the welfare of a person supported by a licensed facility or service.  Tenn. Comp. R. & Reg. 0465-02-02-.013-14, .22 & .24.

73.     If DIDD issues a "Notice of Non-Compliance" to a licensee after an inspection or an investigation, the licensee must submit a written Plan of Compliance to DIDD to be approved by DIDD.  Tenn. Comp. R. & Reg. 0465-02-02-.21.

74.     When DIDD denies, suspends, or revokes a license, DIDD must provide direct assistance to a person supported by notifying the appropriate state and local agencies which may then coordinate placement and/or services.  Tenn. Comp. R. & Reg. 0465-02-02-.23.

75.     DIDD's licensed providers support service recipients with I/DD ("persons supported"), including individuals who are Deaf and whose primary language is ASL ("Deaf persons supported").

76.     DIDD's licensed providers' supports include, but are not limited to, providing DIDD persons supported with residential habilitative facilities in DIDD group homes, with direct service providers ("staff"), habilitative services, safety services, transportation, assistance with

16

making medical and mental health appointments, assistance with taking medication, and the provision of telephones.

77.     DIDD publishes a Provider Manual that sets forth directives to its licensed providers.[20]

78.     DIDD has not promulgated any relevant regulations addressing compliance with the ADA and Section 504 in the provision of I/DD services to Deaf persons supported.

79.     DIDD has not issued specific policies, procedures, or guidance on ensuring accessibility for Deaf persons supported.

80.     DIDD has not adequately instructed its licensees regarding their obligations to ensure that I/DD services are accessible to Deaf persons supported, including through effective communication.

81.     DIDD has not issued any directives to DIDD licensees explaining that they have an affirmative obligation to provide reasonable modifications to Deaf persons supported, and that they must give primary consideration to the preferred form of communication of a Deaf person supported.

82.     DIDD has not conducted or required its licensed providers to have trainings on accessibility and effective communication specifically for Deaf persons supported.

83.     DIDD has not provided sufficient funding to secure supports needed for Deaf persons supported to have equal access to and effective communication for its programs and services.

84.     The State and DIDD administer their licensing program in a manner that subjects Deaf persons supported to discrimination on the basis of disability and solely by reason of disability.

---

[20] *See State of Tennessee Department of Intellectual and Development Disabilities Provider Manual*, effective March 15, 2014 ("DIDD Provider Manual").

85. The State and DIDD have failed and are failing to establish policies, procedures, and practices that ensure that Deaf persons supported receive effective communication and equal access to goods and services in the most integrated setting to their needs.

86. This discrimination is continuous and ongoing.

## DIDD's Person-Centered Practice and Planning

87. DIDD's mission is to "become the nation's most person-centered and cost-effective state support system for people with intellectual and developmental disabilities."[21]

88. DIDD uses a person-centered practice ("PCP") in its delivery of I/DD services and programs. "Person Centered Practices (PCP) is an exponent for people receiving supports. PCP acknowledges that those supported will have better-quality lives; by means of active social roles, community connections, enhanced planning and significant influence with independent decision-making."[22]

89. PCP encompasses all areas of one's life. Some of the person-centered services DIDD provides to its persons supported include, but are not limited to, "occupational therapy, physical therapy, nutrition, nursing, mobility and orientation (not an inclusive list) which are modified for this specialized population and include chronic and maintenance care. Also covered are services that are unique to this population such as specialized behavior services and assistive technology."[23]

90. PCP is the process that is used to develop a person-centered plan for persons supported.

---

[21] *Department of Intellectual and Developmental Disabilities: About Us*, TN.GOV, https://www.tn.gov/didd/about.html (last visited December 8, 2021).

[22] *Accreditation and Person Centered* Practices, TN.GOV, https://www.tn.gov/didd/divisions/accreditation---person-centered-practices/person-centered-practices.html (last visited January 12, 2022).

[23] *Clinical Services*, TN.GOV, https://www.tn.gov/didd/divisions/health-services.html (last visited January 12, 2022).

18

91.   DIDD requires person-centered planning and supports that focus on:

1. Who the person is.
2. What the person wants from life, what a person may want to learn.
3. How to accomplish the person's desired outcomes.
4. What is important to the person including things that help a person feel happy, satisfied, and content and fulfilled.
5. What is important for the person which includes health and safety.

*DIDD Provider Manual* at 3.3.

92.   Person-centered plans also address the individual's communication needs.

93.   The person-centered plan must be revised on a regular basis at a meeting attended by the DIDD person supported's Circle of Support.  The Circle of Support assists the person receiving services and supports with the planning process and may include the DIDD person supported, their provider agency, their Independent Services Coordinator, their medical and therapeutic providers, and others who support the DIDD person supported.  *Id.* at 3.3-3.4.

94.   Person-centered planning meetings are complicated and lengthy and involve future planning, goal setting, and decision-making on the part of the DIDD person supported.

95.   PCP involves understanding each DIDD person supported's unique way of communicating so that programs and services can be delivered in a way that they can understand and receive the benefits thereof.

96.   Plaintiffs Battle, Wilson, Underwood, and Blanchet communicate in ASL.  However, the State and DIDD fail to provide Plaintiffs Battle, Wilson, Underwood, and Blanchett with the full benefits of person-centered planning and supports because they fail to provide their planning, services, and programs in ASL.  Plaintiffs Battle, Wilson, Underwood, and Blanchett do not receive effective communication for DIDD's programs and services because they are not delivered in their primary language of ASL.

97.     The State and DIDD also do not have an adequate network of qualified providers who are sign fluent, familiar with Deaf persons supported, and have sufficient capacity to meet the communication needs of Plaintiffs Battle, Wilson, Underwood, and Blanchett to the same extent that existing providers meet the needs of hearing persons supported.

98.     Plaintiffs Battle, Wilson, Underwood, and Blanchett also need access to DIDD group homes that meet their communication needs. The State and DIDD do not provide for DIDD group homes that are specifically set up for Deaf persons supported, subjecting them to a more restrictive environment than hearing DIDD persons supported.

## VI.     FACTUAL ALLEGATIONS REGARDING THE DIDD PLAINTIFFS

### Plaintiff Dontay Battle

99.     Plaintiff Dontay Battle ("Mr. Battle") is a resident of Shelby County, Tennessee.

100.    Mr. Battle is 21 years old, profoundly Deaf, and communicates primarily in ASL. He lives in a group home run by DIDD-licensed provider Support Solutions of the Mid South, LLC ("Support Solutions").

101.    Support Solutions is listed on the Tennessee DIDD Provider Directory as a licensed DIDD provider of residential services to individuals with I/DD.

102.    Mr. Battle's need to communicate in sign language is obvious.

103.    Mr. Battle has never had a communication evaluation given by a qualified individual who is fluent in ASL and who has experience working with Deaf individuals with I/DD.

104.    Prior to receiving services through DIDD, Mr. Battle was in the custody of Tennessee's Department of Children's Services (DCS) and experienced significant childhood trauma, abuse, and neglect.

105.    Mr. Battle graduated from White Station High School in Memphis in May 2020, where he received his education with the daily assistance of ASL interpreters.  Mr. Battle also received job training in food preparation while he was in high school, which he enjoyed.

106.    Mr. Battle wants to have a job, learn to drive, and be around other Deaf people. Mr. Battle also wants to build relationships with his peers in the community and be more independent.

107.    Despite Mr. Battle's desires, his typical day at his DIDD-licensed provider home consists of getting out of bed, drinking water, taking his medication, watching television, and sleeping. He sees his Deaf friends only about once a month and rarely communicates in his native language of ASL.

108.    Support Solutions recognizes Mr. Battle's need to communicate primarily in ASL and to have his services delivered in ASL. According to Mr. Battle's person-centered support plan, dated October 8, 2020, "It is important for Dontay to be supported by understanding his communication style...ASL is his preferred way to communicate and should be used if at all possible...Dontay may require someone that knows ASL."

109.    Additionally, in an email dated February 12, 2020, from Stephanie Stacy, Support Solutions Quality/IM Specialist, to Support Solutions Program Manager, Octavia Macklin, Ms. Stacy urged Mr. Battle's staff to learn ASL.  She wrote: "Also don't forget to tell your staff about our ASL class.  [Mr. Battle's] ability to communicate with staff may decrease his frustration and maybe the elopements."

110.    Mr. Battle's need to communicate in ASL was also confirmed by an audiologist. Mr. Battle underwent a hearing evaluation at Professional Audiological Services in Memphis, Tennessee, on or about March 18, 2020.  The audiologist, Loretta Coltharp, confirmed that

Mr. Battle is Deaf and has no word discrimination ability. She recommended that all of

Mr. Battle's staff receive sign language training to be able to communicate with him.

111.    Despite these directives, Mr. Battle does not have staff in his home who know ASL, nor

have staff in his home received training on ASL. In addition, his roommate is hearing and does

not sign. Mr. Battle is forced to teach his staff some basic signs in an attempt to communicate

with them.

112.    Mr. Battle's staff attempts to communicate with him through lip reading and written

notes in English, which is not his primary nor preferred language. This causes Mr. Battle to

become frustrated. Mr. Battle needs to communicate in ASL either directly with someone who is

fluent in ASL or through a qualified sign language interpreter.

113.    When Mr. Battle attempts to communicate with his staff using ASL, staff has repeatedly

noted that they do not understand what he is trying to "say."

114.    In addition, Mr. Battle has not been provided with a qualified sign language interpreter

for his person-centered planning meetings; therefore, he cannot participate in the person-centered

planning process, nor does he fully understand the information set forth therein.

115.    Mr. Battle does not routinely get qualified sign language interpreters for medical

appointments. Support Solutions staff do not call ahead of time to ensure that his physicians and

medical providers secure a qualified sign language interpreter for his appointments. As a result,

Mr. Battle cannot effectively and meaningfully participate in his own health care.

116.    This lack of effective communication has led to frustration and exacerbation of mental

health issues. For example, Mr. Battle has eloped at least three times since entering DIDD

services and has had at least one in-patient stay at a psychiatric hospital.

117.    In February 2020, Mr. Battle was admitted to Lakeside Behavioral Health and diagnosed with depression, aggression, psychosis, and suicidal ideations.  In his Discharge Safety Plan, the discharging physician advised that if Mr. Battle had suicidal ideations or became depressed that he could talk to staff at his group home.  However, this treatment plan is impossible to carry out because none of Mr. Battle's staff know ASL nor could they communicate effectively with him during a mental health crisis.

118.    Mr. Battle does not receive his mental health services through a mental health provider who is ASL fluent nor with the assistance of a QMHI.

119.    In the Lakeside Behavior Health Discharge Safety Plan, Lakeside provided Mr. Battle with the phone number to a suicide prevention hotline should he have further suicidal ideations. However, Mr. Battle is unable to make a phone call to this hotline in a potential life or death situation because he does not have a videophone ("VP") in his home.

120.    A VP enables a Deaf person who signs to communicate with a hearing person who does not sign through a video relay service ("VRS"). A Deaf person can use their VP to connect visually with a VRS interpreter who then connects by phone to a hearing person.  When the Deaf person signs, the interpreter voices the signs to the hearing person.  When the hearing person speaks, the interpreter signs to the Deaf person.

121.    Deaf persons who sign can also make calls on a VP directly to another ASL user.  This is known as a "point-to-point" call.  The Deaf person and the ASL user can see each other on the VP and sign directly to each other.

122.    Support Solutions recognizes the need for Mr. Battle to have a VP at his group home.  In an email from Simione Jenkins, BlueCare Tennessee/ECF Choices Support Coordinator, to Octavia Macklin, dated March 3, 2020, Ms. Jenkins requested that Ms. Macklin assist Mr. Battle

23

with completing an application which would allow him to receive free VP services through Sorenson Video Relay Service. Ms. Jenkins followed up with Ms. Macklin in another email dated April 29, 2020, to see if the VP request had been made.

123. Despite this, Mr. Battle does not have a VP in his group home. He is unable to make phone calls independently, cannot access the suicide prevention line, and is unable to independently and confidentially report any possible instances of abuse and neglect. This puts him at greater risk for serious harm, injury, and death.

124. Mr. Battle also does not have other assistive technology ("AT") necessary for Deaf individuals, including, but not limited to, a bed shaker alarm and a visual, flashing fire alarm in his home. In the event of a fire, this means that Mr. Battle is at greater risk of serious harm, injury, or death than his hearing roommate.

125. Due to the State's and DIDD's failure to provide communication supports, Mr. Battle is left vulnerable, lonely, and isolated. Since entering DIDD care, his quality of life has deteriorated. Instead of actively enjoying life in the community, on most days, his only activities are eating and sleeping. He has nobody to talk to or interact with in a meaningful way.

126. Mr. Battle is at grave risk of a decline in his ability to use ASL due to language deprivation and isolation.

127. The State and DIDD have failed and are failing to provide Mr. Battle with effective communication and person-centered supports, including but not limited to:

    a. an appropriate communication evaluation conducted by a person who is fluent in ASL and who has experience working with Deaf individuals with I/DD;

    b. programs, services, and activities offered with signing staff or qualified sign language interpreters;

c. qualified sign language interpreters for person-centered planning meetings;

d. qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

e. qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

f. coordination of and scheduling qualified sign language interpreters for medical appointments;

g. provision of DIDD group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals, such as VPs, flashing fire alarms, and bed shaker alarms;

h. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

i. person-centered planning and supports.

128. The State and DIDD fail to deliver and administer their programs and services to Plaintiff Battle in his primary language of ASL, thereby making DIDD's programs and services inaccessible to him.

129. As a result of the State's and DIDD's failures to provide effective communication to Mr. Battle, he is being denied equal access to DIDD's programs and services.

130. Because he cannot access the programs and services that hearing persons supported can, Mr. Battle is currently placed in a more restrictive environment than his hearing peers and is at an increased risk for institutionalization.

131. The State and DIDD have discriminated and continue to discriminate against Mr. Battle by reason of his disability and solely by reason of his disability from the time he began receiving

services through and administered by the State and DIDD and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices, and procedures, and by administering their programs and services in a discriminatory manner.

132.    As a result of the failures of the State and DIDD, Mr. Battle has suffered and continues to suffer from loss of opportunity, loss of language, emotional distress, isolation, stigma, communication neglect, and discriminatory conduct.  These injuries to Mr. Battle could have been avoided had the State and DIDD stopped their wrongful and discriminatory conduct and provided Mr. Battle with effective communication and equal access to their programs and services.

**Plaintiff Necoas Wilson**

133.    Plaintiff Necoas Wilson ("Mr. Wilson") is a resident of Madison County, Tennessee.

134.    Mr. Wilson is 39 years old.  He is profoundly Deaf and communicates primarily in ASL. He has ID, MI, and Epilepsy.

135.    Mr. Wilson's need to communicate in sign language is obvious.

136.    Mr. Wilson lives at a DIDD-licensed group home run by Loving Arms, LLC ("Loving Arms") in Jackson, Tennessee.

137.    Loving Arms is listed on the Tennessee DIDD Provider Directory as a licensed DIDD provider of residential services to individuals with I/DD.

138.    Mr. Wilson graduated from the Tennessee School for the Deaf ("TSD") in 2006.

139.    Mr. Wilson is very social and would like to make more friends.  It is very frustrating for him when he cannot communicate with people and when people do not understand what he is trying to communicate.

140.     Upon information and belief, Mr. Wilson has never had a communication evaluation given by a qualified individual who is fluent in ASL and who has experience working with Deaf individuals with I/DD.

141.     According to Mr. Wilson's 2022 person-centered support plan, he requires staff support for taking his medication, performing household chores, and with money management, among other things.  Mr. Wilson also requires staff "support with managing my finances and ensuring I do not become exploited."  All of these supports require effective communication.

142.     Mr. Wilson's 2022 person-centered support plan recognizes that he communicates in ASL, and that it is beneficial for staff to know sign language so that he can understand and communicate with them.

143.     Despite these directives, no staff at Mr. Wilson's group home know ASL, nor have Mr. Wilson's staff received sign language training.  As a result, staff cannot effectively communicate with him and provide him with his person-centered supports.  Thus, Mr. Wilson is at great risk for financial, emotional, and other types of exploitation.

144.     Staff attempt to communicate with Mr. Wilson via gestures, lip reading, and written notes.  This is not effective communication for him. Mr. Wilson needs to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

145.     Mr. Wilson has not been routinely provided qualified sign language interpreters for medical appointments.  Staff do not call ahead of time to ensure that his physicians and medical providers secure a qualified sign language interpreter for his appointments.  As a result, Mr. Wilson cannot effectively and meaningfully participate in his own health care.

