UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **DONTAY BATTLE, NECOAS WILSON,** | ) | |
| **DAVID UNDERWOOD, MAURCELIA** | ) | |
| **BLANCHETT, by and through her** | ) | |
| **conservator, Marcia Blanchett, CHRISTAL** | ) | |
| **HELTON, PATRICK DOWNS, by and** | ) | |
| **through his conservator Ashlee Kovalik,** | ) | |
| **and DISABILITY RIGHTS TENNESSEE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00022** |
| | ) | **Judge Aleta A. Trauger** |
| **STATE OF TENNESSEE, TENNESSEE** | ) | |
| **DEPARTMENT OF INTELLECTUAL** | ) | |
| **AND DEVELOPMENTAL DISABILITIES,** | ) | |
| **and TENNESSEE DEPARTMENT OF** | ) | |
| **MENTAL HEALTH AND SUBSTANCE** | ) | |
| **ABUSE SERVICES,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM</u>

Defendants the State of Tennessee, the Tennessee Department of Intellectual and Developmental Disabilities ("DIDD"), and the Tennessee Department of Mental Health and Substance Abuse Services ("DMHSAS") have filed a Motion for Judgment on the Pleadings (Doc. No. 70), to which plaintiffs Dontay Battle, Necoas Wilson, David Underwood, Maurcelia Blanchett, Christal Helton, Patrick Downs, and Disability Rights Tennessee ("DRT") have filed a Response (Doc. No. 78), and the defendants have filed a Reply (Doc. No. 79). For the reasons set out herein, the motion will be granted in part and denied in part.

# I. BACKGROUND[1]

## A. DIDD and DMHSAS

DIDD and DMHSAS are two Tennessee agencies that are, in large part, governed by one shared set of statutes. Rather than setting out two distinct structures, those statutes merely ascribe a number of powers and duties to "the department"—with "department" expressly defined to "mean[] the department of mental health and substance abuse services when the statute at issue deals with mental illness or serious emotional disturbance and mean[] the department of intellectual and developmental disabilities when the statute at issue deals with intellectual and developmental disabilities." Tenn. Code Ann. § 33-1-101(9). The practical effect of this structure is that the agencies perform similar functions—simply with regard to different populations.

DIDD is the state's primary "agency responsible for [administering] services and support to Tennesseans with intellectual and developmental disabilities." *Nored v. Tennessee Dep't of Intell. & Developmental Disabilities*, No. 3:19-CV-00214-DCLC, 2020 WL 13698923, at *1 (E.D. Tenn. Aug. 11, 2020). Many other Tennessee agencies provide services to disabled Tennesseans as well—from local school districts to the state's Medicaid agency. DIDD, however, "is responsible for system planning, setting policy and quality standards, system monitoring and evaluation, disseminating public information and advocacy for persons of all ages who have . . . developmental disabilities." Tenn. Code Ann. § 33-1-201. It relies on both state and federal funding. (Doc. No. 43 ¶ 6.)

DIDD's functions can, broadly speaking, be sorted into three types. First, DIDD provides some direct services, particularly through its Tennessee START[2] Assessment & Stabilization

---

[1] Except where otherwise indicated, the facts herein are taken from the Second Amended and Supplemental Complaint (Doc. No. 43) and are taken as true for the purposes of the Motion for Judgment on the Pleadings.

[2] "START" stands for "systemic, therapeutic assessment, resources, and treatment."

2

Teams ("ASTs"). (*Id.* ¶ 8.a.) Second, DIDD oversees the licensure of private service providers, such as group home operators, who deal with intellectually and/or developmentally disabled individuals. The agency's licensure-related responsibilities involve not only issuing licenses, but also investigating allegations of abuse, neglect, and rights violations by licensees. (*Id.* ¶¶ 8.b, 8.d.) Finally, DIDD more generally "administer[s] a regulatory framework" for services to intellectually and/or developmentally disabled individuals in Tennessee. (*Id.* ¶ 8.c.)

DIDD publishes a detailed Provider Manual setting forth directives to licensees.[3] (*Id.* ¶ 77.) The Provider Manual informs a licensee that it is "participat[ing] in the Tennessee service delivery system for individuals with intellectual and developmental disabilities" by being a party of the "provider network" that DIDD "develop[ed]." *DIDD Provider Manual* at xi. As such, the Manual explains, the private providers are DIDD's "partners in a common goal to provide quality, person-centered and cost effective services to individuals with intellectual and developmental disabilities." (*Id.*) The Manual sets out "the basic principles and requirements for delivery of quality services to persons with intellectual disabilities," with which "[a]ll providers who participate in state- and federally-funded service delivery programs" must comply. *Id.* at IN-2. Among other things, the Manual establishes the framework through which an intellectually disabled individual's necessary services and supports will be determined and documented: through a regularly revised "person-centered plan" crafted with the participation of the patient's "Circle of Support," which must include "the person supported, his/her family member(s) and/or conservator(s), case manager, and the providers of any supports and services that the person receives." *DIDD Provider Manual* at GL-1.