146.    According to Mr. Wilson's 2021 person-centered plan, he also has suicidal ideations. Mr. Wilson is unable to communicate these thoughts of self-harm to his staff during a mental health crisis because they do not know ASL.

147.    For example, On May 17, 2021, Mr. Wilson's staff wrote in his shift notes that Mr. Wilson was having mental health symptoms.  Mr. Wilson attempted to communicate with staff.  Staff noted that Mr. Wilson was "angry" and "in a mood," so staff "talked" to him and "advised" him to pray about it and read his Bible.  Mr. Wilson cannot understand when staff "talks" to him because he is Deaf.

148.    A day later, on May 18, 2021, Mr. Wilson was still experiencing a mental health crisis and attempted to communicate with staff.  After trying to communicate with him in oral English, staff once again advised him to pray and "quit worrying so much."  Mr.  Wilson was unable to communicate with staff during a mental health crisis, thereby subjecting him to an increased risk of danger, harm, or even death.

149.    Mr. Wilson wants to work and be as independent as possible.  However, the lack of communication at his group home prevents him from receiving the habilitative services needed to achieve these goals.

150.    Mr. Wilson does not receive his mental health care through a sign-fluent provider or QMHI.

151.    Mr. Wilson is not provided with a qualified sign language interpreter for his person-centered planning meetings; therefore, he cannot participate in person-centered planning process, nor does he fully understand the information set forth therein.

152.    The lack of communication in Mr. Wilson's home has been frustrating for him.

153.    Mr. Wilson is in grave risk of a decline in his ability to use ASL due to language deprivation and isolation.

154.    The State and DIDD have failed and are failing to provide Mr. Wilson with effective communication and person-centered supports, including but not limited to:

a.  an appropriate communication evaluation conducted by a person who is fluent in ASL and who has experience working with Deaf individuals with I/DD;

b.  programs, services, and activities offered with signing staff or qualified sign language interpreters;

c.  qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

d.  qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

e.  coordination of and scheduling qualified sign language interpreters for medical appointments;

f.  provision of DIDD group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals, such as VPs, flashing fire alarms, and bed shaker alarms;

g.  ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

h.  person-centered planning and supports.

155.    The State and DIDD fail to deliver and administer their programs and services to Plaintiff Wilson in his primary language of ASL, thereby making DIDD's programs and services inaccessible to him.

156.    As a result of the State's and DIDD's failures to provide effective communication to Mr. Wilson, he is being denied equal access to DIDD's programs and services.

157.    Because he cannot access the programs and services that hearing persons supported can, Mr. Wilson is currently placed in a more restrictive environment than his hearing peers and is at an increased risk for institutionalization.

158.    The State and DIDD have discriminated and continue to discriminate against Mr. Wilson by reason of his disability and solely by reason of his disability from the time he began receiving services through and administered by the State and DIDD and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices, and procedures, and by administering their programs and services in a discriminatory manner.

159.    As a result of the failures of the State and DIDD, Mr. Wilson has suffered and continues to suffer from loss of opportunity, loss of language, emotional distress, isolation, stigma, communication neglect, and discriminatory conduct. These injuries to Mr. Wilson could have been avoided had the State and DIDD stopped their wrongful and discriminatory conduct and provided Mr. Wilson with effective communication and equal access to their programs and services.

**Plaintiff David Underwood**

160.    Plaintiff David Underwood is a resident of Davidson County, Tennessee.

161.    Mr. Underwood is 55 years old and resides in a DIDD-licensed group home operated by Reaching Visions Today, LLC ("RVT").

162.    RVT is listed on the Tennessee DIDD Provider Directory as a licensed DIDD provider of residential services to individuals with I/DD.

30

163.    Mr. Underwood is profoundly Deaf and communicates primarily in ASL.  He also has ID and MI.

164.    Mr. Underwood's need to communicate in sign language is obvious.

165.    Mr. Underwood graduated from TSD in the 1980s.

166.    Mr. Underwood has never had a communication evaluation given by a qualified individual who is fluent in ASL and who has experience working with Deaf individuals with I/DD.

167.    According to Mr. Underwood's 2019 person-centered plan, Mr. Underwood's primary language is sign language.  He uses sign language to communicate and can communicate well with someone who knows sign.  Mr. Underwood's person-centered plan also states that he has difficulty understanding written English.  He uses signs to communicate when he is ill.  He also enjoys being around other Deaf people who know his language.

168.    According to Mr. Underwood's person-centered plan, staff who work with Mr. Underwood who are not able to sign "must be willing to learn his form of sign language."

169.    Despite these directives in Mr. Underwood's person-centered plan, none of Mr. Underwood's staff know ASL.  He has no opportunity to use ASL in his group home. Staff attempts to communicate with Mr. Underwood via lip reading or written notes or English on Mr. Underwood's iPad, which is often not effective for Mr. Underwood.  Mr. Underwood needs to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

170.    For example, in one of his daily notes, Mr. Underwood's staff wrote that he became frustrated because staff did not understand his signs.  Staff asked him to write down what he was

31

asking on an iPad, but they still could not understand his wants or needs. As a result, he became upset. Staff could not redirect him because they cannot effectively communicate with him.

171.    In 2019, Mr. Underwood was provided speech therapy services in his home. His speech therapist was not sign fluent and communicated with him through written notes or via English on his iPad. These speech therapy services ended in 2019 because Mr. Underwood had "maximized the benefits" of the services. In fact, Mr. Underwood received no benefit from these speech therapy services as they were not provided in ASL.

172.    Mr. Underwood does not routinely get qualified sign language interpreters for his medical, therapy, and dental appointments. Instead of coordinating qualified sign language interpreters for his medical appointments, Mr. Underwood's staff, who do not know ASL, often accompany him to these appointments and tell Mr. Underwood's providers about his medical issues, without ever having consulted with Mr. Underwood. This compromises his right to individual choice and privacy. Therefore, Mr. Underwood does not have effective communication during these appointments and cannot meaningfully participate in his own health care.

173.    Mr. Underwood has not been provided with a qualified sign language interpreter for his person-centered planning meetings; therefore, he cannot participate in the person-centered planning process, nor does he fully understand the information set forth therein.

174.    Mr. Underwood does not have a VP and, therefore, cannot make independent phone calls in his primary language of ASL, including phone calls to report emergencies or instances of abuse and neglect, putting him at greater risk for serious harm or injury.

175.    Due to the State and DIDD's failure to provide effective communication to Mr. Underwood, Mr. Underwood has lost language. In the early 2000s, Mr. Underwood was

32

able to expressively communicate in ASL and hold expressive conversations in ASL with other people who know ASL. Today, it is difficult for him to do this, and he may "copy sign," or mimic others' signs, instead of expressively signing to them in ASL.

176.    This decline in language has greatly diminished Mr. Underwood's quality of life, including his ability to communicate and relate to others, express his wants and needs, participate in activities, and make friends.

177.    Mr. Underwood spends most of his days isolated in his home with no way to communicate.

178.    The State and DIDD have failed and are failing to provide Mr. Underwood with effective communication and person-centered supports, including but not limited to:

    a.      an appropriate communication evaluation conducted by a person who is fluent in ASL and who has experience working with Deaf individuals with I/DD;

    b.      programs, services, and activities offered with signing staff or qualified sign language interpreters;

    c.      qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

    d.      qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

    e.      coordination of and scheduling qualified sign language interpreters for medical appointments;

    f.      provision of DIDD group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals, such as VPs, flashing fire alarms, and bed shaker alarms;

33

g. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

h. person-centered planning and supports.

179. The State and DIDD fail to deliver and administer their programs and services to Plaintiff Underwood in his primary language of ASL, thereby making DIDD's programs and services inaccessible to him.

180. As a result of the State's and DIDD's failures to provide effective communication to Mr. Underwood, he is being denied equal access to DIDD's programs and services.

181. Because he cannot access the programs and services that hearing persons supported can, Mr. Underwood is currently placed in a more restrictive environment than his hearing peers and is at an increased risk for institutionalization.

182. The State and DIDD have discriminated and continue to discriminate against Mr. Underwood by reason of his disability and solely by reason of his disability from the time he began receiving services through and administered by the State and DIDD and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices, and procedures, and by administering their programs and services in a discriminatory manner.

183. As a result of the failures of the State and DIDD, Mr. Underwood has suffered and continues to suffer from loss of opportunity, loss of language, emotional distress, isolation, stigma, communication neglect, and discriminatory conduct. These injuries to Mr. Underwood could have been avoided had the State and DIDD stopped their wrongful and discriminatory conduct and provided Mr. Underwood with effective communication for and equal access to their programs and services.

**Plaintiff Maurcelia Blanchett**

184.    Plaintiff Maurcelia Blanchett ("Ms. Blanchett") is a resident of Madison County,

Tennessee.

185.    Ms. Blanchett is 41 years old.  She is profoundly Deaf and communicates primarily in

ASL.  Ms. Blanchett has diagnoses of I/DD, anxiety, depression, Bipolar, and dysthymia with

psychotic features.

186.    Ms. Blanchett has complex behavioral and mental health needs.

187.    Ms. Blanchett's need to communicate in sign language is obvious.

188.    Ms. Blanchett lives in a DIDD-licensed group home run by Encare, LLC.

189.    Prior to this, Ms. Blanchett lived in a DIDD-licensed group home run by A+ Care

Solutions ("A+ Care") in Jackson, Tennessee.

190.    Prior to Ms. Blanchett's placement at A+ Care, she lived in a DIDD-licensed group home

run by Support Solutions in Knoxville, Tennessee.

191.    Ms. Blanchett went to University High School in California and graduated in 2001.

Ms. Blanchett had access to sign language interpreters while in high school.

192.    Since receiving services administered by and/or provided directly by DIDD,

Ms. Blanchett has never had a communication evaluation given by a qualified individual who is

fluent in ASL and who has experience working with Deaf individuals with I/DD.

193.    Ms. Blanchett desires to work and live as independently as possible.  She wants to live an

active and meaningful life, which includes being able to communicate with people in her native

language of ASL.  It is very frustrating for her when she cannot communicate with people and

when people do not understand what she is trying to communicate, which can lead to behavior

issues or the exacerbation of existing behavior issues and MI symptoms.

35

194. According to Ms. Blanchett's 2020 person-centered support plan, "she is deaf and unable to verbally speak. … If she is not understood, she often will become agitated and upset."

195. Also, according to the 2020 person-centered support plan, Ms. Blanchett's staff should understand that she and other ASL users can be "very animated when it comes to signing. [Ms. Blanchett's] signing can be mis-judged as aggression." Additionally, Ms. Blanchett does not want to have to teach her staff ASL; she would prefer to have staff who know how to sign and understand Deaf culture.

196. Ms. Blanchett's 2020 person-centered support plan identifies the following risk: "[Ms. Blanchett] is deaf, and she uses ASL to communicate. She does not know English. Her needs will go unmet."

197. Due, in part, to increasing frustration over communication, a Behavior Support Plan (BSP) was implemented for Ms. Blanchett in 2019. Upon information and belief, Ms. Blanchett's behavior analyst, responsible for evaluating Ms. Blanchett's behavior and drafting the plan, does not know ASL. Ms. Blanchett did not receive effective communication during the preparation of the BSP.

198. The BSP requires Ms. Blanchett's staff at A+ Care to do things like "prompt" her to request a break, "praise" her when she follows the BSP, tell her to "calm down" and "speak" to her when she is calm, provide "verbal feedback," "talk" to her after a behavior incident and "explore" alternatives to aggression, and "calmly speak to [Ms. Blanchett] about things." The implementation of these services and action steps requires effective communication.

199. The BSP was inoperable because Ms. Blanchett did not have sign-fluent staff or sign language interpreters at her A+ Care DIDD group home. Due to lack of an operable BSP, Ms. Blanchett is at greater risk for harm, institutionalization, and law enforcement encounters.

200.    Upon information and belief, Ms. Blanchett does not always get qualified sign language interpreters for medical appointments. Staff do not consistently ensure that her physicians and medical providers secure a qualified sign language interpreter for her appointments.  As a result, Ms. Blanchett cannot effectively and meaningfully participate in her own health care.

201.    Upon information and belief, Ms. Blanchett does not receive her mental health care through a sign-fluent provider or QMHI and cannot effectively and meaningfully participate in her own mental health care.

202.    Upon information and belief, in February of 2022, Ms. Blanchett was referred to the Tennessee START Assessment & Stabilization Teams ("TN START AST") for crisis stabilization.

203.    TN START AST is a collaboration between DIDD and the Center for START Services. START (Systematic, Therapeutic, Assessment, Resources & Treatment) is a comprehensive model of service supports that provides prevention and stabilization through crisis response, stabilization planning, training and education, consultation, and formalized partnerships for individuals with I/DD and behavioral needs.[24]

204.    Some of the services TN START AST provides include:  24/7 onsite or remote crisis response and consultation; on-going cross-systems crisis stabilization planning to include prevention and intervention for eligible individual; clinical consultation, education, and training; and comprehensive assessment and evaluation of support needs, existing services, and available

---

[24] *Department of Intellectual and Developmental Disabilities, TN START AST: About Assessment and Stabilization Teams*, TN.GOV, https://www.tn.gov/didd/for-consumers/assessment-stabilization-teams/about-the-assessment-stabilization-teams.html (last visited March 23, 2022).

resources. These services require effective communication for the individual with I/DD receiving them.

205. Referrals for TN START AST can be made by individuals, families, service providers, hospitals, mobile crisis providers, and behavioral health providers.

206. TN START AST is available in all counties statewide and consists of five teams, divided into five multiple-county regions across Tennessee (Memphis, Jackson, Chattanooga, Nashville, and Knoxville). Each region consists of a team of Assessment & Stabilization Facilitators (ASF) and a supervising Assessment & Stabilization Manager (ASM).[25]

207. Upon information and belief, the ASFs and ASMs of the TN START AST program are employees of DIDD.

208. Once a referral is received by TN START AST, an ASF will work with eligible referred individuals and their service/support team to conduct a comprehensive assessment of the needs of the person, develop a person-centered cross-systems crisis prevention and intervention, and provide training and support to reach sustained stabilization for the individual and their system of care. These services require effective communication for the individual with I/DD participating in and receiving them.

209. Upon information and belief, in February of 2022, DIDD accepted Ms. Blanchett into the TN START AST program and placed her in a home run by DIDD-licensed provider, Support Solutions, in Bolivar, Tennessee, to receive direct services through the TN START AST program.

210. Upon information and belief, DIDD did not provide Ms. Blanchett with effective communication for programs and services received through the TN START AST. DIDD did not

---

[25] *Id.*

provide qualified sign language interpreters, QMHIs, sign fluent providers, sign fluent staff, or assistive technology, such as a VP, or bed shaker alarm. DIDD sent Ms. Blanchett, who was already in acute crisis, to a home where she could not communicate effectively and could not access TN START AST programs and services because the services were not provided in her language of ASL.

211.     Upon information and belief, DIDD did not ensure prior to her transfer to Support Solutions, Ms. Blanchett would be provided effective communication while she was enrolled in the TN START AST program.

212.     Due to the State and DIDD's lack of communication support, Ms. Blanchett is left vulnerable, lonely, and isolated. Since entering DIDD care, her quality of life has deteriorated. She has nobody to talk to or interact with in a meaningful way. Ms. Blanchett is also at grave risk of a decline in her ability to use ASL due to language deprivation and isolation.

213.     The State and DIDD have failed and are failing to provide Ms. Blanchett with effective communication and person-centered supports, including but not limited to:

a.     an appropriate communication evaluation conducted by a person who is fluent in ASL and who has experience working with Deaf individuals with I/DD;

b.     programs, services, and activities offered with signing staff or qualified sign language interpreters;

c.     qualified sign language interpreters for person-centered planning meetings;

d.     qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

e.     qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

f.     coordination of and scheduling qualified sign language interpreters for medical appointments;

g.     provision of DIDD group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals, such as VPs, flashing fire alarms, and bed shaker alarms;

h.     ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

I.     person-centered planning and supports.

214.    The State and DIDD fail to deliver and administer their programs and services to Plaintiff Blanchett in her primary language of ASL, thereby making DIDD's programs and services inaccessible to her.

215.    As a result of the State's and DIDD's failures to provide effective communication to Ms. Blanchett, she is being denied equal access to DIDD's programs and services.

216.    Because she cannot access the programs and services that hearing persons supported can, Ms. Blanchett is currently placed in a more restrictive environment than her hearing peers and is at an increased risk for institutionalization.