---

[3] *Available at* https://www.tn.gov/content/dam/tn/didd/documents/providers/provider-manual/Provider_Manual.pdf.

DIDD's oversight authority includes the right to "enter upon or into the premises of any facility . . . providing intellectual and/or developmental disabilities or personal support services in order to make inspections deemed necessary to determine compliance with licensure law and rules," with or without notice. Tenn. Comp. R. & Regs. 0465-02-02-.13. If DIDD finds what it believes to be a violation, it can require the licensee to file a written Plan of Compliance and can, ultimately, suspend or revoke a license. (Doc. No. 43 ¶¶ 73–74.)

DMHSAS has the same general charge as DIDD, but with regard to "persons of all ages who have mental illness [and/or] serious emotional disturbance." Tenn. Code Ann. § 33-1-201. To that end, DMHSAS, like DIDD, engages in a mixture of direct service provision, licensure administration, and regulation. (*Id.* ¶ 15.) Specifically, it provides direct services through regional mental health institutes ("RMHIs") and licenses certain types of residential facilities for adults with mental illnesses. Those facilities are formally referred to as Mental Health Adult Residential facilities and Mental Health Adult Supportive Residential facilities, but they can be described, collectively, as mental health group homes. (*Id.* ¶ 16.) DMHSAS has the right to enter the premises of licensed group homes for inspection, to impose plans of compliance, and suspend or revoke a facility's license. (*Id.* ¶¶ 258–60.) Like DIDD, DMHSAS relies on both state and federal funds. (*Id.* ¶ 33.)

**B. DRT and its Role in Tennessee**

DRT is a Nashville-based nonprofit corporation that advocates for individuals with disabilities. (*Id.* ¶ 41.) Although DRT is a private entity, it has been entrusted with certain public responsibilities as part of the federal Protection and Advocacy ('P&A') system, which relies on a state-by-state network of private agencies that receive public funds to help ensure that disabled individuals "participate in the design of and have access to needed community services,

4

individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs." 42 U.S.C. § 15001(b). "[A] state cannot receive federal funds for" certain disability-related services "unless it has established a protection and advocacy system." *Prot. & Advoc. Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1212 (D. Wyo. 2006) (citing *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 495 (11th Cir. 1996)).

Federal law requires that a state's P&A agency have many of the powers that would typically be possessed by a regulator. For example, P&A agencies must have "authority to investigate incidents of abuse or neglect" and "must [be granted] broad and ready access to records and information to effectively pursue" such investigations. *Ga. Advoc. Off., Inc. v. Reese*, No. 1:15-CV-3372-AT, 2016 WL 8902366, at *3 (N.D. Ga. Aug. 30, 2016) (citing 42 U.S.C. § 15043 (a)(2)(B); *Miss. Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991); *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 429 (M.D. Ala. 1995)) (emphasis omitted). A P&A agency must have the power to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i).

## C. The Plaintiffs

The plaintiffs are deaf[4] individuals who live in licensed group homes and receive services in connection with either DIDD or DMHSAS. Specifically, Battle, Wilson, Underwood, and

---

[4] The word "deaf" is sometimes capitalized and sometimes not. A person is lowercase-d "deaf" if he has a hearing-related disability that meets the relevant definition of deafness, while a person is capital-D "Deaf"

Blanchett have intellectual and developmental disabilities[5] and "receive services through and administered by DIDD," while Downs and Helton have mental health conditions and "receive services through and administered by DMHSAS." (Doc. No. 43 ¶ 4.)

Each plaintiff identifies American Sign Language ("ASL") as his or her primary language. (*Id.* ¶¶ 35–40.) ASL, the plaintiffs stress, is not a system for turning English into hand gestures, but a "complete, complex language" in its own right, which "employs signs made by moving the hands combined with facial expressions and postures of the body," as well as a unique structure of grammar and syntax that is "completely different" from the grammar and syntax found in English. (*Id.* ¶ 46.) Some ASL users are proficient in written and/or spoken English, but others—including many who suffer from developmental and intellectual disabilities—are not and, therefore, frequently require interpreter services and/or assistive technologies to communicate effectively. (*Id.* ¶¶ 46, 52, 210.)

1. The Individual DIDD Plaintiffs

Battle is 21 years old and was formerly in the custody of Tennessee's Department of Children's Services. (*Id.* ¶¶ 100, 104.) He lives in a group home in Memphis, Tennessee, where he receives services that he describes as "administered by DIDD through a service provider— Support Solutions of the Mid-South, LLC, which is licensed by DIDD." (*Id.* ¶ 37.) Battle's DIDD support plan recognizes his need for ASL, but Battle is rarely exposed to other ASL speakers, and his group home has no ASL-proficient staffers. (*Id.* ¶¶ 107–08, 111.) Staff attempt to communicate with him through written notes and lip reading, but these efforts are regularly ineffective and cause

_____

if he both is deaf and identifies with the Deaf community as part of his cultural identity. The court will generally use the term "deaf," because the relevant legal protections arise out of the plaintiffs' disabilities and would be available to any deaf individual, regardless of his or her particular attitude regarding the role of deafness in his or her cultural identity.