217.    The State and DIDD have discriminated and continue to discriminate against Ms. Blanchett by reason of her disability and solely by reason of his disability from the time she began receiving services through and administered by the State and DIDD and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices, and procedures, and by administering their programs and services in a discriminatory manner.

40

218.     As a result of the failures of the State and DIDD, Ms. Blanchett has suffered and

continues to suffer from loss of opportunity, loss of language, emotional distress, isolation,

stigma, communication neglect, and discriminatory conduct.  These injuries to Mr. Blanchett

could have been avoided had the State and DIDD stopped their wrongful and discriminatory

conduct and provided Mr. Blanchett with effective communication for and equal access to their

programs and services.

**VII.     FACTUAL ALLEGATIONS RELATING TO THE STATE AND DIDD'S
FAILURE TO PROVIDE EFFECTIVE COMMUNICATION AND EQUAL
ACCESS TO THEIR PROGRAMS AND SERVICES TO PLAINTIFFS
BATTLE, WILSON, UNDERWOOD, AND BLANCHETT**

**Defendants the State and DIDD Are Failing to Provide Person-Centered Planning for
Plaintiffs Battle, Wilson, Underwood, and Blanchett**

219.     The State and DIDD are failing to provide person-centered planning to Plaintiffs Battle,

Wilson, Underwood, and Blanchett even though DIDD mandates a "Person Centered Practice"

for all of its persons supported.

220.     A DIDD "Person Centered Practice" begins with effective communication for persons

supported.

221.     Mr. Battle, Mr. Wilson, Mr. Underwood, and Ms. Blanchett communicate primarily in

ASL.  Despite this, none of their planning meetings, programs, or services are delivered in ASL.

222.     Without planning and delivery of programs and services in ASL, Mr. Battle, Mr. Wilson,

Mr. Underwood, and Ms. Blanchett get minimal if any benefit from these programs and services.

They cannot access the person-centered planning process and implementation thereof.

223.     Without effective communication for Mr. Battle, Mr. Wilson, Mr. Underwood, and

Ms. Blanchett Defendants the State and DIDD cannot ascertain and implement the key

components of the person-centered planning process, including, but not limited to, "Who the

41

person is?"; "What the person wants from life?"; "How to accomplish the person's desired outcomes?"; and, "What is important to the person including things that help a person feel happy, satisfied, and content and fulfilled?" *See DIDD Provider Manual* at 3.3.

224.    Without effective communication, Mr. Battle, Mr. Wilson, Mr. Underwood, and Ms. Blanchett do not have operative person-centered plans.

225.    Without effective communication, Mr. Battle, Mr. Wilson, Mr. Underwood, and Ms. Blanchett do not receive equal access to Defendant DIDD's services and programs.

226.    Without effective communication, Mr. Battle, Mr. Wilson, Mr. Underwood, and Ms. Blanchett are in a more restrictive environment than their hearing peers and are at greater risk of institutionalization.

227.    Without effective communication, Mr. Battle, Mr. Wilson, Mr. Underwood, and Ms. Blanchett do not receive services and programs in the most integrated setting appropriate to their needs as Deaf persons supported who communicate in ASL. They cannot interact with their own roommates, staff, and providers.

228.    These failures on the part of the State and DIDD against Plaintiffs Battle, Wilson, Underwood, and Blanchett began at the time they began receiving services through and administered by the State and DIDD and are ongoing and continuous to the present and have caused and are causing Plaintiffs Battle, Wilson, Underwood, and Blanchett significant and ongoing harm and discrimination as detailed herein. These injuries could have been avoided had the State and DIDD stopped their wrongful and discriminatory conduct against Plaintiffs Battle, Wilson, Underwood, and Blanchett and provided them with effective communication and equal access to their programs and services.

**The State and DIDD are Failing to Provide Necessary Auxiliary Aids and Services to Ensure Effective Communication for Plaintiffs Battle, Wilson, Underwood, and Blanchett and Denying Them Equal Access to Their Services and Programs**

229. The State and DIDD have failed and are failing to provide necessary auxiliary aids and services to Plaintiffs Battle, Wilson, Underwood, and Blanchett to ensure effective communication for and an equal opportunity to participate in, and enjoy the benefits of, the services, programs, and activities of DIDD.

230. The State and DIDD have failed and are failing to provide:

    a. appropriate communication evaluations conducted by a person who communicates in ASL and who has experience working with Deaf individuals with I/DD;

    b. programs, services, and activities offered with signing staff or qualified sign language interpreters;

    c. qualified sign language interpreters for person-centered planning meetings;

    d. qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

    e. qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

    f. coordination of and scheduling qualified sign language interpreters for medical appointments;

    g. provision of DIDD group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals, such as VPs, flashing fire alarms, and bed shaker alarms;

    h. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

    i. person-centered planning and supports.

43

231.    The State and DIDD also do not have an adequate network of qualified providers that have sign fluent staff, are familiar with Deaf persons supported, and have sufficient capacity to meet the communication needs of Deaf persons supported to the same extent that existing providers meet the needs of hearing persons supported.

232.    Plaintiffs Battle, Wilson, Underwood, and Blanchett are not receiving services, including but not limited to habilitative services in DIDD group homes, and they need to improve their communication. They are being denied one of the most basic forms of habilitation— learning to communicate effectively with the world around them, including staff and peer interaction and support.

233.    Plaintiffs Battle, Wilson, Underwood, and Blanchett live in DIDD group homes where they cannot communicate with peers or staff.  At that time and continuing to the present, the State and DIDD do not provide DIDD group homes that are accessible for Deaf persons supported and meet their communication needs.

234.    The State and DIDD are also failing to give primary consideration to the requests of Plaintiffs Battle, Wilson, Underwood, and Blanchett when choosing auxiliary aids or services to provide in violation of 28 C.F.R. section 35.160.

235.    The State's and DIDD's failure to provide Plaintiffs Battle, Wilson, Underwood, and Blanchett with effective communication are violations of the mandates set forth in Title II of the ADA and Section 504.

236.    Because the State and DIDD do not provide effective communication to Plaintiffs Battle, Wilson, Underwood, and Blanchett, they are denied equal access to DIDD's programs and services in violation of Title II of the ADA and Section 504.

44

237.    These failures on the part of the State and DIDD against Plaintiffs Battle, Wilson, Underwood, and Blanchett began at the time they began receiving services through and administered by the State and DIDD and are ongoing and continuous to the present and have caused and are causing Plaintiffs Battle, Wilson, Underwood, and Blanchett significant and ongoing harm and discrimination as detailed herein.  These injuries could have been avoided had the State and DIDD stopped their wrongful and discriminatory conduct against Plaintiffs Battle, Wilson, Underwood, and Blanchett and provided them with effective communication and equal access to their programs and services.

**Plaintiffs Battle, Wilson, Underwood, and Blanchett are Harmed by the State and DIDD's Failure to Provide Effective Communication and Equal Access to I/DD Services and Programs**

238.    The lack of equal access to DIDD's programs and services for the Plaintiffs Battle, Wilson, Underwood, and Blanchett has damaging effects on them.

239.    Without effective communication and delivery of services in ASL, Plaintiffs Battle, Wilson, Underwood, and Blanchett cannot access DIDD's programs and services that are supposed to enrich their quality of lives.

240.    Lack of communication affects every area of person-centered planning supports, including safety.  Lack of access to report abuse, lack of understanding emergency evacuation directions, and the inability to communicate symptoms such as pain, discomfort, or the side effects of medications, puts the health and safety of Plaintiffs Battle, Wilson, Underwood, and Blanchett at risk.

241.    Prior to the filing of this lawsuit, the State and DIDD had been notified and were aware that they were not providing Deaf persons supported with effective communication pursuant to Title II and Section 504.  Despite this, the State and DIDD failed to take any action to alleviate

45

or eliminate this discrimination, resulting in continuous and ongoing harm to their Deaf persons supported, including Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents.

242.    For example, on February 11, 2021, DRT sent a detailed twelve-page letter to Governor Bill Lee detailing how Defendants were violating Title II of the ADA and Section 504 by failing to provide Deaf persons supported with effective communication and equal access to their programs and services and the resulting harm therefrom.  Despite this, the State and DIDD failed to take action to administer their programs and services in a non-discriminatory manner and create policies and procedures to ensure DIDD's Deaf persons supported receive effective communication.

243.    As a result of the State's and Defendant DIDD's failure to act, Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents suffered and continue to suffer from emotional distress, isolation, stigma, communication neglect, and discriminatory conduct.

244.    As a result of the failures on behalf of the State and DIDD, Plaintiffs Battle, Wilson, Underwood, and Blanchett have suffered and are suffering significant harm.  They have been rendered silent and invisible because they cannot communicate in their native language.  They have lost language and/or are at graver risk of losing language.  They have suffered and continue to suffer loss of opportunity, emotional distress, communication neglect, isolation, stigma, and have been subjected to discriminatory conduct.

245.    These failures on the part of the State and DIDD against Plaintiffs Battle, Wilson, Underwood, and Blanchett began at the time they began receiving services through and administered by the State and DIDD and are ongoing and continuous to the present and have caused and are causing Plaintiffs Battle, Wilson, Underwood, and Blanchett significant and ongoing harm and discrimination as detailed herein.  These injuries could have been avoided had

46

the State and DIDD stopped their wrongful and discriminatory conduct against Plaintiffs Battle, Wilson, Underwood, and Blanchett and provided them with effective communication and equal access to their programs and services.

## VIII.  FACTUAL BACKGROUND RELATING TO DEFENDANT DMHSAS' PROGRAMS AND SERVICES

### DMHSAS Operations

246.    The State has created an extensive, statewide program to provide services and supports to people with MI and SUD.  This program is administered by DMHSAS using state and federal funds.

247.    DMHSAS "serves as the state's mental health and developmental disabilities authority and is responsible for system planning, setting policy and quality standards, system monitoring and evaluation, disseminating public information and advocacy for persons of all ages who have mental illness, [and] serious emotional disturbance..."  Tenn. Code Ann. § 33-1-201.

248.    DMHSAS "administers services for people of all ages living with mental illness, co-occurring disorders, or serious emotional disturbances. Services include housing, crisis services, suicide prevention, and peer recovery." [26]

249.    The State created DMHSAS "to develop and maintain a system of care that provides a comprehensive array of quality prevention, early intervention, treatment, habilitation and rehabilitation services and supports that are geographically available, equitably and efficiently allocated statewide, allowing people to be in their own communities in settings, based on the needs and choices of individuals and families served."  Tenn. Code Ann. § 33-2-102(a).

---

[26]*Department of Mental Health and Substance Abuse Service: Mental Health Services,* TN.GOV,  https://www.tn.gov/behavioral-health.html (last visited December 8, 2021).

250.    DMHSAS must, in part, "(1) Establish and sustain a broad range and scope of flexible services and supports across the domains of residential living, working, learning, community participation, and family support, including crisis, respite and other emergency services, that help service recipients maintain respected and active positions in the community.…" Tenn. Code Ann. § 33-2-102(b)(1).

251.    DMHSAS's mission is "[c]reating collaborative pathways to ***resiliency, recovery, and independence*** for Tennesseans living with mental illness and substance use disorders."[27]

252.    DMHSAS's vision is to be a "state of ***resiliency, recovery, and independence*** in which Tennesseans living with mental illness and substance use disorders thrive."[28]

253.    The State identifies the following fundamental principles to carrying out DMHSAS' responsibilities:

> (1) Stable service systems that provide flexibility, advocacy, **effective communication**, targeted outcomes, continuous evaluation, and improvement based on best practice and research;
> (2) Early identification of needs and the inclusion of both prevention and early intervention services and supports;
> (3) Timely response to the needs, rights and desires of those served;
> (4) Treating service recipients and families with dignity and respect;
> (5) Protection of service recipients from abuse, neglect, and exploitation;
> (6) Accurate and responsible accountability for the use of public resources;
> (7) Ongoing education and skills development of the workforce; and
> (8) **Cultural competence of persons providing service.**

Tenn. Code Ann. § 33-1-203 (emphasis added).

254.    The State and DMHSAS also provide direct services through their RMHIs.

---

[27] *Department of Mental Health and Substance Abuse Disorders:  Our Mission and Our Vision*, TN.GOV, https://www.tn.gov/behavioral-health.html (last visited December 8, 2021) (emphasis in the original).
[28] *Id.*

48

**DMHSAS' Administration of the State's MI and SUD Programs and Services and Oversight of Its Licensed Providers**

255.    DMHSAS is authorized to license facilities and services operated for the provision of mental health and substance abuse services of the State, including, but not limited to, mental health supported living facilities.  Tenn. Comp. R. & Reg. 0940-05-02-.01.  In fact, "no person, partnership, association or corporation may begin delivering services until the Department issues a license."  Tenn. Comp. R. & Reg. 0940-05-02-.03(1).

256.    DMHSAS must ensure that its licensees comply with all federal, state, and local laws, and requires its licensees to be compliant with licensure laws, ordinances, rules, and regulations. Tenn. Comp. R. & Reg. 0940-05-02-.02(1).

257.    DMHSAS investigates reports of potential abuse, neglect, dereliction, or deficiency at its licensed facilities.  A DMHSAS licensee is required to post a sign in its facility displaying DMHSAS' regional telephone number so that service recipients and others know how to report abuse and neglect to DMHSAS.  Tenn. Comp. R. & Reg. 0940-05-02-.20.

258.    DMHSAS has the right to enter the premises of any licensee in order to make inspections, including unannounced inspections, deemed necessary to determine compliance with licensure laws, ordinances, regulations, and rules.   Tenn. Comp. R. & Reg. 0940-05-02-13 & .22.   If any violations are found, DMHSAS may take disciplinary action, including assessing civil penalties, and denying, suspending, or revoking a license for, among other things, violating licensure laws or rules or for conduct or practice detrimental the to the welfare of person served by the licensee. Tenn. Comp. R. & Reg. 0940-05-02-.14 & .25.

259.    If DMHSAS issues a "Notice of Non-Compliance" to a licensee after an inspection or an investigation, the licensee must submit a written Plan of Compliance to DMHSAS to be approved by DMHSAS.  Tenn. Comp. R. & Reg. 0940-05-02-.021.

49

260. When DMHSAS denies, suspends, or revokes a license, DMHSAS must provide direct assistance to a person supported by notifying appropriate state and local agencies which may be able to coordinate placement and/or services. Tenn. Comp. R. & Reg. 0940-05-02-.24.

261. Individuals with MI are often discharged from an RMHI to a DMHSAS-licensed MI group home.

262. A licensed providers' supports include, but are not limited to, providing DMHSAS service recipients[29]with a comprehensive array of prevention, early intervention, treatment, rehabilitation services, including peer recovery or group therapy, habilitation services, safety services, MI group homes with direct service providers (staff), transportation, telephones, assistance with making medical and mental health appointments, and assistance with taking medications.

263. DMHSAS publishes licensure rules for mental health adult residential treatment service providers and mental health supportive living facilities.[30]

264. DMHSAS has not promulgated any relevant regulations addressing compliance with the ADA and Section 504 in the provision of MI and SUD services to Deaf service recipients .

265. DMHSAS has not issued specific policies, procedures, or guidance on ensuring accessibility for Deaf service recipients.

266. DMHSAS has not instructed its licensees regarding their obligations to ensure that MI and SUD services are accessible to Deaf service recipients, including through effective communication.

---

[29] "Service recipient" means a person who is receiving services, has applied for DMHSAS services, or for whom someone has applied for or proposed DMHSAS services because the person has mental illness, serious emotional disturbance, or a developmental disability.
[30]*Rules of the Tennessee Department of Mental Health and Substance Abuse Services,* https://publications.tnsosfiles.com/rules/0940/0940.htm (last visited December 8, 2021).

267.     DMHSAS has not issued any directives to DMHSAS licensees explaining that they have an affirmative obligation to provide accommodations for Deaf service recipients, and that they must give primary consideration to the Deaf service recipients preferred form of communication.

268.     DMHSAS has not conducted or required its licensed providers to have trainings on accessibility and effective communication specifically for Deaf service recipients.

269.     DMHSAS has not provided sufficient funding to secure supports needed for Deaf service recipients to have equal access to and effective communication for its services and programs.

270.     Defendant DMHSAS has not ensured that its licensees provide effective communication at MI group homes, group therapy, community mental health treatment, and for other MI and SUD programs and services.

271.     The State and DMHSAS administer their licensing program in a manner that subjects Deaf service recipients to discrimination on the basis of disability and solely by reason of their disability.