[5] Each of these plaintiffs also has a concurrent diagnosis of mental illness. (Doc. No. 43 ¶¶ 37–40.)

Battle to become frustrated. (*Id.* ¶¶ 112–13.) He has never been provided a qualified ASL interpreter for his person-centered plan meetings. (*Id.* ¶ 114.) Battle has previously been diagnosed with depression, psychosis, and suicidal ideation, but he does not receive mental health services through an ASL-fluent provider. (*Id.* ¶¶ 117–18.) He has no access to a videophone that would permit him to communicate by ASL, and he specifically complains that this lack of a videophone makes him unable to call a suicide prevention hotline. (*Id.* ¶¶ 119–22.)

Wilson is 39 years old and currently lives in a group home in Jackson, Tennessee, where he receives services that he describes as "administered by DIDD through a service provider—Loving Arms, LLC, which is licensed by DIDD." (*Id.* ¶¶ 38, 134.) According to Wilson's support plan, "he requires staff support for taking his medication, performing household chores, and with money management, among other things." (*Id.* ¶ 141.) His group home, however, has no ASL-proficient staff. (*Id.* ¶ 143.) In May of 2021, Wilson experienced a mental health crisis that included thoughts of self-harm, but his efforts to convey the severity of the situation to staff were ineffective. Notes indicated only that he was "angry" or "in a mood," and staff advised him to pray and "quit worrying so much." (*Id.* ¶ 148.)

Underwood is 55 years old and currently lives in a group home in Antioch, Tennessee, where he receives services that he describes as "administered by DIDD through a service provider—Reaching Visions Today, LLC, which is licensed by DIDD." (*Id.* ¶¶ 38, 161.) According to Underwood's 2019 service plan, he has difficulty understanding written English. (*Id.* ¶ 167.) His group home, however, has no ASL-proficient staff, leaving him fundamentally unable to communicate. (*Id.* ¶ 169.) In recent years, Underwood's ASL proficiency has deteriorated through lack of use, leaving him unable to communicate effectively at all—which he had formerly been able to do. (*Id.* ¶¶ 173–76.)

7

Blanchett is 55 years old and has "complex behavioral and mental health needs" related to an array of conditions. (*Id.* ¶¶ 38, 185–86.) She lives in a DIDD-licensed group home in Jackson, Tennessee where she receives services that she describes as "administered by DIDD through a service provider—Encare, LLC, which is licensed by DIDD." (*Id.* ¶ 38.) She has previously lived in other DIDD-licensed group homes on Jackson and Knoxville. (*Id.* ¶¶ 188–90.) Her 2020 support plan acknowledges that she is incapable of oral communication and "often" becomes "agitated and upset" when she is not understood. The same support plan includes an acknowledgment that she "does not know English" and that, as a result, there is a risk that her "needs will go unmet." (*Id.* ¶¶ 194–96.) In February of 2022, Blanchett was referred to the DIDD-operated Tennessee START AST for crisis stabilization. (*Id.* ¶ 202.) DIDD accepted Blanchett into START and placed her in a group home where she would receive START-related services, but DIDD provided no ASL-proficient staff or interpreters. (*Id.* ¶ 210.)

Most of the above-described actions occurred in the group home setting, and each relevant group home was privately operated. However, the DIDD plaintiffs collectively allege that DIDD is responsible for the group homes' failures because it developed and oversees the provider network and has failed to provide or require the following:

    a. appropriate communication evaluations conducted by a person who communicates in ASL and who has experience working with Deaf individuals with [intellectual and developmental disabilities];

    b. programs, services, and activities offered with signing staff or qualified sign language interpreters;

    c. qualified sign language interpreters for person-centered planning meetings;

    d. qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

8

e. qualified sign language interpreters or sign-fluent providers for rehabilitative, habilitative, behavioral, occupational, vocational, community, and other services;

f. coordination of and scheduling qualified sign language interpreters for medical appointments;

g. provision of DIDD group homes that meet the communication needs of Deaf persons . . . , including, but not limited to, sign-fluent staff and necessary [assistive technology] for Deaf individuals, such as [videophones], flashing fire alarms, and bed shaker alarms;

h. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

i. person-centered planning and supports.

(*Id.* ¶ 230.)

2. The Individual DMHSAS Plaintiffs

Helton is 45 years old and has been diagnosed with chronic paranoid schizophrenia. She currently lives in a group home in Manchester, Tennessee, where she receives services that she describes as "administered by DMHSAS through a service provider—Legends RTC Lock-Down, which is licensed by DMHSAS." (*Id.* ¶¶ 36, 278.)