272.     The State and DMHSAS have failed and are failing to establish policies, procedures, and practices that ensure that Deaf service recipients receive effective communication and equal access to goods and services in the most integrated setting to their needs.

273.     This discrimination is continuous and ongoing.

### DMHSAS' Person-Centered Practice and Planning

274.     DMHSAS follows PCP. "The state will accomplish its [DMHSAS'] purposes through community-based systems that provide: (1) Access to services and supports that are **individualized to the capacities, needs and values of each person**…." Tenn. Code Ann. § 33-2-103(1) (emphasis added).

275.     Furthermore, the State mandates the DMHSAS system of care be:

51

(1) [P]**erson-centered** and family-focused, with the needs and choices of the individual and family, as appropriate, determining the types and mix of services and supports provided . . . ;

(2) [I]**ndividualized services and supports** based on an **individualized service plan** that is comprehensive, coordinated, age appropriate, provides smooth transition through life stages, involves families as appropriate, and is developed by qualified professionals in consultation with service recipients and family members as appropriate;

(3) [C]ommunity-based and provides for service in the least restrictive, most appropriate setting;

(4) [C]u**lturally competent** with agencies, programs, services, and supports that are responsive to the cultural, racial, and ethnic differences of the populations they serve; . . .

Tenn. Code Ann. § 33-2-104 (emphasis added).

276. **DMHSAS also "provides a comprehensive array of services and supports … based**

**on the needs and choices of individuals** and families served." Tenn. Code Ann. § 33-2-106(a)

(emphasis added).

## IX.  FACTUAL ALLEGATIONS REGARDING THE DMHSAS PLAINTIFFS

### Plaintiff Christal Helton

277. Plaintiff Christal Helton is a resident of Montgomery County, Tennessee.

278. Ms. Helton is a 45-year-old Deaf individual who has a diagnosis of chronic

paranoid schizophrenia.

279. Ms. Helton is profoundly Deaf and communicates primarily in ASL.

280. Ms. Helton's need to communicate in sign language is obvious.

281. She was educated at TSD in Knoxville, TN.

282. Ms. Helton's primary mode of communication is ASL.

### 2015 Admission to Moccasin Bend Mental Health Institute

283. Ms. Helton was admitted to Moccasin Bend Mental Health Institute (MBMHI), a

DMHSAS-operated Regional Mental Health Institute (RMHI), on or about March 10, 2015.

284.    Ms. Helton's intake records at MBMHI noted that she was "deaf and nonverbal" and had poor written communication skills.   Her records also indicate that Ms. Helton often had difficulty understanding staff due to her deafness.

285.    Ms. Helton's Master Treatment Plan, dated March 13, 2015, noted a need to discuss Ms. Helton's medication with her, and for Ms. Helton to participate in crisis management and counseling, including group therapy.  MBMHI staff wrote in an Interdisciplinary Progress Note (IPN), dated April 14, 2015, that Ms. Helton required a sign language interpreter to discuss these aspects of her care.

286.    Ms. Helton did not have access to QMHIs, sign fluent staff, or sign fluent mental-health providers for her in-patent stay at MBMHI for treatment plan meetings, medication education, mental health counseling, group therapy, and transition meetings.  Therefore, she could not participate in her own mental health care.

287.    MBMHI only sporadically provided a sign language interpreter, who was not qualified in mental health interpreting, for Ms. Helton during the first few weeks of her admission. Approximately one month into her stay at MBMHI, on or about April 14, 2015, and according to medical records, MBMHI ceased providing Ms. Helton with a qualified sign language interpreter except for once a week, so staff could chart notes.

288.    MBMHI staff mostly relied on written notes and lip reading in attempts to communicate with Ms. Helton, even in times of acute mental health crises.  Written notes and lip reading do not provide Ms. Helton with effective communication for her mental health care.  Ms. Helton needs to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

53

289. During a forensic exam on or about April 17, 2015, Ms. Helton was forced to communicate with the therapist through written notes. According to the therapist, Ms. Helton wrote, "I don't understand."

290. MBMHI also failed to provide Ms. Helton with access to a VP during her entire 2015 stay at MBMHI. Instead, Ms. Helton was forced to rely on staff at MBMHI to make phone calls for her on a regular phone, thereby denying her private phone calls. Because she was not provided with a VP, Ms. Helton's phone access was not equal to that of hearing patients.

291. Two months into her admission at MBHI, on or about June 3, 2015, staff wrote in an IPN note that Ms. Helton's behavior was difficult to redirect due to their communication barrier.

292. Ms. Helton's MBMHI team began to discuss her discharge and placement in a group home on or about April 27, 2015. At least three licensed MI group homes turned Ms. Helton down for placement because they could not meet her needs due to her deafness.

293. On or about June 28, 2015, Ms. Helton was discharged to a group home in Camden, Tennessee. Ms. Helton's discharge plan from MBMHI did not address Ms. Helton's communication needs or supports. Thus, MBMHI failed to provide Ms. Helton with appropriate discharge planning that would ensure placement in a community residential setting that would meet her communication needs and left her at greater risk of re-institutionalization due to this discriminatory treatment.

294. At that time and continuing to the present, the State and DMHSAS do not provide MI group homes that meet the communication needs of Deaf service recipients.

**2017 Admission to MBMHI**

295. Ms. Helton was again admitted to MBMHI on or about November 6, 2017.

296. The November 9, 2017, intake records noted that Ms. Helton was Deaf and communicated via ASL.

54

297.    MBMHI drafted an Initial Treatment Plan for Ms. Helton, dated November 10, 2017.

Ms. Helton's treatment goals included a remission in her psychiatric symptoms, attending

individual therapy, and building rapport and trust with nurses.  All of these goals require

effective communication.

298.    MBMHI only sporadically provided Ms. Helton with a sign language interpreter, who

was not qualified in mental health interpreting, during her 2017 stay at MBMHI.  At no time was

she provided with a QMHI, a sign-fluent mental health provider, or sign-fluent staff.  As a result,

Ms. Helton was forced to attempt to communicate through lip reading or written notes, even

during mental health crises.

299.    Ms. Helton did not have access to QMHIs, sign fluent staff, or sign fluent providers for

psychiatric appointments, treatment plan meetings, forensic evaluations, group therapy, meetings

with social workers and staff, and transition meetings.  As such, she could not participate in her

own mental health care.

300.    According to an IPN note, dated December 3, 2017, a nurse wrote that Ms. Helton was

"fearful" because she was unable to hear and felt like nobody communicated with her because of

her deafness.  As a "solution," the nurse provided Ms. Helton with multiple pads of paper and

pens so she could write notes in English.  This was not effective for Ms. Helton to have peer

interaction and support equal to that of hearing patients.

301.    MBMHI failed to provide Ms. Helton with a VP during her 2017 stay.

302.    Ms. Helton was discharged from MBMHI on or about December 5, 2017.  Ms. Helton's

discharge plan from MBMHI did not address Ms. Helton's communication needs or

supports.  Thus, MBMHI failed to provide Ms. Helton with appropriate discharge planning that

would ensure placement in a community, residential setting that would meet her communication needs, leaving her at greater risk of re-institutionalization.

303.    At that time and continuing to the present, the State and DMHSAS do not provide MI group homes that meet Deaf service recipient's needs.

### 2018-2020 Admission to MBMHI

304.    Ms. Helton was admitted to MBMHI for a third time on or about October 3, 2018.

305.    At the time of Ms. Helton's intake, her estimated length of stay was thirty (30) days.

306.    Ms. Helton did not have access to QMHIs, sign fluent staff, or sign fluent mental health providers for psychiatric appointments for treatment plan meetings, forensic evaluations, group therapy, meetings with social workers and staff, and transition meetings.  As such, she could not participate in her own mental health care.

307.    MBMHI staff often relied on written notes and lip reading in attempts to communicate with Ms. Helton even though they knew she communicated primarily in ASL.  This caused Ms. Helton frustration and prevented her from fully and meaningfully participating in her mental health treatment.  Ms. Helton needs to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

308.    According to an Adjunctive Therapy note dated January 8, 2019, Ms. Helton did not get to participate in many activities at MBMHI due to her deafness.

309.    Ms. Helton also expressed a strong desire to interact with her Deaf peers in the Deaf community while at MBMHI.  According to a July 5, 2019, Adjunctive Therapy note, she was very interested in going to more Deaf activities in the community and researched upcoming Deaf events to show to her social worker.  Despite Ms. Helton's interest, MBMHI failed to connect Ms. Helton with the Deaf community.

56

310.    Ms. Helton's staff at MBMHI also noted a lack of effective communication with her.  According to an Adjunctive Therapy note dated September 10, 2019, a staff member wrote that Ms. Helton would benefit from having an interpreter being more readily available.  By this point in time, Ms. Helton had been at MBMHI for nearly a year.

311.    Ms. Helton had access to a VP some of the time at MBMHI.  However, the VP was often not in operating order.

312.    On or about April of 2019, MBMHI did provide Ms. Helton with a sign language interpreter to participate in the Bleyzer Home Program, a program developed for patients who have been in the hospital for an extended period of time which focuses on skills needed to live in the community.  With the assistance of the sign language interpreter for this program, Ms. Helton was finally able to interact with staff and peers and made strides towards independent living.

313.    On or about January 14, 2019, MBMHI began looking for a group home placement for her at a licensed DMHSAS facility.

314.    According to medical records, Ms. Helton's discharge from MBMHI was dependent on being placed in a group home.  On or about April 25, 2019, a social worker noted that she had checked with several MI group homes who were unable or unwilling to accommodate Ms. Helton's disability of deafness.

315.    According to an IPN note, dated October 16, 2018, a sign language interpreter advised staff at MBMHI that placement for Ms. Helton in the community was difficult due to her inability to communicate with staff, and that Ms. Helton would be most successful in a group home with staff who knew how to sign or who understand how to work with Deaf individuals.

316.    Ms. Helton expressed a strong desire to be placed in a facility and/or home with other Deaf residents and staff accustomed to working with Deaf individuals.

317. At that time and continuing to the present, the State and DMHSAS do not provide provision of MI group homes that meet the communication needs of Deaf service recipients.

318. At that time and continuing to the present, the State and DMHSAS do not contract with, fund, or provide an adequate network of facilities and providers who meet the needs of Deaf service recipients.

319. A group home that would accept Ms. Helton was finally located in February 2020. By that time, Ms. Helton had been **unnecessarily institutionalized for over a year** due to an insufficient network of facilities and providers for Deaf individuals.

320. Ms. Helton was discharged to a DMHSAS-licensed group home in Cookeville, Tennessee, on February 28, 2020. Ms. Helton's discharge plan from MBMHI did not address Ms. Helton's communication needs or supports. Thus, MBMHI failed to provide Ms. Helton with appropriate discharge planning that would ensure placement in a community, residential setting that would meet her communication needs, leaving her at greater risk of re-institutionalization.

**Residential Placement at Absolute Care, LLC.**

321. Ms. Helton began living at a DMHSAS-licensed group home run by Absolute Care, LLC ("Absolute Care") on or about February 28, 2020.

322. Absolute Care is licensed by DMHSAS as a Mental Health Adult Residential Treatment provider and Mental Health Adult Supportive Residential provider. It is also a Mental Health Outpatient Facility. Absolute Care also has the licensing designation of serving "hearing impaired" individuals.

323. Ms. Helton requires mental health services and other group home services to stay compliant on her medication, to manage the symptoms of her mental illness, and to gain the skills to transition to independent living.

58

324.    Ms. Helton's person-centered plan, dated February 26, 2020, listed the following goals: being compliant with treatment, socializing with peers, and attending group therapy.  All of these goals required effective communication.

325.    At the time of her placement, Ms. Helton's group home had no sign-fluent staff, no sign-fluent roommates, no VP, and no access to qualified sign language interpreters, QMHIs, and sign-fluent mental health providers.  Thus, Ms. Helton was going into a home where she would have no effective communication for mental health treatment, habilitative programs, peer interaction and support, and other programs and services.

326.    Staff at Absolute Care communicated with Ms. Helton through lip reading or written English on a white board or via texting on an iPad, which was not effective for Ms. Helton and lead to frustration and behavior issues.  Ms. Helton needed to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

327.    According to records from Absolute Care, Ms. Helton required prompting and assistance in group therapy due to not being able to hear.

328.    Ms. Helton was required to attend multiple group therapy sessions approximately five days a week at her group home for her mental health, wellbeing, and recovery.  The group therapy involved various habilitative and rehabilitative topics, including coping skills, communication, and medication management.

329.    The topics in group therapy often involved the exchange of lengthy and complex information. For example, during one group therapy session that Ms. Helton attended with other residents on June 18, 2021, the topic was the "SIFT technique" (S = sensations, I = images, F = feelings, T = thoughts), a technique to help understand and manage emotions.

59

330.    The group therapy education and instructions were delivered in spoken English.  During group therapy sessions, residents of Ms. Helton's group home were given the opportunity to orally discuss the information presented.  The instructor gave the residents worksheets to complete that require proficiency in English reading comprehension along with oral instructions on how to complete the worksheet.  Finally, the instructor gave residents oral instructions about a topic to write about in their journals.

331.    Ms. Helton did not receive any sign language interpreting for the group therapy sessions at her group home.  She sat in group therapy unable to hear and fully understand the information presented, feeling isolated.

332.    The instructor attempted to communicate with Ms. Helton via written notes which is ineffective for Ms. Helton during group therapy.  She could not participate in the group therapy discussion with her peers.  She could not hear the questions that her fellow residents ask nor ask questions herself.  She could not get the benefits of these mental health treatment services that her hearing peers received.

333.    One of Ms. Helton's regular group therapy sessions dealt with how to better communicate with staff, peers, and others.  However, Ms. Helton did not have sign language interpreters during these sessions, so she was unable to effectively communicate in the sessions about communication.

334.    Ms. Helton had a VP, but it was not always in operating order.

335.    Ms. Helton wanted to work and earn her own money so that she could work towards independence and avoid re-institutionalization at an RMHI.  However, Absolute Care staff insisted that because she had to attend group therapy sessions in her home (which were inaccessible to her), she could not work outside of the home.

60

336.    According to Absolute Care records, Ms. Helton had difficulty communicating with staff and peers at her group home and became frustrated when she could not communicate and socialize with peers. As a result, she was often withdrawn and isolated herself from staff and peers and began exhibiting problematic behaviors.

337.    Ms. Helton's Crisis Plan at Absolute Care required Ms. Helton's staff to "remain calm and speak in a normal tone of voice" when trying to mitigate a mental health crisis. However, this crisis plan was inoperable as Ms. Helton is Deaf and Absolute Care staff could not communicate in ASL.

**Residential Placement at Legends RTC Lock-Down**

338.    Due in large part to the communication barriers Ms. Helton experienced at Absolute Care, Ms. Helton was discharged from Absolute Care to Legends RTC Lock-Down ("Legends") on or about February 22, 2022. Ms. Helton's Preliminary Discharge Plan, dated December 22, 2021, noted that she was "unable to communicate efficiently."

339.    Legends is licensed by DMHSAS as a Mental Health Residential Treatment provider and Mental Health Adult Supportive Residential provider. It is not designated as serving individuals with hearing impairments.

340.    Ms. Helton does not understand why she was discharged from Absolute Care and moved to Legends because the reason for the move was not communicated to her in ASL.

341.    Upon information and belief, Legends is a more restrictive and institutionalized environment than Absolute Care. Upon information and belief, residents are locked in 24 hours a day. The exterior and interior have the appearance of a hospital instead of a home. Ms. Helton sleeps in a hospital bed. Residents have specific mealtimes and cannot cook for themselves. Residents also line up at an office to get medication. Residents have little to no access to the community. In fact, Ms. Helton has rarely been outside since she's been at Legends.

61

342.    Upon information and belief, residents at Legends must have 15 hours of group or individual therapy a week.  Ms. Helton cannot participate in this therapy because she has no sign fluent staff, no sign fluent providers, no QMHIs, and no sign language interpreters.

343.    Ms. Helton has not had effective communication since she has been at Legends.

344.    When Ms. Helton was placed at Legends, she was put in a more restrictive environment than her previous placement at Absolute Care.  This is due to the State's and DMHSAS's inadequate network of MI group homes or other long-term mental health care programs that can meet the needs of Deaf individuals.

345.    As a result, Ms. Helton's mental illness goes untreated, and she is at greater risk for further institutionalization.

346.    Ms. Helton desires to have staff and roommates with whom she can communicate and seek support.

347.    Without effective communication, Ms. Helton cannot reach the goals set forth by DMHSAS in providing its services, including rehabilitative, therapeutic, habilitative, and independence goals and has suffered loss of opportunity.