In 2015, Helton was admitted to a DMHSAS-operated RMHI, the Moccasin Bend Mental Health Institute ("Moccasin Bend"), where she stayed for about three and one-half months. (*Id.* ¶ 283.) Helton's patient notes acknowledged that she needed an ASL interpreter, particularly for medication education, counseling, and treatment-related meetings, but one was rarely made available. Instead, staff relied largely on lip reading and written notes to communicate with Helton, including during moments of acute mental health crisis. (*Id.* ¶ 287.) Moccasin Bend employees struggled with the communication barrier and eventually sought out a potential group home for discharge. Although multiple group homes declined the placement because they were unable to

address Helton's needs, she was eventually accepted at a Camden, Tennessee home. Helton's discharge plan, however, did not address her need for communication supports. (*Id.* ¶ 293.)

In 2017, Helton was admitted to Moccasin Bend again. (*Id.* ¶ 295.) Similar problems arose. Helton's records acknowledged her need for an interpreter, but one was rarely provided. A nurse's note from nearly a month into Helton's admission described her as "fearful" due to her inability to communicate. (*Id.* ¶ 300.) Eventually, she was discharged, again, with a discharge plan that did not address her need for communication supports. (*Id.* ¶ 302.)

Helton was admitted to Moccasin Bend a third time in October 2018. At the time of admission, the estimated length of her stay was to be about a month. She actually remained for well over a year, until the end of February 2020. (*Id.* ¶ 320.) At first, this stay, like the others, was marked by a lack of communication supports, although Helton did, at times, have access to a videophone. (*Id.* ¶¶ 306–11.) Ultimately, however, several months into treatment, in April of 2019, Moccasin Bend did provide an interpreter for Helton's participation in a life skills program, the Bleyzer Home Program. Helton states that, "[w]ith the assistance of the sign language interpreter for this program, [she] was finally able to interact with staff and peers and made strides towards independent living." (*Id.* ¶ 312.) Again, however, Moccasin Bend struggled to find a group home willing to accept Helton in light of her needs. (*Id.* ¶¶ 312–20.)

Moccasin Bend eventually discharged Helton to a group home operated by Absolute Care, LLC, but she was again left without ASL-proficient staff or access to interpreter services. Helton struggled with the placement, which included, among other things, requiring her to sit through numerous group therapy sessions performed in spoken English. (*Id.* ¶¶ 328–33.) Finally, she was discharged to her current group home on February 22, 2022. (*Id.* ¶ 338.) It is a highly restrictive

10

and institutionalized environment, and she has continued to lack communication supports or ASL-proficient staff. (*Id.* ¶¶ 341–46.)

Downs is 31 years old and has been diagnosed with epilepsy and Bipolar I Disorder. (*Id.* ¶¶ 357, 359.) He currently lives in a group home in Memphis, where he receives services that he describes as "administered by the State and DMHSAS through a service provider—Alliance Healthcare Services, which is licensed by DMHSAS." (*Id.* ¶ 35.). He has experienced isolation and lack of supports similar to those alleged by the other plaintiffs, and, in addition to his group home placement, he has received care in the RMHI setting, although that care is not ongoing. (*Id.* ¶¶ 356–413.)

As with the DIDD plaintiffs, many of the services that the DMHSAS plaintiffs received were rendered by private entities in the group home setting—with the substantial exception that Moccasin Bend and other RMHIs are DMHSAS-operated. However, the DMHSAS plaintiffs collectively allege that DMHSAS is responsible for the group homes' failures because it developed and oversees the provider network and has failed to provide or require the following:

a.  appropriate communication evaluations conducted by a person who communicates in ASL and who has experience working with Deaf individuals with [mental illness];

b.   programs, services, and activities offered with signing staff or qualified sign language interpreters;

c.  qualified sign language interpreters for case plan meetings;

d.  qualified mental health sign language interpreters or sign-fluent mental health providers for mental health treatment;

e.  qualified sign language interpreters or sign-fluent providers for behavioral, vocational, habilitative, counseling, and other community services;

f.  coordination of and scheduling qualified sign language interpreters for medical appointments;

11

g. provision of [mental illness] group homes [that] meet the communication needs of Deaf service recipients, including, but not limited to, sign-fluent staff and necessary [assistive technology] for Deaf individuals;

h. ongoing, strong connections with the Deaf community, including, but not limited to, sign-fluent roommates and continued ASL exposure; and

i. person-centered planning and supports.

(*Id.* ¶ 433.)

## D. This Litigation

On February 11, 2021, DRT sent a twelve-page letter to Governor Bill Lee alleging that DIDD and DMHSAS were violating federal law by failing to provide deaf beneficiaries adequate support. According to DRT, the state took no action to remedy the cited issues. (*Id.* ¶ 242.)