348.    The State and DMHSAS have failed and are failing to provide Mr. Helton with effective communication and person-centered supports, including but not limited to:

a.  an appropriate communication evaluation conducted by a person who communicates in ASL and who has experience working with Deaf individuals with MI;

b.  programs, services, and activities offered with signing staff or qualified sign language interpreters;

c.  qualified sign language interpreters for case plan meetings;

d.  qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

e.  qualified sign language interpreters or sign-fluent providers for behavioral, vocational, habilitative, counseling, community, and other services;

f.  coordination of and scheduling qualified sign language interpreters for medical appointments;

g.  provision of MI group homes that meet the communication needs of Deaf service recipients , including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals;

h.  ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

i.  person-centered planning and supports.

349.   Ms. Helton is in grave risk of a decline in her ability to use ASL due to language deprivation and isolation.

350.   Because there are no or an inadequate network of MI group homes or other long-term mental health care programs accessible and available in the State for Deaf persons, Ms. Helton's mental illness goes untreated.

351.   To date, Ms. Helton has not had a mental health provider or group home that has been able to meet her communication needs.  This inadequate network of providers puts Ms. Helton at greater risk of re-institutionalization.

352.   As a result of the State and DMHSAS' failures to provide effective communication to Ms. Helton, she has been re-institutionalized at RMHIs and more restrictive MI group homes.

353.     Because she cannot access the programs and services that hearing service recipients can, Ms. Helton is currently placed in a more restrictive environment than her hearing peers and is at an increased risk for further re-institutionalization.

354.     The State and DMHSAS have discriminated and continue to discriminate against Ms. Helton by reason of her disability and solely by reason of her disability from the time she began receiving services through DMHSAS and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices, and procedures, and by administering their programs and services in a discriminatory manner.

355.     As a result of the failures of the State and DMHSAS, Ms. Helton has suffered and continues to suffer from loss of opportunity, loss of language, emotional distress, isolation, stigma, communication neglect, and discriminatory conduct.  These injuries to Ms. Helton could have been avoided had the State and DMHSAS stopped their wrongful and discriminatory conduct and provided Ms. Helton with effective communication for and equal access to its programs and services.

**Plaintiff Patrick Downs**

356.     Plaintiff Patrick Downs is a resident of Shelby County, Tennessee.

357.     Mr. Downs is 31 years old and profoundly Deaf.  He communicates primarily in ASL.

358.     Mr. Downs' need to communicate in sign language is obvious.

359.     Mr. Downs has also been diagnosed with Bipolar I Disorder and Epilepsy.  He has also experienced depression, anxiety, and psychosis.

360.     He currently lives in a group home run by DMHSAS licensed provider Alliance Healthcare Services in Memphis, Tennessee.  The location where Mr. Downs resides, the

Ridgemont Adult Supportive Residential Facility, is not designated to serve individuals with hearing impairments.

361.    Prior to residing at his WCSL group home, Mr. Downs resided in a group home run by DMHSAS licensed provider Eagle's Nest Transitional Living ("Eagle's Nest") in Nashville, Tennessee. Eagle's Nest is licensed by DMHSAS as a Mental Health Adult Supportive Residential provider and is designated to serve hearing impaired individuals.

362.    Prior to residing in his Eagle's Nest group home, Mr. Downs was in and out of mental health hospitals and MI group homes, including RMHIs.

363.    Mr. Downs requires mental health services to stay compliant on his medication, to manage the symptoms of his mental illness, and to gain the skills to transition to independent living.

**Eagle's Nest**

364.    Mr. Downs was required to attend multiple group therapy sessions almost every day at his group home for his mental health and wellbeing and recovery. The group therapy involved oral instruction on various habilitative and rehabilitative topics, including coping skills, medication, management, and communication. These topics often involved the exchange of lengthy and complex information.

365.    However, Mr. Downs did not have effective communication, including, but not limited to, sign fluent staff or QMHIs, and, therefore, received little to no benefit from these sessions. The multiple group therapy sessions per day were conducted in spoken English. Mr. Downs sat in group therapy unable to hear or fully understand the information presented or participate in the discussion with his hearing peers. Staff often wrote notes back and forth with him during the group therapy sessions in an attempt to communicate with him. This was not effective for Mr.

Downs. Mr. Downs needs to communicate in ASL either directly with someone who is fluent in ASL or through a qualified sign language interpreter.

366. Looking at some of the answers to these written questions drafted by Mr. Downs' staff, it was obvious that Mr. Downs did not often understand what was being conveyed in these group therapy sessions.

367. For example, On January 7, 2020, staff did a group therapy or "PSR" session on coping skills. When asked about his coping skills, Mr. Downs responded "I don't know."

368. On February 23, 2020, staff did a PSR on understanding your medication. When staff asked Mr. Downs if he understood, Mr. Downs shrugged his shoulders.

369. On May 31, 2020, staff did a PSR on the side effects of medication. Mr. Downs once again shrugged his shoulders.

370. Group home staff had no idea how to communicate or interact with Mr. Downs. On March 16, 2021, one of his staff members wrote in frustration that she "tried to express to consumer [Mr. Downs] the importance of attending his [mental health] appoints [sic] but consumer refuse [sic] to listen." Mr. Downs has no way of "listening" to verbal directives from staff, as he is Deaf.

371. Mr. Downs had no staff members at Eagle's Nest who signed and no roommates who signed. He expressed feelings of extreme isolation and loneliness at the group home. He had no friends and no peer support.

372. Staff wrote that Mr. Downs should "talk" to them when he felt sad or has suicidal ideations. For instance, he experienced intense grief when two of his relatives, including his mother, passed away in quick succession in 2020. However, Mr. Downs could not effectively

66

express any feelings of despair, isolation, and thoughts of killing himself to staff because they did not understand his language of ASL.

373.    Mr. Downs' Individual Care Plan, dated January 6, 2021, set forth goals and objectives for the upcoming year.

374.    In the plan, Mr. Downs stated that his goal is to have his own apartment with his own roommates.  The discharge plan was listed as "to step down to a lower level of care."

375.    One objective to meet this goal included Mr. Downs initiating engaging with staff four times a week.  None of Mr. Downs' staff knew ASL, so it would have been nearly impossible for Mr. Downs and his staff to have engaged in any meaningful way four times a week.  This implausible discharge plan put Mr. Downs in a more restrictive setting than his hearing peers and at greater risk of re-institutionalization.

376.    Another objective for this goal included Mr. Downs responding to education and coaching on improving anger management "by using coping skills at least 4 times each day without prompting."  The education and coaching on anger management skills were not provided to Mr. Downs in ASL and, therefore, it would have been difficult if not impossible for him to respond to this education and coaching in any meaningful way.

377.    Mr. Downs' Individual Care Plan also provided for psychiatric emergency management, otherwise known as a "crisis plan."  For example, the crisis plan lists Eagle's Nest director, Yavonda Barefield, as the name of the person who can help in a crisis situation. Ms. Barefield does not know ASL.  In a crisis, Ms. Barefield would have been unable to effectively communicate with Mr. Downs.  Thus, Mr. Downs had an inoperable crisis plan at Eagle's Nest and was at great risk for self-harm should he experience a psychiatric emergency.

67

378.    In non-crisis situations, Eagle's Nest did not provide Mr. Downs with qualified sign language interpreters.  During meetings with Ms. Barefield, she attempted to communicate with Mr. Downs in written notes which did not provide him with effective communication.

379.    Staff also got frustrated when they though Mr. Downs did not "listen" or follow house rules, and Mr. Downs, in turn got frustrated with them for not being able to communicate with him.  It was a vicious cycle that has led to physical confrontations between Mr. Downs, his roommates, and staff.

380.    Understandably frustrated with the lack of communication in his home, Mr. Downs eloped from his home in September of 2021, and ended up on the streets for several days leaving him at greater risk of harm, serious injury, and death.

### 2021 Inpatient Stay at Mental Tennessee Mental Health Institute

381.    Mr. Downs was institutionalized at a DMHSAS regional mental health institute (RMHI), Middle Tennessee Mental Health Institute (MTMHI), from November 27, 2021, until December 9, 2021, for having suicidal and homicidal ideations.

382.    Upon information and belief, this was his fourth institutionalization at an RMHI since 2015.

383.    At intake at MTMHI, staff noted Mr. Downs was deaf.  Despite this, Mr. Downs underwent multiple evaluations on November 27, 2021, all without the assistance of a sign language interpreter.  Staff attempted to do these evaluations through written notes.  These evaluations included a pain assessment, a psychosocial assessment, and a medical history and exam, all of which require effective communication to complete.  MTMHI did not procure a sign language interpreter for any of these critical evaluations and, thus, these evaluations were inaccurate and/or meaningless.

68

384. On November 27, 2021, an MTMHI physician signed an order allowing Mr. Downs to be chemically restrained without his consent. According to the document, Mr. Downs lacked capacity to give consent to the chemical restraint because he gave "completely irrelevant responses to efforts to discuss possible medication." However, MTMHI did not provide Mr. Downs with a sign interpreter to discuss the medication prior to the time the order of involuntary chemical restraint went into effect.

385. As a result, Mr. Downs was chemically restrained with Haldol and Trazadone on multiple occasions during his in-patient stay at MTMHI.

386. Staff at MTMHI also gave Mr. Downs the Columbia Suicide Severity Rating Scale (CSSRS) on November 30, 2021, through written notes. Mr. Downs was "asked" about possible suicidal ideations and plans for self-harm "with the help of writing and patient nodding no." MTMHI failed to provide a sign language interpreter and, thus, effective communication, for this critical evaluation concerning matters of life and death.

387. Also on November 30, 2021, MTMHI staff drafted an "Initial Treatment Plan" for Mr. Downs. Goals in this plan included educating Mr. Downs on MI, discussing the benefits and side effects of medication, establishing rapport and trust with Mr. Downs, verbally reinforcing him, and engaging him in meaningful activities. All of these goals require effective communication. Despite this, Mr. Downs' Initial Treatment Plan had no plan for providing effective communication to him, including, but not limited to, QMHIs and sign fluent providers.

388. Based on information and belief, MTMHI did not provide Mr. Downs with a sign language interpreter for the first seven days of his in-patient stay at MTMHI. Upon information and belief, MTMHI did not provide Mr. Downs with a QMHI, sign fluent staff, or sign fluent provider during his entire in-patient stay at MTMHI.

69

389.     Throughout the first few days of Mr. Downs' in-patient stay at MTMHI, staff members noted that they attempted to communicate with Mr. Downs via written notes, a vision board, and gestures.  However, these attempts at communication were unsuccessful.  One nurse noted in an IPN that Mr. Downs "makes sign language and can get easily irritable/frustrated if he cannot be understood."

390.     As a result of MTMHI's failure to provide effective communication to Mr. Downs, he had no way to communicate his feelings and thoughts, nor could he participate in his own mental health treatment.

391.     Nurses at MTMHI noted that he needed "constant redirection," but they had no means to effectively communicate redirection techniques.  As a result, and upon information and belief, Mr. Downs was chemically restrained when his behavior, such as tapping on walls and mumbling, could not be redirected.  Upon information and belief, these involuntary, chemical restraints could have been avoided had MTMHI provided Mr. Downs with effective communication.

392.     Mr. Downs was "evaluated" multiple times by psychiatry staff at MTMHI without a QMHI or even a non-QMHI sign language interpreter.  Additionally, none of the psychiatry staff were sign fluent or could effectively communicate with Mr. Downs.  For example, one psychiatrist described his evaluation of Mr. Downs as a series of written questions about suicidal and homicidal ideations with Mr. Downs answering by nodding his head.

393.     During another psychiatry evaluation, Mr. Downs became upset when the psychiatrist showed him a list of written questions and threw the papers away.

394.     During another psychiatry evaluation, a psychiatrist handed Mr. Downs a list of written questions, and Mr. Downs raised his eyebrows and walked away.  The psychiatrist noted that he

70

was unable to assess Mr. Downs' psychotic symptoms, but he "seems" paranoid and suspicious. This psychiatrist continued to prescribe Mr. Downs psychotropic medication without ever having effectively communicated with him.

395. During his stay at MTMHI, Mr. Downs also went to the "Treatment Mall," or group therapy. During Treatment Mall sessions, patients interact and communicate with their peers and professionals at MTMHI to discuss therapeutic topics such as "frustration," "understanding mental illness," "wellness," and "stress." However, Mr. Downs could not participate in the Treatment Mall program because MTMHI failed to provide him with sign fluent staff, a QMHI, or any sign language interpreter.

396. One Treatment Mall note, dated November 30, 2021, stated that "patient needs interpreter." Another note, dated December 1, 2021, stated that Mr. Downs "could not participate without an interpreter."

397. MTMHI finally secured the services of a sign language interpreter on December 4, 2021, **seven** days after Mr. Downs was involuntarily committed to MTMHI. Mr. Downs was finally able to communicate in ASL with his psychiatrist instead of through head nods. He was also able to participate in the group therapy sessions at the Treatment Mall where staff noted that they had a conversation through the aid of the interpreter and that Mr. Downs had "a good sense of humor."

398. MTMHI discharged Mr. Downs on December 9, 2021, back to Eagle's Nest without a plan that addressed his communication needs. His Psychiatry Discharge Notes state that Mr. Downs should talk to his group home staff if he "gets suicidal or wants to hurt himself." However, this discharge plan was inoperable because none of Mr. Downs' Eagle's Nest group home staff knew ASL or could effectively communicate with Mr. Downs.

399.    MTMHI failed to provide Mr. Downs with appropriate discharge planning that would ensure placement in a community, residential setting that would meet his communication needs, leaving him at greater risk for re-institutionalization.

400.    At the time Mr. Downs was re-institutionalized at MTMHI, the State and DMHSAS had no policies, procedures, or working plan to ensure Mr. Downs and other Deaf service recipients had effective communication and equal access to RMHI programs and services.

401.    At the time of Mr. Downs' discharge from MTMHI, the State and DMHSAS had an inadequate network of licensed MI group homes that could meet the needs of Mr. Downs and Deaf service recipients. This inadequate network of providers puts Mr. Downs at greater risk of re-institutionalization.

### 2022 In-Patient Stay at Crestywn Behavioral Health & Placement at William Carroll Supportive Living

402.    Mr. Downs was only back at his group home at Eagle's Nest a short time when he was re-institutionalized at Crestwyn Behavioral Health Hospital in Memphis, Tennessee, in approximately January of 2022.  Crestwyn Behavioral Health Hospital is licensed by DMHSAS.

403.    In February of 2022, Mr. Downs was discharged from Crestwyn to William Carroll Supportive Living (WCSL) MI group home, a licensee of the State and DMHSAS, in Memphis, Tennessee.  However, WCSL is not designated as a licensee that serves hearing impaired individuals.

404.    Mr. Downs' natural supports—his father and his sister—reside in the Eastern part of Tennessee.  Mr. Downs was placed in a home across the state from his family.

405.    Upon information and belief, there were no communication supports for Mr. Downs at WCSL.  There was no working VP and no signing staff.  He did not understand the rules of the home.  He could not access group therapy.  He did not even understand when and if he had

72

access to food in the home. He was completely isolated. His physical and mental health deteriorated rapidly, as well as his ability to communicate in ASL.

## 2022 In-patient Stay at Memphis Mental Health Institute (MMHI) & Placement at Alliance Healthcare Systems

406.     Partly or wholly as a result of living in complete communication deprivation and isolation at his WCSL supported living home, Mr. Downs's mental health deteriorated, and he was re-institutionalized at a state mental health hospital, Memphis Mental Health Institute (MMHI), on or about April 12, 2022.

407.     Based on information and belief, MMHI failed to provide Mr. Downs with effective communication while at MMHI.

408.     Mr. Downs remained institutionalized at MMHI for eight months and was finally discharged to an Alliance Healthcare Systems (AHS) supported living residential facility licensed by the state on or about December 16, 2022.

409.     The discharge plan from MMHI does not discuss plans for Mr. Downs to have effective communication at his AHS home, including but not limited to sign-fluent staff, sign language interpreters, and a videophone, nor does it discuss whether this home is the least restrictive environment for Mr. Downs's needs.

410.     The location where Mr. Downs resides, the Ridgemont Adult Supportive Residential Facility, does not have the licensing designation to serve individuals with hearing impairments.

411.     Upon information and belief, AHS is not providing Mr. Downs with effective communication at the Ridgemont location.