On January 14, 2022, DRT, joined by most of the named plaintiffs, filed their initial Complaint in this case. (Doc. No. 1.) Following amendments and supplementation, the operative Complaint is the Second Amended and Supplemental Complaint. (Doc. No. 43.) The plaintiffs state claims against DIDD, DMHSAS, and the State of Tennessee pursuant to Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). (*Id.* ¶¶ 470–593.)

The defendants filed an Answer (Doc. No. 46), and they have now filed a Motion for Judgment on the Pleadings (Doc. No. 70). The defendants argue that they are entitled to judgment in their favor because (1) the services at issue were privately rendered; (2) the plaintiffs' ADA claims are barred by sovereign immunity; (3) many of the claims are untimely; and (4) DRT is seeking to assert claims broader than those for which it has standing. (Doc. No. 70 at 1.)

12

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c)[6] is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[6] Because the defendants characterize some of their arguments as related to standing, those aspects of their motion could arguably be considered in connection with Rule 12(b)(1), rather than Rule 12(c). The relevant arguments, however, do not actually dispute the court's jurisdiction over this case, but rather the scope of the claims asserted. The court, accordingly, will consider those arguments pursuant to Rule 12(c). Because any standing argument would be a facial challenge, however, the standard would be the same. *See Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

13

**A. Timeliness of Motion**

As a preliminary matter, the plaintiffs argue that the defendants unnecessarily delayed the filing of their motion for judgment on the pleadings. A Rule 12(c) motion must be brought "early enough not to delay trial," Fed. R. Civ. P. 12(c), and the motion was filed on February 23, 2024, with the trial set to begin of February 4, 2025.[7] (*See* Doc. No. 49 at 1.) The court finds that the amount of time between the filing of the motion and the then-relevant trial date was sufficient to comply with Rule 12(c) and that no other timing-related doctrine, such as laches or estoppel, would justify disregarding the motion.

**B. Applicability of Title II and Section 504 to the Underlying Circumstances**

Title II and Section 504 are both antidiscrimination statutes governing public services, but they reach those services through different mechanisms. Title II is simply a straightforward prohibitory statute: "[u]nder Title II of the ADA, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Jones v. City of Detroit, Mich.*, 20 F.4th 1117, 1119 (6th Cir. 2021) (quoting 42 U.S.C. § 12132). Section 504, in contrast, arises out of the federal government's spending power; it "prohibits discrimination against the disabled by recipients of federal funding," which state agencies frequently are. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). For some purposes—including one that will come up later in this opinion—that distinction is important. In most substantive ways, however, the "requirements of both statutes are precisely the same." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287

---

[7] That date was later postponed to September 23, 2025 as part of a broader request by the parties to revise litigation deadlines. (*See* Doc. No. 82; Doc. No. 84.)

F.3d 138, 146 n. 6 (2d Cir. 2002)). In order to prevail, a plaintiff must establish that (1) he has a disability; (2) he is otherwise qualified for the benefit or services at issue; and (3) he was excluded from participation in, denied the benefits of, or was subjected to discrimination under the program by the defendant because of his disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). The defendants argue that the overwhelming majority of the plaintiffs' allegations fail to state a claim pursuant to those elements, because the underlying actions were taken by DIDD or DMHSAS licensees—not the agencies themselves.

The plaintiffs do not dispute that their group home operators are private entities that are distinct from DIDD or DMHSAS. They argue, however, that those agencies' actions and policies both developed the network of group home providers and dictate the manner in which group home services are rendered, such that the agencies are an immediate cause of the ultimate discrimination. Department of Justice regulations have already foreseen the possibility that confusion might arise regarding potential liability of licensure authorities, explaining that:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

28 C.F.R. § 35.130(b)(6). That provision "does not extend the requirements of the Act . . . directly to the programs or activities of licensees or certified entities themselves," nor does it mean that "[t]he programs or activities of licensees . . . are . . . themselves programs or activities of the public entity merely by virtue of the license or certificate." 28 C.F.R. § Pt. 35, App. B; *see Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 71 (2d Cir. 2012). Nevertheless, the regulation

leaves open the possibility of liability based on an agency's operation of its licensure authority in a manner resulting in discrimination.

The defendants suggest that the court should read 28 C.F.R. § 35.130(b)(6) only to forbid discrimination in the issuance of licenses. That, though, is not what the regulation says, and the court is aware of no reason why a regulation would even be necessary to address so obviously discriminatory a policy. There is, moreover, substantial reason why one would interpret Title II and Section 504 to leave open the possibility of liability based on the administration of a licensure scheme that results in discrimination. As courts have recognized, not all systems of licensure are the same when it comes to either their function or how much power they exercise over the services rendered by licensees. Some licensure systems exist solely to authorize a licensee's otherwise independent commercial activity—such as, for example, with the permitting of private construction. *See S.G. v. City of Los Angeles*, No. LA CV17-09003 JAK (PJWx), 2020 WL 8837146, at *11 (C.D. Cal. Feb. 21, 2020). The defendants might be correct that federal disability antidiscrimination laws require only that such licenses not be handed out in a discriminatory fashion. On the other end of the spectrum, however, are schemes in which the licensee is, in effect, actually carrying out a government program on the government's terms—such as when the government licenses private retailers to sell the government's own lottery tickets. *See Paxton v. State Dep't of Tax & Revenue*, 192 W. Va. 213, 219, 451 S.E.2d 779, 785 (1994). In this latter type of situation, 28 C.F.R. § 35.130(b)(6) recognizes that a government agency's decision to rely on a privatize-and-license model, rather than a direct services model, does not inherently excuse it from its antidiscrimination obligations in performing the underlying public services. *See id.*