412.     Mr. Downs desires to have staff and roommates with whom he can communicate and seek support.

413.    The State and DMHSAS have failed and are failing to provide Mr. Downs with effective communication and person-centered supports, including but not limited to:

   a.   an appropriate communication evaluation conducted by a person who communicates in ASL and who has experience working with Deaf individuals with MI;

   b.   programs, services, and activities offered with signing staff or qualified sign language interpreters;

   c.   qualified sign language interpreters for case plan meetings;

   d.   qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

   e.   qualified sign language interpreters or sign-fluent providers for behavioral, vocational, habilitative, community, and other services;

   f.   coordination of and scheduling qualified sign language interpreters for medical appointments;

   g.   provision of MI group homes that meet the communication needs of Deaf persons supported, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals;

   h.   ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

   i.   person-centered planning and supports.

414.    Due to this lack of person-centered supports and effective communication, Mr. Downs has made little to no progress in his goal of gaining skills necessary to transition out of the house

to more independent living and has suffered loss of opportunity. He feels isolated, depressed, and frustrated.

415.    Mr. Downs is at grave risk of a decline in his ability to use ASL due to language deprivation and isolation.

416.    Because there are no MI group homes or other long-term mental health care programs available or accessible in the State for Deaf persons, Mr. Downs's mental illness goes untreated.

417.    To date, Mr. Downs has not had a mental health provider or MI group home that has provided effective communication to meet his needs. This inadequate network of providers puts Mr. Downs at greater risk of re-institutionalization.

418.    As a result of the State and DMHSAS' failures to provide effective communication to Mr. Downs, he has been re-institutionalized in an RMHI.

419.    Because he cannot access the programs and services that hearing service recipients can, Mr. Downs is currently placed in a more restrictive environment than his hearing peers and is at an increased risk for further re-institutionalization.

420.    The State and DMHSAS have and continue to discriminate against Mr. Downs by reason of his disability and solely by reason of his disability from the time he began receiving services through and administered by DMHSAS and ongoing until the present through their continuous and ongoing actions, including but not limited to, through implementing their discriminatory policies, practices and procedures, and by administering their programs and services in a discriminatory manner.

421.    As a result of the failures of the State and DMHSAS, Mr. Downs has suffered and continues to suffer from loss of opportunity, loss of language, emotional distress, isolation, stigma, communication neglect, and discriminatory conduct. These injuries to Mr. Downs could

75

have been avoided had the State and DMHSAS stopped their wrongful and discriminatory conduct and provided Mr. Downs with effective communication and equal access to its programs and service.

## X. FACTUAL ALLEGATIONS RELATING TO THE STATE AND DMHSAS' FAILURE TO PROVIDE EFFECTIVE COMMUNICATION AND EQUAL ACCESS TO THEIR PROGRAMS AND SERVICES FOR PLAINTIFFS HELTON AND DOWNS

**Defendants the State and DMHSAS Are Failing to Provide Person-Centered Planning and Supports for Plaintiffs Helton and Downs**

422.    Defendants the State and DMHSAS are failing to provide PCP and supports for Plaintiffs Helton and Downs.

423.    PCP begins with effective communication for service recipients.

424.    Ms. Helton and Mr. Downs communicate primarily in ASL.  Despite this, none of their planning meetings, programs, or services are delivered in ASL.

425.    Without planning and delivery of programs and services in ASL, Ms. Helton and Mr. Downs get minimal if any benefit from and cannot access the person-centered planning process and implementation thereof.

426.    Without effective communication for Ms. Helton and Mr. Downs, their providers cannot access and sustain "a broad range and scope of flexible services and supports across the domains of residential living, working, learning, community participation, and family supports, including crisis, respite and other emergency services, that help service recipients maintain respected and active positions in the community. …"  Tenn. Code Ann. § 33-2-102(b)(1).

427.    Without effective communication, Ms. Helton and Mr. Downs do not have operative person-centered plans.

428.    Without effective communication, Ms. Helton and Mr. Downs do not receive equal access to Defendant DMHSAS' programs and services.

76

429.    Without effective communication, Ms. Helton and Mr. Downs are in a more restrictive environment than their hearing peers and are at greater risk of re-institutionalization and incarceration.

430.    These failures on the part of the State and DMHSAS against Plaintiffs Helton and Downs began at the time they began receiving services through and administered by DMHSAS and are ongoing and continuous to the present and have caused and are causing Plaintiffs Helton and Downs significant and ongoing harm and discrimination as detailed herein.  These injuries could have been avoided had the State and DMHSAS stopped their wrongful and discriminatory conduct against Plaintiffs Helton and Downs and provided them with effective communication and equal access to their programs and services.

431.    These failures on the part of the State and DMHSAS are causing Plaintiffs Helton and Downs significant and ongoing harm as detailed herein.

**Defendants the State and DMHSAS are Failing to Provide Necessary Auxiliary Aids and Services to Ensure Effective Communication for Plaintiffs Helton and Downs and Denying Them Equal Access to Their Services and Programs**

432.    The State and DMHSAS are failing to provide necessary auxiliary aids and services to Plaintiffs Helton and Downs to ensure effective communication for and an equal opportunity to participate in, and enjoy the benefits of, the services, programs, and activities of DMHSAS.

433.    The State and DMHSAS are failing to provide:

   a.   appropriate communication evaluations conducted by a person who communicates in ASL and who has experience working with Deaf individuals with MI;

   b.    programs, services, and activities offered with signing staff or qualified sign language interpreters;

   c.   qualified sign language interpreters for case plan meetings;

77

d. qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

e. qualified sign language interpreters or sign-fluent providers for behavioral, vocational, habilitative, counseling, and other community services;

f. coordination of and scheduling qualified sign language interpreters for medical appointments;

g. provision of MI group homes meet the communication needs of Deaf service recipients, including, but not limited to, sign-fluent staff and necessary AT for Deaf individuals;

h. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

i. person-centered planning and supports.

434. The State's and DMHSAS's failures to provide Plaintiffs Helton and Downs with effective communication are a violation of the mandates set forth in Title II of the ADA and Section 504.

435. Plaintiffs Helton and Downs are not receiving the rehabilitative and habilitative services they need to improve their communication. Because Plaintiffs Helton and Downs live in MI group homes where they cannot communicate with peers or staff, they are being denied one of the most basic forms of habilitation—learning to communicate effectively with the world around them.

436. Plaintiffs Helton and Downs are not receiving mental health therapeutic services, including group therapy, in ASL and, therefore, receive little to no benefit from these services in

relation to hearing service recipients and are, therefore, at greater risk of re-institutionalization in a more restrictive setting.

437.    At that time and continuing to the present, the State and DMHSAS do not provide provision of MI group homes that meet the communication needs of Deaf service recipients.

438.    The State and DMHSAS do not provide an adequate network of qualified providers who are familiar with Deaf culture and have sufficient capacity to meet the communication needs of Deaf service recipients to the same extent that existing providers meet the needs of hearing service recipients.

439.    The State and DMHSAS are also failing to give primary consideration to the requests of Plaintiffs Helton and Downs when choosing auxiliary aids or services to provide, in violation of 28 C.F.R. § 35.160.

440.    Because the State and DMHSAS do not provide effective communication to Plaintiffs Helton and Downs, they are denied equal access to DMHSAS' programs and services in violation of Title II of the ADA and Section 504.

441.    These failures on the part of the State and DMHSAS against Plaintiffs Helton and Downs began at the time they began receiving services through and administered by DMHSAS and are ongoing and continuous to the present and have caused and are causing Plaintiffs Helton and Downs significant and ongoing harm and discrimination as detailed herein.  These injuries could have been avoided had the State and DMHSAS stopped their wrongful and discriminatory conduct against Plaintiffs Helton and Downs and provided them with effective communication and equal access to their programs and services.

442.    These failures on the part of the State and DMHSAS are causing Plaintiffs Helton and Downs significant and ongoing harm as detailed herein.

79

**Plaintiffs Helton and Downs are Harmed by the State and DMHSAS' Failure to Provide Effective Communication and Equal Access to DMHSAS' Programs and Services**

443.    The lack of appropriate programs for Plaintiffs Helton and Downs has damaging effects on them and leaves them at risk of greater re-institutionalization.

444.    Without effective communication and delivery of services in ASL, Plaintiffs Helton and Downs cannot access DMHSAS' programs and services that are supposed to enrich their quality of lives and promote recovery and independence.

445.    Lack of communication affects every area of person-centered planning supports, including safety.  Lack of access to report abuse, lack of understanding emergency evacuation directions, and the inability to communicate symptoms such as pain, discomfort, the side effects of medications, or mental health symptoms, such as suicidal ideations, puts the health and safety of Plaintiffs Helton and Downs at risk.

446.    The State and DMHSAS knew about the lack of effective communication and access for DMHSAS' Deaf service recipients and the resulting harm as early as 2013 when the Tennesseans for Behavioral Health Access for the Deaf, Hard of Hearing, and Deaf-Blind (TBHA), a collaboration of disability rights groups, members of the Deaf community, state department representatives, and service providers, directly notified the State and DMHSAS of their failure to provide Deaf service recipients effective communication.  Despite this, the State and DMHSAS failed to alleviate or eliminate this discrimination, resulting in ongoing and continuous harm to DMHSAS Deaf service recipients, including Plaintiffs Helton, Downs, and DRT's constituents.

447.    On February 11, 2021, DRT sent a detailed twelve-page letter to Governor Bill Lee detailing how Defendants were violating Title II of the ADA and Section 504 of the Rehab Act by failing to provide Deaf service recipients with effective communication and equal access to their programs and services and the resulting harm therefrom.  Despite this, the State and

DMSAS failed to take action to administer their programs, practices, and services in a non-discriminatory manner, and create policies and procedures to ensure DMHSAS' Deaf service recipients receive effective communication.

448.    As a direct result of the State and DMHSAS failure to act, Plaintiffs Helton, Downs, and DRT's constituents have suffered and continue to suffer from emotional distress, isolation, stigma, communication neglect, and discriminatory conduct.

449.    The failures on the part of the State and DMHSAS against Plaintiffs Helton and Downs began at the time they began receiving services through and administered by DMHSAS and are ongoing and continuous to the present and have caused and are causing Plaintiffs Helton and Downs significant and ongoing harm and discrimination as detailed herein.  These injuries could have been avoided had the State and DMHSAS stopped its wrongful and discriminatory conduct against Plaintiffs Helton and Downs and provided them with effective communication and equal access to their programs and services.

450.    As a result of these failures on behalf of the State and DMHSAS, Plaintiffs Helton and Downs have suffered and are suffering significant harm.  They have been rendered silent and invisible because they cannot communicate in their native language.  They have lost language and/or are at graver risk of losing language.  They have suffered emotional distress, loss of opportunity, loss of language, isolation, stigma, exacerbation of mental health symptoms, and have been subjected to discriminatory conduct.

## XI.    FACTUAL ALLEGATIONS RELATING TO PLAINTIFF DISABILITY RIGHTS TENNESSEE

### The Protection & Advocacy System

451.    DRT is part of the nationwide P&A system which is mandated by Congress to protect and advocate for the rights of people with disabilities in the United States. There is a P&A in all

81

fifty (50) states and in United States territories. Together, the P&As make up the National Disability Rights Network.

452. Congress has given the P&As the statutory responsibility to represent, advocate for, and redress the rights of persons with disabilities, including Deaf individuals who receive services through a state or a state entity.[31]

453. DRT is the P&A organization designated in the State of Tennessee.

### Disability Rights Tennessee's Operations

454. DRT serves the entire state of Tennessee and has offices in Memphis, Nashville, and Knoxville.

455. DRT's mission is to protect the rights of Tennesseans with disabilities with the vision that Tennesseans with disabilities will experience freedom from harm, freedom to participate in the community, and freedom from discrimination.

456. DRT has a multiple member board of directors, including a member who is Deaf. The board of directors is comprised of a minimum of 1/3 of the membership being people with disabilities and/or immediate family members of people with disabilities.

457. DRT's Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Advisory Council (PAC) is comprised of people with mental illness, family members, and others who have experience advocating for or serving people with mental illness. Many members of the PAC are individuals who have received or are receiving mental health services or are family members of such individuals.

---

[31] *See generally* 42 U.S.C.A. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f).

458.   DRT represents people with sensory disabilities, including those who are Deaf, and

provides means by which they express their collective views and protect their collective interests.

459.   DRT routinely seeks input from individuals with disabilities when formulating its

specific areas of work and collaborates regularly with local and state disability organizations and

taskforces that consist, in part, of people with disabilities.

460.   People with disabilities who are served individually or whose communities are served

provide input through information gathering from DRT's stakeholders and constituents, DRT's

Board of Directors, PAC, and the Developmental Disabilities Network, which is comprised of

the Council on Developmental Disabilities, the ARC, and the University Centers of Excellence

in Developmental Disabilities.

461.   Input from constituents, their families, and service providers informs the financial and

programmatic decisions regarding the delivery of services and the allocation of resources for

future advocacy. DRT conducts multiple types of information gathering from its constituents and

stakeholders. Surveys of constituents and stakeholders are conducted every four years. Focus

groups are also conducted every four years. Annually, public comment is requested. Satisfaction

surveys regarding the experience of service recipients are provided at the conclusion of each

service request.

462.   DRT has also a grievance procedure so that individuals with disabilities have access to a

mechanism for resolving any issues of concern with DRT's provision of services. Additionally,

DRT has a PAIMI Assurance Grievance process to assure individuals receiving mental health

services and family members or representatives of such individuals that DRT is operating in

compliance with requirements of the PAIMI Act.

463. As a result of DRT's organizational structure, leadership, allocation of resources for future advocacy and outreach, connections with constituents in the disability community and involvement in disability-rights advocacy, people with disabilities, including Deaf individuals, have a strong voice in and a direct influence on the work of DRT.

464. DRT's Board of Directors, PAC, and employees, most of whom have disabilities themselves and/or are family members of individuals with diverse disabilities, are knowledgeable about the needs and rights of individuals with disabilities served by the agency.

**DRT's Associational Standing**

465. For many years, DRT has actively collaborated with and sought input from individuals who are Deaf about issues facing them. Members of the Deaf community have expressed their grave concerns about how Deaf individuals who receive services through DIDD and DMHSAS are not getting effective communication for and equal access to those services.

466. Deaf individuals who receive DIDD and DMHSAS services are among the constituents who are served by, and who inform the work of, DRT ("DRT's constituents"). The interest of these constituents goes to the heart of DRT's mission to ensure that people with disabilities, including Deaf individuals, are free from harm and free from discrimination and have equal access to statewide I/DD, MI, and SUD services and supports.

467. DRT brings this suit in its associational capacity as the State's P&A, and in conjunction with Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, and Downs to redress the rights of its Deaf constituents to have effective communication for and equal access to DIDD and DMHSAS' services, programs, and supports, pursuant to Title II of the ADA and Section 504.

468. DRT has standing on behalf of its Deaf constituents who receive services through DIDD and DMHSAS, and who are substantially affected by Defendants' noncompliance with constitutional and statutory protections, to enforce their legal and Constitutional rights because:

84

(1) DRT's constituents would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to DRT's purpose of protecting and enforcing the rights of individuals with disabilities; and (3) neither the claim asserted nor the relief requested requires the participation of DRT's constituents.

469.    In addition, the relief DRT seeks—declaratory and injunctive—is the type of relief appropriate for DRT to receive on behalf of its constituents.

### XII.    CLAIMS FOR RELIEF

### A.    FIRST CLAIM FOR RELIEF BY PLAINTIFFS BATTLE, WILSON, UNDERWOOD, BLANCHETT, AND DRT AGAINST THE STATE AND DIDD

### TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12131 et seq.

**General Provisions**

470.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

471.    Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130(a)-(b).

472.    Title II of the ADA prohibits public entities from discriminating against individuals with disabilities by reason of their disabilities, either directly or through contractual arrangements. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a)-(b).

473.    The ADA applies to "all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a). All governmental activities of public entities, such as Defendants the State and DIDD, are covered even if they are carried out by contractors. Public entities, such as the State and DIDD, are obligated by Title II of the ADA to ensure that their

services, programs, and activities operated under contract by private entities are in compliance with Title II's requirements.  28 C.F.R. § part 35 Appendix B § 35.102.

474.    Public entities, such as the State and DIDD, may not, directly or through contractual or other arrangements, employ methods of administering their programs that result in discrimination or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.  28 C.F.R. § 35.130(b)(3)(i)-(ii).

475.    Public entities, such as the State and DIDD, may not "administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability."  28. C.F.R. § 35.130(b)(6).