The plaintiffs have adequately pleaded that group home licensure systems imposed by DIDD and DMHSAS are, in practice, mechanisms through which those two agencies themselves

render public services. A group home operator is not simply handed a license that allows it to operate freely in an open commercial marketplace. Rather, it must render services pursuant to specific structures and expectations set out by DIDD and DMHSAS as part of those agencies' networks. It appears that DIDD and DMHSAS are not, for the most part, the parties that actually pay for individuals' stays in group homes, which might be covered by other sources (including other government programs, such as Medicaid). Liability under the relevant statutes, however, arises out of an agency's administration of services, not its funding of them. Moreover, the plaintiffs' allegations largely focus, not on the day-to-day operation of group homes, but the defendant agencies' roles in coordinating care and setting minimum standards—both of which are services that DIDD and DMHSAS do provide, even if they do not pay for the underlying placements.

It bears noting that the idea that DIDD and DMHSAS are themselves services agencies—and not simply commercial licensors or disinterested regulators—is not some invention of the plaintiffs for the purposes of litigation. DIDD describes itself as a "state support system for people with intellectual and developmental disabilities." (Doc. No. 43 ¶ 87.) The agencies' shared originating statute designates each agency as, respectively, "the state's mental health [or] developmental disabilities authority," each of which is responsible for "system planning." Tenn. Code Ann. § 33-1-201. That responsibility, in practice, involves the development and curation of a network of service providers who work with services agencies—including, but not limited to, the defendants—to serve the highly vulnerable populations for which DIDD and DMHSAS are responsible. To that end, DIDD and DMHSAS do not simply evaluate and license private providers; they "assess the needs of service recipients and potential service recipients throughout the state" and "plan for a system to meet [those] needs," including, as necessary, by "promot[ing]

17

the development of services and supports for service recipients." Tenn. Code Ann. § 33-1-304(1). As a result, every group home in which the plaintiffs have resided was allegedly part of a care system that was developed and shaped by the defendant agencies, in the furtherance of those agencies' specific and acknowledged statutory responsibilities, and for the express and intentional benefit of individuals like the named plaintiffs.

The agencies' powers, responsibilities, and missions, combined with the allegations of the Second Amended and Supplemental Complaint, are sufficient to establish, for pleading purposes, that DIDD and DMHSAS are administering their licensure authority "in a manner that subjects qualified individuals with disabilities to discrimination" in the provision of public services, including with regard to both care itself and any associated case management services over which DIDD or DMHSAS exercises direct or indirect control. The plaintiffs still have the ultimate burden to establish that DIDD and DMHSAS actually use the kind of authority that the plaintiffs claim and that the agencies' actions do, in fact, result in discrimination in the provision of public services. The court, however, will not dismiss the plaintiffs' claims at the pleading stage, because the facts alleged, read in the light most favorable to the plaintiffs, state a plausible basis for relief.

## C. Sovereign Immunity

The State of Tennessee, like every other U.S. state, possesses certain immunities from suit that "flow[] from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). Consequently, a state may not be sued for money damages in federal court by a private party, subject to a few exceptions. *Id.* at 358–59; *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'"

18

(quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). Sovereign immunity extends not only to a state itself but to "arms of the state," such as certain state agencies. *Ernst*, 427 F.3d at 358 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Unlike the state itself, arms of the state, like DIDD and DMHSAS, may still be sued for injunctive relief through the well-established *Ex parte Young* framework of seeking such relief against official officers, but no such option is available with regard to money damages. *See Stanley v. W. Michigan Univ.*, No. 23-1808, 2024 WL 3100987, at *3 (6th Cir. June 24, 2024).