476.    The State has been and is a "public entity" within the meaning of Title II of the ADA.  42 U.S.C. § 12131(1).

477.    DIDD has been and is a "public entity" within the meaning of Title II of the ADA.  42 U.S.C. § 12131(1).

478.    Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents have disabilities within the meaning of Title II of the ADA: They have physical impairments that substantially limit one or more major life activities, including, but not limited to, hearing. They also have an impairment of their ability to communicate effectively.  28 C.F.R. § 35.108(a)(1)(i).

479.    Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents are "qualified individuals with a disability" within the meaning of Title II of the ADA and its implementing regulation and meet the essential eligibility requirements for receipt of DIDD's offered services,

programs, or activities, within the meaning of Title II of the ADA. 42 U.S.C. §12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § 35.108(a)(1)(i).

### Effective Communication & Auxiliary Aids and Services

480.   Under Title II of the ADA, public entities, including the State and DIDD, must take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions who are Deaf are as effective as communications with those who are hearing. 28 C.F.R. § 35.160(a).

481.   Pursuant to Title II of the ADA's implementing regulations, public entities, including the State and DIDD, must furnish appropriate auxiliary aids and services where necessary to afford Deaf individuals effective communication and an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity. *Id*. § 35.160(b)(1).

482.   Auxiliary aids and services include qualified sign language interpreters, assistive listening devices, open and closed captioning, and other effective methods of making aurally delivered information available, such that they may understand and respond sufficiently well so as to have equal opportunity to participate in and enjoy the benefits of a service, program or activity of a public entity. *Id*. § 35.104.

483.   The auxiliary aid or service used must be both appropriate and effective. *Id*. § 35.160(b)(1)– (b)(2). In order to be effective, the auxiliary aid or service must be provided in an accessible format, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. *Id*. § 35.160(b)(2).

484.   Title II of the ADA's implementing regulations provide that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the

communication involved; and the context in which the communication is taking place." *Id*.

§ 35.160(b)(2).

485.    Furthermore, when selecting an auxiliary aid or service to use, public entities shall give

"primary consideration to the requests of individuals with disabilities." 28 C.F.R.

§ 35.160(b)(2).  The United States Department of Justice, charged with interpreting the ADA,

issued the following guidance regarding effective communication:

> It is important to consult with the individual to determine the most
> appropriate auxiliary aid or service, because the individual with a
> disability is most familiar with [their] disability and is in the best position
> to determine what type of aid or service will be effective. Some
> individuals who were deaf at birth or who lost their hearing before
> acquiring language, for example, use sign language as their primary form
> of communication and may be uncomfortable or not proficient with written
> English, making use of a notepad an ineffective means of communication.[32]

### Reasonable Modification, the Administration of Services & Programs, & Other Provisions

486.    Public entities, including the State and DIDD, "shall make reasonable modifications in

policies, practices or procedures when the modifications are necessary to avoid discrimination on

the basis of disability[.]" 28 C.F.R. § 35.130(b)(7).

487.    Public entities, including the State and DIDD, also must "administer services, programs,

and activities in the most integrated setting appropriate to the needs of qualified individuals with

disabilities." 28 C.F.R. § 35.130(d).

488.    Public entities, such as the State and DIDD, may not "administer a licensing or

certification program in a manner that subjects qualified individuals with disabilities to

discrimination on the basis of disability, nor may a public entity establish requirements for the

---

[32] The Americans with Disabilities Act: Title II Technical Assistance Manual § II-7.1100,
available at https://www.ada.gov/taman2.html#II-7.1100  (Last Accessed December 8, 2021.)

programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability." 28. C.F.R. § 35.130(b)(6).

489. In providing any aid, benefit, or service, a public entity may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others;

> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; …

> (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; …

> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

*Id.* at § 35.130(b)(1)(i),(ii),(iii),(v) & (vii).

### The Integration Mandate & Olmstead v. L.C. ex rel. Zimring

490. In enacting the ADA, Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including … segregation." 42 U.S.C. § 12101(a)(5).

491. Furthermore, a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

492. "Most integrated setting," as used in section 35.130(d), is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Id.* at App. A.

493.     The Supreme Court addressed the scope of the ADA's integration clause in *Olmstead v.*

*L.C. ex rel. Zimring*.  The Court recognized that Congress explicitly identified unjustified

"`segregation" of persons with disabilities as a "for[m] of discrimination.'" *Id.* at 599, quoting 42

U.S.C. § 12101(a)(2).

494.     The Supreme Court held in *Olmstead* that, under Title II of the ADA, states are required

to provide community-based treatment for persons with disabilities when such placement is

appropriate, the affected persons do not oppose such treatment, and the placement can be

reasonably accommodated.  *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 606 (1999).

495.     Under *Olmstead*, states must ensure that persons with disabilities are receiving services in

the most integrated setting appropriate to their needs.  The Court held that a state must have a

comprehensive and effective working plan to ensure that persons with disabilities are placed in

the least restrictive setting of the person's liberties and are not subjected to risk of unjustified

institutionalization.   *Id.* at 600 & 605-06.

496.     The Court elaborated:

> Recognition that unjustified institutional isolation of persons with
> disabilities is a form of discrimination reflects two evident judgments.
> First, institutional placement of persons who can handle and benefit from
> community settings perpetuates unwarranted assumptions that persons so
> isolated are incapable or unworthy of communicating in community life
> … Second, confinement in an institution severely diminishes the everyday
> life activities of individuals, including family relations, social contacts,
> work options, economic independence, educational advancement, and
> cultural enrichment.

*Id.* at 600.

### Allegations

497.     The State and DIDD's lack of any policies, procedures, or practices regarding

accessibility for Deaf persons supported results in the widespread denial of effective

communication for them and denies Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's

90

constituents the opportunity to benefit from DIDD's I/DD services, programs, and activities in relation to hearing DIDD persons supported.

498. In administering statewide I/DD services and programs, the State and DIDD, through its actions and omissions, discriminate against Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents by reason of their disabilities in violation of Title II of the ADA and its implementing regulations. The State and DIDD's discriminatory conduct against Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents includes, but is not limited to:

    a.  failing to provide effective communication for programs, services, and activities;

    b.  denying them the opportunity to participate in and benefit from DIDD's aids, benefits, and services;

    c.  failing to afford them an opportunity to participate in or benefit from aids, benefits, or services that is equal to the opportunity afforded to hearing DIDD persons supported;

    d.  failing to provide them with aids, benefits, or services that are as effective in affording them an opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as those provided to hearing DIDD persons supported;

    e.  aiding and perpetuating discrimination against them by providing significant assistance to their licensed providers that discriminate against them on the basis of disability in the provision of aids, benefits or services;

    f.  limiting their enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

g.  failing to provide necessary auxiliary aids and services for effective communication;

h.  failing to give primary consideration to their requests when selecting auxiliary aids or services to provide;

i.  failing to provide reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination;

j.  administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, and establishing requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability;

k.  failing to enact policies and practices that ensure that the State and DIDD's services and programs are administered in the most integrated setting to their needs and that the State and DIDD's licensees provide effective communication to them;

l.  using methods of administration that have the effect of subjecting them to discrimination by reason of disability; and

m.  failing to establish an ADA compliant system.

499.  In addition, the State and DIDD are violating the ADA's and *Olmstead's* integration mandate. Defendants the State and DIDD are failing to administer I/DD services, programs, and activities in the most integrated setting appropriate to the needs of Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents because they are failing to provide their services and programs in their primary language of ASL, which prevents them from interacting with non-disabled persons, including, but not limited to, staff, to the fullest extent possible.

92

500. The State and DIDD are also violating the ADA's and *Olmstead's* integration mandate by failing to enact policies or practices that assure their services are administered in the most integrated setting appropriate to Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents needs.

501. In violation of *Olmstead,* the State and DIDD's failure to provide any working plan to ensure that Deaf persons supported receive effective communication for and equal access to DIDD's programs, services, and activities also places Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents in a more restrictive environment than their hearing peers who communicate in and can access DIDD's programs and services in English, and unlawfully subjects them to isolation and an increased risk of unjustified institutionalization.

502. In violation of *Olmstead*, the State and DIDD's failure to provide an adequate network of qualified providers who are familiar with Deaf persons supported and have sufficient capacity to meet the communication needs of Deaf persons supported, places Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents in a more restrictive environment than their hearing peers and unlawfully subjects them to isolation and an increased risk of unjustified institutionalization.

503. Defendants the State and DIDD administer their services, programs, and activities in a manner that violates the mandates of Title II of the ADA and in a manner that fails to place Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents in the most integrated settings appropriate to their needs as Deaf persons supported.

504. Plaintiffs Battle, Wilson, Underwood, and Blanchett have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DIDD's ongoing discrimination against them.

505.    DRT's constituents have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DIDD's ongoing discrimination against them.

506.    The State and DIDD's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that their actions and/or omissions would result in a violation of the ADA rights of Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents.

507.    Because the State and DIDD's discriminatory conduct is ongoing, Plaintiffs Battle, Wilson, Underwood, and DRT are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs in bringing this action.

508.    Due to the ongoing emotional distress, stigma, isolation, neglect, and a denial of their civil rights caused by the State and DIDD, Plaintiffs Battle, Wilson, Underwood, and Blanchett are entitled to compensatory relief.

509.    Pursuant to the remedies, procedures, and rights set forth in Title II of the ADA, Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT pray for the relief set forth below.

## B.    SECOND CLAIM FOR RELIEF BY PLAINTIFFS BATTLE, WILSON, UNDERWOOD, BLANCHETT, AND DRT AGAINST THE STATE AND DIDD

### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq.

510.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth here.

511.    Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); *see also* 45 C.F.R. §§ 84.4(b), 84.21, 84.52.

94

512.     Section 504 prohibits entities that receive Federal financial assistance from discriminating against individuals with disabilities on the basis of disability either directly or through contractual arrangements.  45 C.F.R. § 84.4(b)(1).

513.     The State has been and is a recipient of Federal financial assistance within the meaning of Section 504 and its implementing regulations.

514.     The State's program is a "program or activity receiving Federal financial assistance" because the State receives Federal financial assistance for I/DD services.

515.     DIDD has been and is a recipient of Federal financial assistance within the meaning of Section 504 and its implementing regulations.

516.     DIDD's program is a "program or activity receiving Federal financial assistance" because DIDD receives Federal financial assistance for I/DD services.

517.     Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents have physical impairments that substantially limit one or more major life activities.  They are qualified individuals with disabilities within the meaning of Section 504 and are otherwise qualified to participate in and receive benefits from the State and DIDD's I/DD services.  29 U.S.C. § 794(a); 29 U.S.C. § 705(20).

518.     Recipients of Federal financial assistance, including the State and DIDD, are prohibited from denying a qualified person with a disability any health, welfare, or other social services or benefits on the basis of disability.  45 C.F.R. § 84.52(a)(1).

519.     Recipients of Federal financial assistance, including the State and DIDD, may not afford a qualified individual with a disability an opportunity to receive health, welfare, or other social services or benefits that is not equal to that offered to people without disabilities.  45 C.F.R. § 84.52(a)(2).

520.    Recipients of Federal financial assistance, including the State and DIDD, may not provide a qualified person with a disability health, welfare, or other social services or benefits that are not as effective as the benefits or services provided to others.  45 C.F.R. § 84.52(a)(3).

521.    Recipients of Federal financial assistance, including the State and DIDD, may not provide any benefits or services in a manner that limits or has the effect of limiting the participation of qualified individuals with disabilities.  45 C.F.R. § 84.52(a)(4).

522.    Recipients of Federal financial assistance, including the State and DIDD, may not aid or perpetuate discrimination against a person with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service, to individuals with disabilities.  45 C.F.R. § 84.4(b)(1)(v).

523.    Recipients of Federal financial assistance may not otherwise limit a qualified person with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.  45 C.F.R. § 84.4(b)(1)(vii).

524.    Recipients of Federal financial assistance that employ fifteen (15) or more persons, including the State and DIDD, must "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."  45 C.F.R. § 84.52(d)(1).

525.    Auxiliary aids include interpreters and other aids for persons with hearing disabilities.  45 C.F.R. § 84.52(d)(3).

526.    In overseeing statewide-I/DD services and programs, the State and DIDD, through its actions and omissions, discriminate against Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents solely by reason of their disabilities and in violation of Section 504 and its

96

implementing regulations. The State and DIDD's discriminatory conduct against these Plaintiffs include, but is not limited to:

a. failing provide effective communication for their programs, services, and activities;

b. failing to provide them DIDD's health, welfare, or other social services benefits on the basis of disability;

c. failing to provide them an opportunity to receive benefits or services that are equal to that afforded to others;

d. failing to provide them with benefits or services that are not as effective as those benefits or services provided to others;

e. failing to provide benefits or services in a manner that does not limit or has the effect of limiting their participation;

f. aiding or perpetuating discrimination against them by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service, to them;

g. limiting their enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service;

h. failing to provide auxiliary aids for effective communication and which are necessary to afford them an equal opportunity to benefit from benefits or services;

i. failing to provide reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination;

j. failing to enact policies that ensure that the State and DIDD's licensees provide effective communication to them;

k.  using methods of administration that have the effect of subjecting them to discrimination solely by reason of disability; and

l.   failing to establish a Section 504 compliant system.

527.   Plaintiffs Battle, Wilson, Underwood, and Blanchett have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DIDD's ongoing discrimination against them.

528.   DRT's constituents have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DIDD's ongoing discrimination against them.

529.   The State and DIDD's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that their actions and/or omissions would result in a violation of the Section 504 rights of Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT's constituents.

530.   Because the State and DIDD's discriminatory conduct is ongoing, Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs in bringing this action.

531.   Due to the ongoing emotional distress, stigma, isolation, neglect, and denial of their civil rights caused by the State and DIDD, Plaintiffs Battle, Wilson, Underwood, and Blanchett are entitled to compensatory relief.

532.   Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a) and § 794a, Plaintiffs Battle, Wilson, Underwood, Blanchett, and DRT pray for the relief set forth below.

## C. FIRST CLAIM FOR RELIEF BY PLAINTIFFS HELTON, DOWNS, AND DRT AGAINST THE STATE AND DMHSAS

### TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12131 et seq.

#### General Provisions

533.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

534.    Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity."  42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a), (b)(1).

535.    Title II of the ADA prohibits public entities from discriminating against individuals with disabilities based on their disabilities, either directly or through contractual arrangements.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(a)-(b).

536.    The ADA applies to "all services, programs, and activities provided or made available by public entities."  28 C.F.R. § 35.102(a).  All governmental activities of public entities, such as Defendants the State and DMHSAS, are covered even if they are carried out by contractors.

537.    Public entities, such as the State and DMHSAS, may not, directly or through contractual or other arrangements, employ methods of administering their programs that result in discrimination or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.  28 C.F.R. § 35.130(b)(3)(i)-(ii).

538.    Public entities, such as the State and DMHSAS, may not "administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with

99

disabilities to discrimination on the basis of disability." 28. C.F.R. § 35.130(b)(6). Public

entities, such as the State and DMHSAS, are obligated by Title II of the ADA to ensure that their

services, programs, and activities operated under contract by private entities are in compliance

with Title II's requirements. 28 C.F.R. § part 35 Appendix B § 35.102.

539.    The State has been and is a "public entity" within the meaning of Title II of the ADA. 42

U.S.C. § 12131(1).

540.    DMHSAS has been and is a "public entity" within the meaning of Title II of the ADA.

42 U.S.C. § 12131(1).

541.    Plaintiffs Helton and Downs and DRT's constituents have disabilities within the meaning

of Title II of the ADA: They have physical impairments that substantially limit one or more

major life activities, including, but not limited to, hearing. 28 C.F.R. § 35.108(a)(1)(i).

542.    Plaintiffs Helton and Downs and DRT's constituents are "qualified individuals with a

disability" within the meaning of Title II of the ADA and its implementing regulations and meet

the essential eligibility requirements for receipt of DMHSAS's offered services, programs, or

activities, within the meaning of Title II. 42 U.S.C. §12131(2); 28 C.F.R. § 35.104; 28 C.F.R. §

35.108(a)(1)(i).

**Effective Communication & Auxiliary Aids and Services**

543.    Under Title II of the ADA, public entities, including the State and DMHSAS, must take

appropriate steps to ensure that communications with applicants, participants, members of the

public, and companions who are Deaf are as effective as communications with those who are

hearing. 28 C.F.R. § 35.160(a).

544.    Pursuant to Title II of the ADA's implementing regulations, public entities, including the

State and DMHSAS, must furnish appropriate auxiliary aids and services where necessary to

afford Deaf individuals effective communication for and an equal opportunity to participate in,

100

and enjoy the benefits of, a service, program, or activity of a public entity. *Id.* § 35.160(b)(1).