Sovereign immunity can be abrogated, either by a state itself or, in some situations, by Congress. Congress unambiguously sought to do so in connection with Title II of the ADA, which provides:

> A state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. However, the Supreme Court held in *United States v. Georgia*, 546 U.S. 151 (2006), that, while this provision demonstrates Congress's *intent* to abrogate states' Eleventh Amendment immunity from Title II claims, that fact does not necessarily mean that such abrogation was actually accomplished, because Congress's power to abrogate sovereign immunity depends on the source of its legislative authority for the particular enactment at issue. *See Stanley*, 2024 WL 3100987, at *4. When Congress enacted the ADA, it expressly relied on the full "sweep" of its legislative power, including both its power to regulate interstate commerce and its power to enforce the Fourteenth Amendment, 42 U.S.C. § 12101(b)(4). Only the latter of those sources of

Congressional authority—Congress's 14th Amendment enforcement power—would support an abrogation of sovereign immunity. Accordingly, Congress's power to create causes of action under the ADA was broader than its authority to abrogate sovereign immunity, and a claim may fall within the substance of the ADA, but outside the scope of its valid waiver of sovereign immunity. *Georgia*, 546 U.S. at 157.

The Supreme Court has held that lower courts must decide on a case-by-case basis to what extent abrogation is constitutional in a Title II case. *Id.* at 154. Any alleged misconduct that violates both Title II and a plaintiff's constitutional rights under the Fourteenth Amendment can proceed under Congressional abrogation of immunity, but, "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment," the court must consider "whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid" for some other reason, *id.* at 159, including Congress's power to enact "appropriate legislation" that implements and safeguards the protections of the Fourteenth Amendment in ways that go beyond mere "legislative repetition of this Court's constitutional jurisprudence." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001).

While the Equal Protection Clause of the 14th Amendment does provide disabled individuals with some protection in connection with their disabilities, the Supreme Court has held that that protection is markedly limited when what is at issue is not differential treatment, in and of itself, but a request for accommodations. "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001). "Rational," moreover, is being used, in this instance, in the same manner as it is used in connection with so-called rational basis review, which affords the government considerable discretion. *Id.*

20

The defendants, therefore, are correct that their Title II claims for damages are barred by sovereign immunity. All of the plaintiffs' claims involve the failure to provide adequate supports in light of their disabilities. There are no allegations that the defendants treated deaf individuals differently from other otherwise similarly situated people. The plaintiffs, therefore, have not alleged any behavior that would itself violate the Fourteenth Amendment under current caselaw. Nor have the plaintiffs identified any caselaw that would suggest that Congress's "appropriate legislation" authority permitted it to abrogate the State of Tennessee's sovereign immunity with regard to allegations of this particular type.

The limits of Congress' abrogation power, however, pose no obstacle to the plaintiffs' Section 504 claims. The protections of Section 504 were not imposed on Tennessee by Congress, but voluntarily accepted by the State of Tennessee in return for federal funds. In making that voluntary decision, Tennessee chose to subject itself to liability for whatever damages Section 504 clearly provides. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022). Sovereign immunity, therefore, provides no basis for dismissing the Section 504 claims.

Similarly, sovereign immunity provides no basis for dismissing the plaintiffs' Title II claims for injunctive, rather than compensatory, relief. "[T]he Sixth Circuit has held expressly that the Eleventh Amendment does not bar an ADA Title II claim for prospective relief against state officials in their official capacities." *Martin v. Taft*, 222 F. Supp. 2d 940, 958 (S.D. Ohio 2002) (citing *Carten v. Kent State Univ.,* 282 F.3d 391, 396–97 (6th Cir. 2002)). While the plaintiffs styled their claims as against the relevant agencies—as opposed to the agencies' heads in their official capacities—that is not a substantively meaningful distinction, because an official-capacity suit is, as a formal matter, simply a suit against the agency regardless. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989) ("[A] suit against a state official in his or her official

capacity is not a suit against the official but rather is a suit against the office."). The court, accordingly, will construe the plaintiffs' ADA claims as stating potential claims for injunctive relief under the ADA.

## D. Timeliness

The defendants argue, next, that many of the plaintiffs' claims are untimely. The Sixth Circuit has held that ADA and Section 504 claims in Tennessee are governed by the state's one-year statute of limitations for personal injury actions. *Straser v. City of Athens, Tenn.*, 951 F.3d 424, 427 (6th Cir. 2020) (citing Tenn. Code Ann. § 28-3-104(a)(1)(B); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 547 (6th Cir. 2000)). Many of the events described in the Second Amended and Supplemental Complaint occurred more than a year before the initial Complaint was filed. The defendants argue that any claims based on those events should, therefore, be dismissed.

The plaintiffs respond that none of their claims are untimely because they have pleaded continuing violations of the underlying statutes. "[T]he continuing violation doctrine does not allow recovery for discrete acts of discrimination outside the filing period." *Mayers v. Campbell*, 87 F. App'x 467, 470 (6th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Rather, it allows a plaintiff to recover for cumulative acts of discrimination—some of which occurred within the filing period and some of which did not—in two discrete situations: first, where the plaintiff seeks to recover for a "series of discriminatory actions" that, taken together, constitute the actionable discrimination; and, second, where he seeks to recover for an "ongoing discriminatory policy or environment" that "results in an allegedly discriminatory act within the limitations period." *Straser*, 951 F.3d at 427 (citing *Dixon v. Anderson*, 928 F.2d 212, 216–18 (6th Cir. 1991)). The Sixth Circuit, however, has made a point of distinguishing between continuing violations and continuing injuries, with only the former allowing a party to overcome

22

a statute of limitations. *See Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at \*12 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, J.) (collecting cases).