545. Auxiliary aids and services may include qualified sign language interpreters, exchange of written notes, assistive listening devices, open and closed captioning, and other effective methods of making aurally delivered information available, such that they may understand and respond sufficiently well so as to have equal opportunity to participate in and enjoy the benefits of a service, program or activity of a public entity. *Id.* at § 35.104.

546. The auxiliary aid or service used must be both appropriate and effective. *Id.* § 35.160(b)(1)– (b)(2). In order to be effective, the auxiliary aid or service must be provided in an accessible format, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. *Id.* § 35.160(b)(2).

547. Title II of the ADA's implementing regulations provide that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Id.* § 35.160(b)(2).

548. Furthermore, when selecting an auxiliary aid or service to use, public entities must give "primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). The United States Department of Justice, charged with interpreting the ADA, issued the following guidance regarding effective communication:

> It is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with [their] disability and is in the best position to determine what type of aid or service will be effective. Some individuals who were deaf at birth or who lost their hearing before acquiring language, for example, use sign language as their primary form

of communication and may be uncomfortable or not proficient with written English, making use of a notepad an ineffective means of communication.[33]

### Reasonable Modifications, the Administration of Services & Programs, and Other Provisions

549.    Public entities, including the State and DMHSAS, "shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7).

550.    Public entities, including the State and DMHSAS, also must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

551.    Public entities, such as the State and DMHSAS, may not "administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability." 28. C.F.R. § 35.130(b)(6).

552.    In providing any aid, benefit, or service, a public entity may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others;

> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; …

---

[33] The Americans with Disabilities Act: Title II Technical Assistance Manual *supra* note 28 at § II-7.1100.

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; …

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

*Id*. at § 35.130(b)(1)(i),(ii),(iii),(v) & (vii).

## The Integration Mandate & *Olmstead v. L.C. ex rel. Zimring*

553.    In enacting the ADA, Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including … segregation."  42 U.S.C. § 12101(a)(5).

554.    Furthermore, a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

555.     "Most integrated setting," as used in section 35.130(d), is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  *Id.* at App. A.

556.    The Supreme Court addressed the scope of the ADA's integration clause in *Olmstead v. L.C. ex rel. Zimring*.  The Court recognized that Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination.'"  *Id.* at 599, quoting 42 U.S.C. § 12101(a)(2).

557.    The Supreme Court held in *Olmstead* that, under Title II of the ADA, states are required to provide community-based treatment for persons with disabilities when such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated.  *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 606 (1999).

558. Under *Olmstead*, states must ensure that persons with disabilities are receiving services in the most integrated setting appropriate to their needs. The Court held that a state must have a comprehensive and effective working plan to ensure that persons with disabilities are placed in the least restrictive setting of the person's liberties and are not subjected to risk of unjustified institutionalization. *Id.* at 600 & 605-06.

559. The Court elaborated:

> Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of communicating in community life … Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Id.* at 600.

## Allegations

560. DMHSAS's lack of any policies, procedures, or practices regarding accessibility for Deaf service recipients results in the widespread denial of effective communication. It also denies Plaintiffs Helton and Downs and DRT's constituents the opportunity to benefit from DMHSAS's services, programs, and benefits in relation to hearing service recipients.

561. In administering statewide MI and SUD services and programs, the State and DMHSAS, through their actions and omissions, discriminate against Plaintiffs Helton and Downs and DRT's constituents by reason of their disabilities in violation of Title II of the ADA and its implementing regulations. The State and DMHSAS's discriminatory conduct against these Plaintiffs includes but is not limited to:

    a. failing to provide effective communication for programs, services, and activities;

b.  denying them the opportunity to participate in and benefit from DMHSAS' aids benefits and services;

c.  failing to afford them an opportunity to participate in or benefit from aids, benefits, or services that is equal to the opportunity afforded to hearing DMHSAS service recipients;

d.  failing to provide them with aids, benefits, or services that are as effective in affording them an opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as those provided to hearing DMHSAS service recipients;

e.  aiding and perpetuating discrimination against them by providing significant assistance to licensed providers that discriminate against them on the basis of disability in the provision of aids, benefits or services;

f.  limiting their enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service;

g.  failing to provide necessary auxiliary aids and services for effective communication;

h.  failing to give primary consideration to their requests when selecting an auxiliary aid or service to provide;

i.  failing to provide reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination;

j.  administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, and establishing

requirements for the programs or activities of licensees that subject qualified

individuals with disabilities to discrimination on the basis of disability;

k.  using methods of administration that have the effect of subjecting them to

discrimination by reason of disability;

l.  failing to enact policies and practices that ensure that the State and DMHSAS'

services and programs are administered in the most integrated setting to their

needs and that the State and DMHSAS' licensees provide effective

communication to them; and

m.  failing to establish an ADA complaint system.

562.    In addition, the State and DMHSAS are violating the ADA's and *Olmstead's* integration

mandate.  Defendants the State and DMHSAS are failing to administer I/DD services, programs,

and activities in the most integrated setting appropriate to the needs of Plaintiffs Helton and

Downs and DRT's constituents because they are failing to provide their services and programs in

their primary language of ASL, which prevents them from interacting with non-disabled persons,

including, but not limited to, staff, to the fullest extent possible.

563.    The State and DMHSAS are also violating the ADA's and *Olmstead's* integration

mandate by failing to enact policies or practices that assure their services are administered in the

most integrated setting appropriate to Plaintiffs Helton, Downs, and DRT's constituents needs.

564.    In addition, the State and DMHSAS are violating the mandates of *Olmstead*, including,

but not limited to, the integration mandate.  The State and DMHSAS's failure to provide any

working plan to ensure that Deaf service recipients receive effective communication for and

equal access to DMHSAS's programs, services, and activities places Plaintiffs Helton and

Downs and DRT's constituents in a more restrictive environment than their hearing peers who

communicate in and can access DMHSAS's programs and services in English, and unlawfully subjects them to isolation and an increased risk of unjustified institutionalization.

565.    In violation of *Olmstead*, the State and DMHSAS's failure to provide an adequate network of qualified providers who are familiar with Deaf service recipients and have sufficient capacity to meet the communication needs of Deaf service recipients, places Plaintiffs Helton and Downs and DRT's constituents in a more restrictive environment than their hearing peers and unlawfully subjects them to isolation and an increased risk of unjustified institutionalization.

566.    Plaintiffs Helton and Downs have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DMHSAS's ongoing discrimination against them.

567.    DRT's constituents have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DMHSAS's ongoing discrimination against them.

568.    The State and DMHSAS's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that its acts or omissions would likely result in a violation of the ADA rights of Plaintiffs Helton and Downs and DRT's constituents.

569.    Because the State and DMHSAS's discriminatory conduct is ongoing, Plaintiffs Helton, Downs, and DRT are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs in bringing this action.

570.    Due to the ongoing emotional distress, stigma, isolation, neglect, and a denial of civil rights caused by the State and DMHSAS, Plaintiffs Helton and Downs are entitled to compensatory relief.

571.    Pursuant to the remedies, procedures, and rights set forth in Title II of the ADA, Plaintiffs Helton, Downs, and DRT pray for the relief set forth below.

**D.** **SECOND CLAIM FOR RELIEF BY PLAINTIFFS HELTON, DOWNS, AND DRT AGAINST THE STATE AND DMHSAS**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq.**

572.     Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth here.

573.     Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a); *see also* 45 C.F.R. §§ 84.4(b), 84.21, 84.52.

574.     The State has been and is a recipient of Federal financial assistance within the meaning of Section 504 and its implementing regulations.

575.     The State's program is a "program or activity receiving Federal financial assistance" because DMHSAS receives Federal financial assistance for its services.

576.     DMHSAS has been and is a recipient of Federal financial assistance within the meaning of Section 504 and its implementing regulations.

577.     DMHSAS's program is a "program or activity receiving Federal financial assistance" because DMHSAS receives federal financial assistance for its services.

578.     Plaintiffs Helton and Downs and DRT's constituents have physical impairments that substantially limit one or more major life activities. They are qualified individuals with disabilities within the meaning of Section 504 and are otherwise qualified to participate in and receive benefits from the State and DMHSAS's services.  29 U.S.C. § 794(a); 29 U.S.C. § 705(20).

579.     Recipients of Federal financial assistance, including the State and DMHSAS, are prohibited from denying a qualified person with a disability any health, welfare, or other social services or benefits on the basis of disability.  45 C.F.R. § 84.52(a)(1).

580.     Recipients of Federal financial assistance, including the State and DMHSAS, may not afford a qualified individual with a disability an opportunity to receive health, welfare, or other social services or benefits that is not equal to that offered to people without disabilities.  45 C.F.R. § 84.52(a)(2).

581.     Recipients of Federal financial assistance, including the State and DMHSAS, may not provide a qualified person with a disability health, welfare, or other social services or benefits that are not as effective as the benefits or services provided to others.  45 C.F.R. § 84.52(a)(3).

582.     Recipients of Federal financial assistance, including the State and DMHSAS, may not provide any health, welfare, or other social services or benefits in a manner that limits or has the effect of limiting the participation of qualified individuals with disabilities.  45 C.F.R. § 84.52(a)(4).

583.     Recipients of Federal financial assistance, including the State and DMHSAS, may not aid or perpetuate discrimination against a person with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service, to individuals with disabilities.  45 C.F.R. § 84.4(b)(1)(v).

584.     Recipients of Federal financial assistance, including the State and DMHSAS, may not otherwise limit a qualified person with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.  45 C.F.R. § 84.4(b)(1)(vii).

585. Recipients of Federal financial assistance that employ fifteen (15) or more persons, including the State and DMHSAS, must "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1).

586. Auxiliary aids include interpreters and other aids for persons with impaired hearing. 45 C.F.R. § 84.52(d)(3).

587. In overseeing statewide MI and SUD services and programs, the State and DMHSAS, through its actions and omissions, discriminate against the Plaintiffs Helton and Downs and DRT's constituents solely by reason of their disabilities in violation of Section 504 and its implementing regulations. The State and DMHSAS's discriminatory conduct against these Plaintiffs includes but is not limited to:

    a.   failing to ensure effective communication for programs, services, and activities;

    b.   failing to provide them DMHSAS's health, welfare, or other social services benefits on the basis of disability;

    c.   failing to provide them an opportunity to receive benefits or services that are equal to that afforded to others;

    d.   failing to provide them with benefits or services that that are not as effective as those benefits or services provided to others;

    e.   failing to provide benefits or services in a manner that does not limit or has the effect of limiting their participation;

    f.   aiding or perpetuating discrimination against them by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service, to them;

110

g. limiting their enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service;

h. failing to provide auxiliary aids and services for effective communication and which are necessary to afford them an equal opportunity to benefit from benefits or services;

i. failing to provide reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination;

j. failing to enact policies that ensure that the State and DMHSAS's licensees provide effective communication to them;

k. using methods of administration that have the effect of subjecting them to discrimination solely by reason of disability; and

l. failing to establish a Section 504 compliant system.

588. Plaintiffs Helton and Downs have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DMHSAS's discrimination against them.

589. DRT's constituents have been injured and aggrieved by and will continue to be injured and aggrieved by the State and DMHSAS's ongoing discrimination against them.

590. The State and DMHSAS's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that their acts and/or omissions would result in a violation of the Section 504 rights of Plaintiffs Helton and Downs and DRT's constituents.

591. Because the State and DMHSAS's discriminatory conduct is ongoing, Plaintiffs Helton, Downs, and DRT are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs in bringing this action.

592.    Due to the ongoing emotional distress, stigma, isolation, neglect, and denial of their civil rights caused by the State and DMHSAS, Plaintiffs Helton and Downs are entitled to compensatory relief.

593.    Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a) and § 794a, Plaintiff Helton, Downs, and DRT pray for the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Exercise and assume jurisdiction over their claims;

2.    Enter declaratory relief finding that Defendants' above-described actions violate Title II of the Americans with Disabilities Act and its implementing regulations, and Section 504 of the Rehabilitation Act and its implementing regulations;

3.    Order Defendants, their members, partners, agents, employees, successors, licensees, and transferees to cease discriminating against Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, and Downs and DRT's constituents based on their disabilities and solely by reason of their disabilities in the provision of mental health, substance use disorder, and I/DD services;

4.    Order Defendants their members, partners, agents, employees, successors, contractors, licensees, and transferees to cease using methods of administration that subject discrimination that subject Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, Downs, and DRT's Deaf constituents to discrimination by reason of their disabilities and solely by reason of their disabilities;

5.    Issue an injunction ordering Defendants to comply with the statutes set forth in this Amended Complaint, including but not limited to, ordering Defendants to:

a. ensure that Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton and Downs, and DRT's constituents receive communication assessments conducted by a qualified individual who communicates in ASL and other sign language and who has worked with individuals with I/DD and MI, in order to identify their primary and preferred mode of communication as well as effective modes of communication;

b. ensure that Plaintiffs and DRT's constituents receive effective communication and supports and services in ASL and other sign language in provision of all mental health, substance abuse disorder, and I/DD services;

c. ensure that Defendants give primary consideration to the choice of the Plaintiffs and DRT's constituents when choosing auxiliary aids or services to provide them;

d. ensure that Plaintiffs and DRT's constituents are provided with necessary auxiliary aids and services to achieve effective communication;

e. ensure that Plaintiffs and DRT's constituents are afforded equal and meaningful access to mental health, substance use disorder, and I/DD services with effective communication and reasonable modifications thereto;

f. ensure that Defendants provide oversight at each department level to guarantee the delivery of communication and other supports to Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, and Downs and DRT's constituents;

g. ensure an adequate network of I/DD, MI, and SUD providers who can meet the needs of Deaf persons supported and service recipients; and

h. ensure the provision of a working plan so that Deaf persons supported by DIDD and Deaf service recipients supported by DMHSAS receive effective communication and equal access to programs, services, and activities in the least restrictive environment.

6. Award Plaintiffs Battle, Wilson, Underwood, Blanchett, Helton, and Downs compensatory damages in an amount sufficient to compensate these Plaintiffs' injuries, including but not limited to loss of opportunity, loss of language, emotional distress, isolation, neglect, stigma, and violation of Plaintiffs' civil rights, as a result of Defendants' discriminatory conduct.

7. Award Plaintiffs reasonable attorneys' fees, litigation expenses, and costs pursuant to federal law, including but not limited to the provisions of 42 U.S.C § 12205 and 29 U.S.C § 794A(b); and

8. Grant Plaintiffs such other and further relief as the Court deems to be just, necessary, and equitable.

Date: ______________

Respectfully Submitted,

**DISABILITY RIGHTS TENNESSEE**

/s/_Stacie L. Price
Stacie L. Price (TN Bar# 030625)
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
staciep@disabilityrightstn.org

Jack W. Derryberry, Jr. (TN Bar# 003870)
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
jackd@disabilityrightstn.org

Nathan W. Walsh, (TN Bar# 035379)
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
nathanw@disabilityrightstn.org

**Baker, Donelson, Bearman, Caldwell & Berkowitz**

/s/ Christopher J. Barrett
Christopher J. Barrett, (TN Bar #032978)
Baker, Donelson, Bearman, Caldwell & Berkowitz
1600 W. End Avenue
Nashville, TN 37203-3169
(615) 726-5646
cbarrett@bakerdonelson.com


**Disability Rights Advocates**

/s/ Jinny Kim
Jinny Kim (CA Bar # 208953)
JKim@dralegal.org
Meredith J. Weaver (CA Bar # 299328)
Mweaver@dralegal.org
Amelia Evard (CA Bar # 341940)
AEvard@dralegal.org
2001 Center Street, 3rd Floor
Berkeley, CA 94704
(510) 665-8644

## CERTIFICATE OF SERVICE

I certify that, on _____ I served the foregoing Plaintiff's Second Amended and

Supplemental Complaint upon all parties herein by e-filing with the CM/ECF system maintained

by the court which will provide notice to the following:

**STEVEN A. HART**, **BPR No. 7050**
Special Counsel Office of the Tennessee Attorney General
Post Office Box 20207
Nashville, Tennessee
37202-0207 615.741.3505
Steve.hart@ag.tn.gov

**JEFFREY CADLE**
Assistant Attorney General,
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-
(615) 741-2472
Jeffrey.cadle@ag.tn.gov


/s/ Stacie L. Price
Stacie L. Price (TN Bar # 030625)
Attorney for Plaintiffs
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
staciep@disabilityrightstn.org
(615) 732-6982

116