The extent to which the plaintiffs' various specific allegations represent continuing violations presents a factual question that is difficult to evaluate on the pleadings alone. The general rule is that "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment] . . . , because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at \*4 (W.D. Ky. Mar. 23, 2015)). Only if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed'" does the plaintiff have an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). Some of the facts that the plaintiffs have pleaded are, in fact, clearly outside the statute of limitations, meaning that the plaintiffs did have a responsibility to address the issue of timeliness in their pleadings. The plaintiffs, however, did so by alleging continuing violations, and the defendants have failed to establish that the court can reject that characterization at this stage.

For example, the allegations that appear to face the most serious timeliness issue are those involving discrete admissions to facilities directly operated by the defendant agencies, such as Helton's series of admissions to Moccasin Bend, a DMHSAS-operated RMHI. While the plaintiffs must deal with the conditions in their group homes on an ongoing basis, that is not the case with regard to the state facilities in which they have received care for only limited periods. The individual plaintiffs, however, have conditions that plausibly (and, it seems, actually) carry with

23

them the risk of repeated readmission to such facilities. For example, Helton has been admitted to Moccasin Bend several times and has experienced similar alleged violations of antidiscrimination laws each time. Such recurring violations could give rise to a viable continuing violation theory. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (recognizing that recurring intermittent violations may support a finding of a continuing violation). The same may well be true with regard to the other plaintiffs, given their diagnoses and history. While the defendants may have valid statute of limitations-based defenses to claims based on some allegations, the court is unable to evaluate those defenses definitively at this juncture. The court, therefore, will not dismiss any claims on that basis.

## E. DRT's Standing

The defendants argue next that the court "should dismiss all claims for unnamed plaintiffs because DRT only has associational standing to bring claims for the named [p]laintiffs."[8] (Doc. No. 71 at 17.) As this court has addressed before, "the unique structure of the P&A system creates something of a challenge for traditional standing principles." *Trivette v. Tenn. Dep't of Correction*, No. 3:20-CV-00276, 2024 WL 3366335, at *13 (M.D. Tenn. July 9, 2024). A P&A agency is entrusted with the rough equivalent of enforcement power by the federal and state governments, but it lacks the government's "standing to enforce its own law[s]." *Stauffer v. Brooks Bros., Inc.*,

---

[8] Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing under the Constitution, a plaintiff must show that: (1) it has suffered an "injury in fact" that is (a)(i) concrete and (ii) particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

619 F.3d 1321, 1325 (Fed. Cir. 2010). Instead, it, like other advocacy organizations, must rely on the principle that "[a]n association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim [brought] nor the relief requested requires the participation of individual members in the lawsuit." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth*, 528 U.S. at 181). The individuals whom a P&A agency is called on to protect, however, typically are not "members" of the organization but something more like constituents or beneficiaries. In the absence of a formal membership structure, the P&A agency can rely on its constituents for the purposes of standing only if it can establish sufficient "indicia of membership." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *accord Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 682 (S.D. Ohio 2017). The result, as this court has explained, is that "a P&A agency is . . . between something of a rock and a hard place, unable to rely on the enforcement standing that a government could assert but not ideally suited to caselaw that primarily deals with membership-based organizations." *Trivette*, 2024 WL 3366335, at *13.

Nothing about those principles, however, requires the court to restrict DRT's standing as narrowly as the defendants request. It is true that DRT has no categorical standing to assert claims based on the injuries of every hypothetical deaf person in a DIDD or DMHSAS-licensed facility, simply by virtue of that person's disability. At the same time, however, there is no basis for treating DRT's standing as limited solely to the injuries of the specific named plaintiffs. Rather, as the court has held, DRT has standing to assert the injuries of any constituent with whom it has a "demonstrated relationship" sufficient to establish the indicia of membership. *Trivette*, 2024 WL 3366335, at *13. While that formulation likely *includes* all of the named plaintiffs, there is no basis

for assuming that it is limited to them. *See Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (holding that P&A organization can assert associational standing on the same terms as membership-based organizations because its relationship with its constituents is "[m]uch like" the relationship of "members of a traditional association").

Because the named plaintiffs' injuries are sufficient to afford DRT standing to bring its claims as a general matter, there is no reason to formally prune the case based only on the defendants' apparent fear that, somewhere down the line, DRT will seek remedies to which it is not entitled. It suffices, at this point, to hold that DRT has standing and that the scope of any relief will be subject to the limits of that standing. No aspect of its pleaded claims, however, needs to be preemptively dismissed in the name of those limits.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Judgment on the Pleadings (Doc. No. 70) will be granted in part and denied in part, and all ADA claims for damages will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

26