# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DONTAY BATTLE** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00022** |
| | ) | **Judge Aleta A. Trauger** |
| **STATE OF TENNESSEE** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are cross-Motions for Summary Judgment. (Doc. Nos. 121 (defendants'), 125 (plaintiffs').) For the reasons set forth herein, the plaintiffs' motion will be denied in its entirety, and the defendants' motion will be granted in part and denied in part.

## I.    LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence" that the nonmoving party is entitled to a verdict. *Id.*

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II.    PROCEDURAL HISTORY

Plaintiff Disability Rights Tennessee ("DRT"), joined by most of the individual plaintiffs, filed the initial Complaint in this case on January 14, 2022. (Doc. No. 1.) Following amendments

and supplementation, the operative pleading is the Second Amended and Supplemental Complaint ("SAC"). (Doc. No. 43.) The SAC states claims against the State of Tennessee, the Tennessee Department of Intellectual and Developmental Disabilities ("DIDD"), which is now called the Department of Disability and Aging ("DDA") (Doc. No. 118-1 at 2),[1] and the Tennessee Department of Mental Health and Substance Abuse Services ("DMH" or "DMHSAS") under Title II of the Americans with Disabilities Act ("ADA" or "Title II") and Section 504 of the Rehabilitation Act ("Section 504"). (SAC ¶¶ 470–593.) The individual plaintiffs—Dontay Battle, Necoas Wilson, David Underwood, Maurcelia (Racqual) Blanchett, Christal Helton, and Patrick Downs—are deaf individuals who also have mental illness and/or intellectual and developmental disabilities ("IDD" or "I/DD") and who are alleged to receive services in connection with either DDA or DMH. The plaintiffs claim, in essence, that the defendants violated Title II and Section 504 by failing to ensure that the plaintiffs had constant access to American Sign Language ("ASL" or "sign language") interpreters when they received services either directly from the defendants or from any entity licensed by the defendants to provide services to individuals with mental illness and/or IDD.

The court ruled on the defendants' Motion for Judgment on the Pleadings in September 2024, holding that the plaintiffs' claims for damages under Title II were barred by sovereign immunity and therefore subject to dismissal, but that sovereign immunity did not preclude the damages claims under Section 504 or the claims for prospective injunctive relief under both

---

[1] The DIDD and the Tennessee Commission on Aging and Disability merged as of July 1, 2024 to form the DDA. This case proceeds against DDA as the successor of DIDD. (*See* Doc. No. 126 at 2 n.1.)

statutory schemes. *Battle v. Tennessee* ("*Battle I*"), No. 3:22-cv-00022, 2024 WL 4113531, at *10–11 (M.D. Tenn. Sept. 6, 2024).[2]

After several extensions of the applicable deadlines, the parties have now filed their cross-Motions for Summary Judgment, along with supporting Memoranda of Law, Statements of Undisputed Material Facts, Responses thereto, and Replies, and the evidentiary material on which each party relies.

Before addressing these motions, the court will first set out an overview of the legal standards governing Title II and Section 504 claims and then summarize the relevant facts. Finding that the defendants are entitled to summary judgment on nearly every claim, the court does not, for the most part, reach the merits of the plaintiffs' motion.

## III. OVERVIEW OF TITLE II AND SECTION 504

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12143. The term "public entity" encompasses "any State or local government," as well as "any department, agency, special purpose district, or other instrumentality of a State." *Id.* § 12131(1)(A), (B). Thus, the anti-discrimination provision in Title II bars state agencies from

---

[2] As noted by the defendants, the claims against the State of Tennessee appear to be entirely derivative of the claims against DMH and DDA, because the only services, programs, and activities identified in the SAC are those of either DMH or DDA. The court further notes that the plaintiffs have never formally named as defendants the officials in charge of either of the two agencies, as would technically be required for liability under the *Ex parte Young* framework, for purposes of the plaintiffs' Title II claims for prospective injunctive relief. Sovereign immunity, however, does not bar the Section 504 claims, which effectively mirror the Title II claims. The court therefore continues to find that the plaintiffs' failure to name as defendants "the agencies' heads in their official capacities . . . is not a substantively meaningful distinction, because an official-capacity suit is, as a formal matter, simply a suit against the agency regardless." *Battle*, 2024 WL 4113531, at *11 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989).

discriminating against qualified individuals with disabilities when providing services, programs or activities.

The receipt of federal funding is a prerequisite for Rehabilitation Act coverage. 29 U.S.C. § 794(a), (b)(1)(A). Otherwise, the court's "analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.'" *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459–60 (6th Cir. 1997)). Here, the parties have not provided any argument for treating the claims under Title II and Section 504 differently. Because the Title II and Section 504 claims are "essentially one claim," the court "consider[s] them in tandem." *Accord Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460 (6th Cir. 2020).

The Sixth Circuit "recognize[s] two types of claims under Title II of the ADA: (1) failure-to-accommodate claims and (2) intentional-discrimination claims." *Keller v. Chippewa Cnty.*, 860 F. App'x 381, 385 (6th Cir. 2021) (citing *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017)). "A failure-to-accommodate claim asserts that the defendant 'could have reasonably accommodated [the plaintiff's] disability, but refused to do so.'" *Id.* (quoting *McPherson*, 119 F.3d at 460). "An intentional-discrimination claim asserts that the plaintiff's 'disabilities were actually considered by the [defendant] in formulating or implementing' the harmful policies or conduct." *Id.* (quoting *McPherson*, 119 F.3d at 460).

Title II "does not expressly define 'discrimination' to include a refusal to make a reasonable accommodation for a person with a disability." *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020). Instead, the statute's implementing regulations set forth the reasonable-accommodation requirement. *See* 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make

reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). The Sixth Circuit recognizes that refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination. *Keller*, 860 F. App'x at 385 (citing *Roell*, 870 F.3d at 488; *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907–08 (6th Cir. 2004)).

However, "Title II does not require a plaintiff to receive her 'preferred' accommodation, but merely a reasonable one that provides 'meaningful access' to the public entity." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (internal citations omitted); *see also Keller*, 860 F. App'x at 386 ("We have interpreted . . . Title II to require that covered entities provide 'meaningful access' to their services, programs, and activities." (citing *Ability Ctr.*, 385 F.3d at 909). "[T]he 'determination of what constitutes [a] reasonable [accommodation] is highly fact-specific, requiring case-by-case inquiry.'" *Bennett*, 86 F.4th at 326 (quoting *Roell*, 870 F.3d at 489).

In addition, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999), the Supreme Court recognized that one form of discrimination prohibited by Title II (and Section 504) is "unjustified institutional isolation of persons with disabilities." *See also* 42 U.S.C. § 12101(a)(2) (setting forth Congress's finding that, "historically, society has tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"). To implement § 12132, the Attorney General promulgated a regulation known as the "integration mandate," which provides that public entities must "administer services, programs, and activities in the most integrated

setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 41.51(d) (providing that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons"); *Waskul*, 979 F.3d at 459. "The 'most integrated setting' is one 'that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" *Waskul*, 979 F.3d at 459 (quoting *Olmstead*, 527 U.S. at 592; 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

Following *Olmstead*, the Department of Justice issued guidance in 2011, stating that "'[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent' in order to bring a claim for violation of the integration mandate." *Id.* at 460 (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (last updated Feb. 25, 2020) (hereinafter, "DOJ Statement on *Olmstead*"), available at https://archive.ada.gov/olmstead/q&a_olmstead.htm [https://perma.cc/3UZ8-KPFK]).[3] Instead, a plaintiff may show a sufficient risk of institutionalization "if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* at 461 (quoting DOJ Statement on *Olmstead*).

---

[3] The Sixth Circuit has noted that, "[e]ven if not authoritative, the DOJ's 'views warrant respect' in this area." *Waskul*, 979 F.3d at 461 (citing *Olmstead*, 527 U.S. at 598).

IV.     FACTS[4]

    A.     **The Defendants**[5]

        *1.     DMH*

DMH is a department of the State of Tennessee that receives financial funding and employs more than fifteen employees. By statute, the functions of DMH are to "coordinate, set standards for, plan for, monitor, and promote the development and provision of services and supports to meet the needs of persons with mental illness or serious emotional disturbance through the public and private sectors in this state as set out in applicable provisions of title 33" of the Tennessee Code, Tenn. Code Ann. § 33-1-101 to § 33-11-106. Tenn. Code Ann. § 4-3-1601. As set forth in Title 33, DMH "serves as the state's mental health authority and is responsible for system planning, setting policy and quality standards, system monitoring and evaluation, disseminating public information and advocacy for persons of all ages who have mental illness or serious emotional disturbance." Tenn. Code Ann. § 33-1-201. By statute, DMH is directed to "plan for and promote the availability of a comprehensive array of high quality prevention, early intervention, treatment, and habilitation services and supports based on the needs and choices of service recipients and families served." *Id.*[6] It is also directed by the legislature to "plan, coordinate, administer, monitor, and evaluate state and federally funded services and supports as a community-based system within

---

[4] This recitation of the factual background is drawn from the defendants' Response (Doc. No. 149) to the Plaintiffs' Statement of Material Facts ("plaintiffs' SUF") (Doc. No. 127), the plaintiffs' Amended Responses ("Amended Response") (Doc. No. 152) to Defendants' Statement of Undisputed Material Facts ("defendants' SUMF") (Doc. No. 123), and the documents cited therein. The facts are undisputed unless otherwise indicated.

[5] The "facts" relating to the statutory framework outlining both defendants' authority are set forth in the plaintiffs' SUF, even though they are, in reality, statements of law. This legal framework is nonetheless useful for understanding what the defendants do.

[6] The term "service recipient" is defined as a "person who is receiving service, has applied for service, or for whom someone has applied for or proposed service because the person has mental illness or serious emotional disturbance." Tenn. Code Ann. § 33-1-101(23).

the total system of services and supports for persons with mental illness or serious emotional disturbance, or at risk for those conditions and for their families." *Id.* § 33-2-101.

There are fifty in-patient psychiatric hospitals across the state. (Doc. No. 124-1, Yancey Decl. ¶ 8(a).) Out of that total, DMH operates and provides direct services through four regional mental health hospitals ("RMHIs"): Memphis Mental Health Institute, Western Mental Health Institute, Middle Tennessee Middle Health Institute, and Moccasin Bend Mental Health Institute. (Doc. No. 158-18, Thornton Dep. 55–56.)[7] The RMHIs are licensed as stand-alone psychiatric hospitals, but they are "together part of a hospital system that is owned and operated" by DMH. (*Id.* at 57.) DMH has not created a "deaf unit" at any of its RMHIs. (*Id.* at 223.)

DMH does not operate any community-based mental health treatment facilities. (Yancy Decl. ¶ 8(b).) Rob Cotterman, Director of Hospitals for DMH, testified that he "oversees" several mental health services for the department. (Doc. No. 131-4, Cotterman Dep. 25.)[8] All of these services are "contracted" to third-party entities and funded by DMH, though DMH does not provide them directly. (*Id.* at 37–38.) According to Cotterman, all of DMH's contracts require the grantees to comply with the ADA. (Cotterman Dep. 34.) However, DMH does not assess whether contract grantees are in fact complying with the ADA. (Doc. No. 158-14, Yancey Dep. 40.)

In addition to the provision of direct services, DMH is authorized to license facilities and services that provide mental health and substance abuse services in Tennessee. Tenn. Comp. R. & Reg. 0940-05-02-.01. DMH is required to adopt licensure rules regarding the "adequacy of services, qualification of professional staff, and facility conditions." Tenn. Code Ann. § 33-2-

---

[7] Most of the deposition transcripts in the record were filed in condensed format, with four transcript pages per page. The page citations for these transcripts are to the original transcript page numbers, rather than the CM/ECF page numbers.

[8] Only excerpts of the Cotterman deposition transcript are in the record.

404(a). These rules must "include consideration of the adequacy of environment, life safety, treatment or habilitation services, education and training requirements of the staff, and other considerations that the department deems necessary to determine the adequacy of the provision of mental health and alcohol and drug abuse prevention and/or treatment services." *Id.*

DMH has several licensure categories for community-based service providers, depending on the type of care provided, including Mental Health Adult Residential Treatment Services, Mental Health Supportive Living Facilities, and Adult Supportive Residential Facilities. (Doc. No. 152 ¶ 6.)

### 2.    *DDA*

DDA is a separate department of the State of Tennessee. Like DMH, it receives financial funding and employs more than fifteen employees. DDA is the State's agency with primary responsibility to administer statewide programs and services to Tennesseans with IDD using state and federal funds. (Doc. No. 149 ¶ 105.) DDA does not administer, oversee, manage, control, or fund all IDD services in Tennessee. (Doc. No. 152 ¶ 39.) The general functions of DDA are to "coordinate, set standards for, plan for, monitor, and promote the development and provision of services and supports to meet the needs of persons with [IDD] through the public and private sectors in this state as set out in applicable provisions of title 52." Tenn. Code Ann. § 4-3-2701. "To this end, [DDA], through its commissioner, shall have the authority, . . . to modify or rescind orders, rules and regulations, decisions or policies heretofore issued and to adopt, issue or promulgate new orders, rules and regulations, decisions or policies as may be necessary for the administration of the programs or functions herein transferred." *Id.* § 4-3-2708.

Under Title 52, DDA is directed to "plan, coordinate, administer, monitor, and evaluate state and federally funded services and supports as a community-based system within the total system of services and supports for persons with an intellectual or developmental disability, or at

risk for those conditions, and for their families." *Id.* § 52-2-101. DDA "[s]erve[s] as the state's intellectual and developmental disability authority" and is "responsible for system planning, setting policy and quality standards, system monitoring and evaluation, disseminating public information, and advocacy for persons of all ages who have an intellectual or developmental disability." *Id.* § 52-1-104(a)(1). "Within the limits of available resources, it is the goal of the state to develop and maintain a system of care that provides a comprehensive array of quality prevention, early intervention, treatment, habilitation, and rehabilitation services and supports that are geographically available, and equitably and efficiently allocated statewide, allowing people to be in their own communities in settings based on the needs and choices of individuals and families served." *Id.* § 52-2-102(a).

One of DDA's primary roles is to license third-party providers of IDD home-based services. (Doc. No. 152 ¶ 40.) DDA is required to adopt licensure rules regarding the adequacy of services, staff qualifications, and facility conditions. Tenn. Code Ann. §§ 52-2-403, -404; *see* Tenn. Comp. R. & Reg. 0465-02-02-.01. DDA's licensure rules must consider the "adequacy of environment, life safety, treatment or habilitation services, education and training requirements of the staff, and other considerations that the department deems necessary to determine the adequacy of the provision of intellectual and developmental disability services." Tenn. Code Ann. § 52-2-404. DDA licensure rules are "designed to set minimum standards that protect the physical health and safety of individuals and guard against abuse and neglect of persons with I/DD." (Doc. No. 124-4, Horn Decl. ¶ 4.)

Providers who are licensed by DDA can provide an array of services and supports, including Supportive Living Residential, Medical Residential Family Model Residential, Rehabilitative Habitation Services, Semi-independent Living Services, Employment Services,

Day Services, and Community Participation Services. DDA's licensure rules require provider agencies to "develop and implement" an Individual Support Plan ("ISP")—now called a Person-Centered Support Plan ("PCSP") (*see* Doc. No. 158-10, Allen Dep. 49)—for each "person supported," but they do not "dictate the specific contents" of the PCSP or "monitor its implementation." (Horn Decl. ¶ 5.)

DDA also administers three so called "1915(c) waivers," named after § 1915(c) of the Social Security Act (now codified at 52 U.S.C. § 1396n(c)). These programs are a component of the federal Medicaid program that allows states to provide home and community-based services ("HCBS") as an alternative to institutional care for individuals who need a level of care similar to that provided in an institutional setting.[9] (Doc. No. 124-6, Black Decl. ¶¶ 4–5.) The three waiver programs are the Congregate Aggregate Capped Waiver ("CAC Waiver"), the Stateside Waiver, and the Self-Determination Waiver. (Doc. No. 152 ¶ 64.) Enrollment in these programs has been closed since 2015. (Doc. No. 152 ¶ 65.)

In addition, DDA provides direct services to individuals with IDD through the Tennessee START Assessment & Stabilization Teams ("TN START"). (Doc. No. 149 ¶ 146.) TN START is a crisis prevention and intervention program for individuals who have co-occurring intellectual and developmental disabilities as well as mental health disorders. (Doc. No. 152 ¶ 53.). The goal of the program is to "prevent higher levels of care." (Doc. No. 158-4, Dhanarajan Dep. 20.)

---

[9] *See* https://www.medicaid.gov/medicaid/home-community-based-services/home-community-based-services-authorities/home-community-based-services-1915c [https://perma.cc/AS2L-BWG5].

### B.     The Plaintiffs

#### 1.     *DRT*

Plaintiff DRT is the federally mandated protection and advocacy (P&A) agency for the State of Tennessee, and Congress has given it the statutory responsibility to represent, advocate for, and redress the rights of persons with disabilities, including deaf individuals, who receive services through a state entity. (Doc. No. 149 ¶ 206.)

#### 2.     *Christal Helton*

Plaintiff Christal Helton is deaf, has a diagnosis of mental illness, and uses ASL as her primary language. (*Id.* ¶¶ 207–09.) She can read and write single words in English at approximately a fifth-grade level and full sentences at a third- to fourth-grade level. (Doc. No. 134-1, Williams Expert Report 13.) She has no functional ability to speechread (lip read) or speak. (*Id.*) She can write notes or use fingerspelling[10] to communicate with people who do not know ASL, but her communication level in written English is similar to that of a ten-year-old child. (Doc. No. 149 ¶ 213.) She needs to use ASL to communicate or understand anything beyond basic information. (*Id.* ¶ 214.)

Helton was admitted to Moccasin Bend Mental Health Institute ("MCMHI"), one of Tennessee's RMHIs, three times: in 2015, 2017, and 2018–2020. (*Id.* ¶ 215.) During her most recent admission, according to the defendants, Helton had an ALS interpreter for nearly "all her meetings" and group therapy sessions. (Doc. No. 158-13, Moss Dep. 58, 70–71; Doc. No. 158-6, Boston Dep. 31–32 ("It was my understanding that she always had an interpreter in treatment mall,

---

[10] According to the plaintiffs' expert Roger C. Williams, fingerspelling is "the process of spelling English words using the ASL signs for letters in the English alphabet. This form of communication requires comprehension of both English and of the ASL signs for English letters." (Williams Expert Report 13 n.10.)

which is our groups and such."); Doc. No. 64-2, Thornton 2/2/2024 Decl. ¶ 10 ("During her admission to MBMHI from October 2018 to February 2020, . . . Ms. Helton received ASL interpreters on a regular, near-daily basis for all important meetings and conversations, including for any evaluations, treatment team meetings, treatment mall participation, meetings with social services, or other substantive treatment activities.").) However, it is undisputed that MBMHI did not have a video phone until 2019, that MBMHI never formally assessed her ability to communicate in written English during her 2018–2020 admission, that she frequently communicated with staff through written notes, and that she did not always have access to ASL interpreters for group therapy sessions, psychiatric encounters, and various other consultations, assessments, appointments, or program activities. (*See generally* Doc. No. 149 ¶¶ 219–31, 232, 234; *see also* Doc. No. 134-3 at 6, 13, 18–19; Doc. No. 158-13, Moss Dep. 58.)

Although Helton met the criteria for discharge by January 30, 2019, she was not actually discharged until February 2020. (Doc. No. 149 ¶¶ 239, 244.) MBMHI determined that the appropriate placement following discharge would be in a supportive group home that was licensed to take hearing-impaired residents. (Boston Dep. 74.) According to Linda Moss, a psychiatric social worker at MNMHI, one of the primary barriers to discharge was Helton's deafness, as several group homes told MBMHI social workers that they were unwilling or unable to accommodate a deaf resident. (Moss Dep. 110, 112.) According to Deanna Boston, Moss's supervisor, none of the group homes she reached out to declined to take Helton because she was deaf; rather, Helton's lack of TennCare insurance and her history of an assault charge made it difficult to find a group home willing to accept her. (Boston Dep. 46–48.) Boston acknowledged that "a little more work" went into finding" a placement because Helton "specifically needed a group home licensed for deaf and hard of hearing." (*Id.* at 48.) But, according to Boston, that

simply meant they "wouldn't even consider . . . a group home that wasn't licensed for somebody that was hearing-impaired." (*Id.*)

Boston agreed that Helton would do better being discharged to a home where she could communicate in ASL, but it would also have been detrimental to her to stay "three or four more years in a more restrictive environment solely because [they] could not provide a group home with staff that did sign language. (*Id.* at 75–76.) In any event, discharge plans typically do not include information on what a patient's primary language is or whether the patient needs interpreting services, ASL-fluent staff, and access to the Deaf community, or assistive technology. (Doc. No. 149 ¶ 246.)

Helton was discharged on February 28, 2020 to Absolute Care, LLC, a group home licensed by DMH to serve hearing-impaired individuals. (*Id.* ¶ 251.) Absolute Care does not have a contractual relationship with DMH. (Doc. No. 158-3, Lawson Dep. 84–85.) MBMHI did not create or provide a written communication plan to Absolute Care upon Helton's discharge. (Doc. No. 149 ¶ 252.) Absolute Care was not required to provide Helton interpretation services or staff who know sign language. (Boston Dep. 106.) Upon Helton's placement at Absolute Care, her hours of having access to a sign language interpreter were reduced to zero. (Doc. No. 149 ¶ 254.) During her two years at Absolute Care, she was not provided ASL interpreters. (*Id.* ¶ 261.) When she was discharged to Absolute Care, a grant-funded video phone had been ordered for her, but it was on "back order." (Boston Dep. 98.) Boston was not sure whether Helton had a cell phone that she could use to make video calls when she was discharged. (*Id.*).

DMH did not require Absolute Care to provide effective communication services for Helton or to provide its staff any training on services offered to deaf residents; nor did it instruct it that it must comply with the ADA. (Doc. No. 149 ¶¶ 256–58.) While she was at Absolute Care,

Helton was characterized as requiring "enhanced care," and her difficulties in communicating effectively were a barrier to being moved to a lower level of care. (Doc. No. 131-9 at 8, Dalton Dep. 35.) While at Absolute Care, Helton could not participate in or benefit from group therapy or religious, educational, community service, vocational, or recreational activities. (Doc. No. 149 ¶ 262.) While at Absolute Care, Helton became increasingly agitated and frustrated at being unable to express herself, and she isolated herself from the house community. (*Id.* ¶ 263.) She felt lonely, depressed, and isolated as a result of not being able to communicate effectively with anyone at Absolute Care. (Doc. No. 60, Helton Decl. ¶ 21.)

Helton was transferred from Absolute Care to Legends Lockdown RTC ("Legends") in Manchester, Tennessee in February 2022. (Doc. No. 149 ¶ 264.) Legends is licensed by DMH as a Mental Health Residential Treatment provider and Mental Health Adult Residential provider. It is not specifically designated to serve individuals with hearing impairments. (*Id.* ¶ 265.) Legends provides residents services including psychosocial services, group therapies, counseling, psychiatric nurse practitioner care, and on-site medical appointments, medical management, telephone service. (*Id.* ¶ 266.) At Legends, the doors are locked, and residents can only leave the unit or go outside if fobbed out by staff. (*Id.* ¶ 267.) Residents do not cook, do their own laundry, clean, make their own beds, or maintain employment. (*Id.* ¶ 268.) Helton left the facility only three to four times during the two years she resided there. (*Id.* ¶ 269.)

Helton did not receive a video phone until DRT advocated for her to receive one. (*Id.* ¶ 270.) Legends never provided or arranged for an ASL interpreter for Helton for mental health treatment, counseling, group therapy, evaluations, socialization, or recreational activities. (*Id.* ¶ 272.) She was forced to use written English to communicate during treatment. (*Id.* ¶ 273.) Her

counselor at Legends acknowledged that her treatment would have been more effective if she had had an ASL interpreter. (*Id.* ¶ 274.)

Legends discharged Helton to her mother's home around May 13, 2024, because the staff could not communicate with her. (Doc. No. 129, Watson Decl. ¶ 5.) While living at her mother's home, Helton received mental health services at Centerstone, which did not provide a sign language interpreter and, instead, relied on written notes or Helton's mother for interpretation during appointments. (Doc. No. 149 ¶¶ 276–77.)

In this setting, Helton's mental health deteriorated, and she was eventually admitted to Trustpoint Hospital. (*Id.* ¶ 278.) Trustpoint did not have a video phone when Helton was admitted, and it did not provide interpreters until a DRT advocate intervened and educated Trustpoint on communication for deaf patients. (*Id.* ¶ 280.) Trustpoint had difficulty finding a group home licensed to take hearing impaired patients, but it eventually discharged Helton to a DMH-licensed residential facility, MSHN, three hours away from Helton's mother. (*Id.* ¶¶ 281–84.) MSHN did not supply a video phone for Helton until a DRT advocate intervened and brought her one from her mother's house. (*Id.* ¶ 285.)

Helton continues to reside at MSHN, which is licensed by DMH as an Adult Supportive Residential Facility. (Doc. No. 152 ¶¶ 9–10.) According to the defendants, Helton has had "limited interactions with crisis service providers that are partially funded by DMHSAS." (Yancey Decl. ¶ 11.) Otherwise, she has not sought or received services or accessed or attempted to access any of the programs, activities, or services provided by DMH, and has not been readmitted to any psychiatric hospital operated by DMH. (Doc. No. 152 ¶ 37; *see also* Yancey Decl. ¶ 11.) The plaintiffs contend that Helton attempted to receive mental health services through Centerstone, a

DMH-licensed community health provider and grant recipient (*see* Doc. No. 158-14, Yancey Dep. 32), but Centerstone failed to provider her with sign language interpreters (Doc. No. 149 ¶ 277).

It is undisputed that Helton is currently not eligible for the DMH grant-funded Behavioral Health Safety Net program, which is DMH's only mechanism for funding outpatient, community-based mental health treatment services. (Doc. No. 152 ¶ 38.) The plaintiffs point out that Helton was uninsured when she was discharged from MBMHI to the Absolute Care group home in February 2020. (Doc. No. 158-6, Boston Dep. 46–47.) They also purport to dispute that DMH's only mechanism for funding outpatient, community-based mental health services is through the Behavioral Health Safety Net program. (*See* Doc. No. 152 ¶ 33.) However, they do not show that Helton would be eligible for other programs.

### 3. Patrick Downs

Plaintiff Patrick Downs is deaf and has a mental illness diagnosis. (Doc. No. 149 ¶¶ 286–87.) He uses ASL as his primary language, and he prefers to communicate in ASL with the assistance of a deaf interpreter. (*Id.* ¶¶ 288, 290.) He has receptive fluency in ASL, but, because of a motor disability and mental illness, he has some limitations in his expressive ASL. (Doc. No. 134-1, Williams Expert Rep. 19.) He has limited competence in speechreading and can read and write understandable sentences in English at the 6th- to 7th-grade level, though he has difficulty with fine motor control. (*Id.*) He needs ASL interpreters to communicate with people who are not ASL fluent for anything beyond very basic interactions. (*Id.* at 21.)

Downs was admitted to Middle Tennessee Mental Health Institute ("MTMHI") from November 27, 2021 until December 9, 2021 for suicidal and homicidal ideations. (Doc. No. 149 ¶ 294.) This was his fourth admission since 2015. (*Id.* ¶ 295.) According to the defendants, Downs received a psychiatric evaluation through a sign language interpreter upon his admission on November 26, 2021. (Doc. No. 124-2, Thornton Decl. ¶ 9.) However, according to the plaintiffs,

Downs was not admitted to the hospital until November 27, 2021, and the defendants admitted in their Answer that a sign language interpreter was not present on November 27, 2021. (Doc. No. 46, Answer ¶ 383; Doc. No. 152 ¶ 25.)

On November 28, 2021, staff at MTMHI requested a sign language interpreter for Downs to start on December 1, 2021, but the interpreter had car issues and could not make it the first few days. (Thornton Decl. ¶ 10.) Downs did not have a sign language interpreter for any assessments, evaluations, or mental health treatment and group sessions from November 27 until December 4, 2021. (*Id.* ¶ 11; *see also* Answer ¶ 388.) He had sign language interpreters from 6 to 7.5 hours per day from December 4 through his discharge on December 8, 2021. (Thornton Decl. ¶¶ 11–12.)

Downs was discharged to a group home in December 2021 but readmitted to a psychiatric hospital licensed by DMH in Memphis, Tennessee in January 2022. (Answer ¶ 402.) In February 2022, he was discharged to William Carroll Supportive Living ("WCSL"), a group home licensed by DMH but not designated to serve individuals with hearing loss. (Doc. No. 149 ¶ 300–01.) He did not have a video phone when he first arrived at WCSL, and he never received sign language interpreters and did not have access to the deaf community during his stay at WCSL. (*Id.* ¶¶ 302– 04.) Downs "could not participate in daily group therapy or interact with his peers. He mostly stayed to himself, isolated away from people, and began to act out. As a result, WCSL had to call mobile health crisis on several occasions." (Doc. No. 130, Patty-Brown Decl. ¶ 11.)

Downs was admitted to Memphis Mental Health Institute ("MMHI") from April 12, 2022 until his discharge on December 16, 2022. (Doc. No. 149 ¶ 307.) Staff at MMHI were aware that ASL was Downs' primary method of communication. (*Id.* ¶ 308.) MMHI made efforts to have sign language interpreters available to Downs every day from 8:00 a.m. to 10:00 p.m. during his admission and to ensure that all medical assessments and discussions about treatment were

conducted through an interpreter. (Thornton Decl. ¶ 14.) However, despite these efforts, Downs did not have a sign language interpreter for approximately nineteen group therapy sessions that took place between May 19, 2022 and October 4, 2022. (Doc. No. 149 ¶ 309.) Also, he was not provided a sign language interpreter for nurse encounters occurring on June 4, 2022 and September 1, 2022. (*Id.* ¶ 310.)

On December 16, 2022, Downs was discharged to Ridgemont Adult Supportive Residential Facility ("Ridgemont"), which is privately operated by Alliance Healthcare Services. (Doc. No. 152 ¶ 8; Doc. No. 149 ¶ 311.) Ridgemont is licensed by DMH as an Adult Supportive Residential Facility, but it is not specifically designated to serve the hearing impaired. (Doc. No. 152 ¶ 8; Doc. No. 149 ¶ 312.) He continues to reside at Ridgemont, where he receives six hours of interpretation services per week. (Doc. No. 149 ¶ 313.)

At the time of Downs' admissions to the two RMHIs, he had health insurance through Medicaid. (Doc. No. 152 ¶ 23.) Downs has only accessed DMH-provided services during his in-patient treatment. (Yancey Decl. ¶ 10.) He is not eligible, and has not been eligible, for the DMH grant-funded Behavioral Health Safety Net program, which is DMH's only mechanism for funding outpatient, community-based mental health treatment services, because he is insured, not indigent, and does not meet other eligibility requirements. (*Id.* ¶ 12.) The plaintiffs attempt to dispute whether the Behavioral Health Safety Net program is the only mechanism for funding outpatient, community-based mental health treatment services (*see* Doc. No. 152 ¶ 33), but, even if they are correct, they have not shown that Downs would be eligible for any of those services or that he has attempted to access any of the DMH grant-funded, non-treatment, ancillary supports for people with mental illness (Yancey Decl. ¶ 13).

4.      *Dontay Battle*

Plaintiff Dontay Battle is deaf and has an intellectual disability and a mental illness diagnosis. (Doc. No. 149 ¶ 316.) ASL is his most effective means of communication. (*Id.* ¶ 317.) He is below the first-grade level in reading and writing English. (Doc. No. 134-11, Shepard-Kegl Expert Rep. re: Battle 16, 19.) He currently lives in Memphis and receives supportive services— including support with transportation, communication, cooking, housekeeping, managing finances and medications, scheduling appointments, and shopping—through Support Solutions of the Mid-South ("SSMS"), a DDA-licensed organization. (Doc. No. 149 ¶ 320.) DDA's Supported Living License is issued to provider agencies that perform IDD supportive services at the residence of the person supported rather than at a licensed facility. (Doc. No. 124-4, Horn Decl. ¶ 7.) He is enrolled in the ECF Choices waiver.[11] (Doc. No. 149 ¶ 321.)

He has not been provided a video phone and has received interpreters in limited circumstances, including medical appointments. Since being at this residential placement, his communication skills have declined "to the point of not using language to communicate on a daily basis." (Doc. No. 134-11, Shepard-Kegl Expert Rep. re: Battle 46.) According to the plaintiffs' expert, Battle shows signs of Language Deprivation Syndrome, a mental health condition associated with language isolation. (*Id.*) His behavior has worsened over the past several years, and he was repeatedly arrested for trespassing on the University of Memphis campus. (Doc. No.

---

[11] ECF Choices apparently sets standards for "Employment and Community First Choices waiver," and the program opened when new enrollment in the 1915(c) waiver programs closed in 2015. (Doc. No. 158-10, Allen Dep. 103.) The ECF Choices waiver is "conducted through managed care organizations" and administered by TennCare. (*Id.* at 124–25.) It is not administered by DMH or DDA, though DDA does provide annual quality review and reportable event management. (*Id.* at 125, 127–28.)

149 ¶ 325.) Staff at SSMS were not sure whether he understood that he was trespassing. (Doc. No. 158-17, Taylor Dep. 75–76.)

Battle is not enrolled in any of the three 1915(c) waivers administered by DDA. (Doc. No. 152 ¶ 70.)

### 5. Necoas Wilson

Plaintiff Necoas Wilson is deaf and has an intellectual disability and a mental illness diagnosis. (Doc. No. 149 ¶ 326.) He is a fluent user of ASL, and ASL is his most effective means of communication. (*Id.* ¶ 327.) His lipreading is poor, and he reads English between a kindergarten and first-grade level. (*Id.* ¶¶ 329–30.) He cannot benefit, even partially, from mental health services provided to him in written or spoken English. (Doc. No. 134-10, Shepard-Kegl Expert Rep. re: Wilson 91.)

Wilson is not enrolled in a 1915(c) waiver program administered by DDA. (Doc. No. 152 ¶ 73.) He is enrolled in the ECF Choices waiver. (Doc. No. 149 ¶ 332.) He lives in Knoxville, Tennessee, where he receives IDD support services through Sevita Health (formerly D&S Residential Services LP), which has a supported living license issued by DDA. (*Id.* ¶ 333; Doc. No. 152 ¶¶ 51–52.) According to the defendants, however, DDA issues supportive living licenses to agencies that provide IDD supportive services at the "residence of the person supported rather than at a licensed facility," and the entity performing services for Wilson has a supported living license. (Doc. No. 124-4, Horn Decl. ¶¶ 7, 11.)

Wilson's prior service provider, Loving Arms, did not provide Wilson with ASL interpreters for medical meetings, job placement programs, or financial assistance programs. (Doc. No. 158-5, Chism Dep. 51, 53–54.) However, Wilson used an app on his phone for communication during these meetings. (*Id.*)

Wilson enrolled in the TN START program in August 2023 and is still enrolled. (Doc. No. 149 ¶¶ 335, 337.) He was referred to TN START by a crisis worker who was concerned about Wilson's increase in mental illness symptoms, leading to crisis events and emotional instability. (*Id.* ¶ 336.) TN START facilitator Kate Vogt became Wilson's facilitator in February or March 2024. She was assigned to work with Wilson because she is fluent in ASL and familiar with the Deaf community. (*Id.* ¶¶ 340–41.) She has raised concerns with DDA that Wilson has no one in his home with whom he can communicate in sign language. (*Id.* ¶ 342.)

### 6. *Maurcelia Blanchett*

Plaintiff Maurcelia (Racqual) Blanchett is deaf and has an intellectual disability and a mental illness diagnosis, as a result of which she has both behavioral and mental health needs. (*Id.* ¶¶ 344–47.) ASL is her preferred and most effective means of communication. (*Id.* ¶ 348.) She reads and writes at the second- to third-grade level in English and uses ASL grammar in her English writing; her speechreading skills are minimal. (*Id.* ¶¶ 351, 353.)

Blanchett is enrolled in the CAC Waiver program, one of the HCBS 1915(c) waivers administered by DDA. (*Id.* ¶ 354; Doc. No. 152 ¶ 71.) She receives IDD support services from Encare, LLC, which is licensed by DDA. (Doc. No. 149 ¶ 355.) Although she received approximately 50 hours per week of in-person sign language interpreters through a previous service provider, Encare does not employ any sign-fluent staff. (*Id.* ¶¶ 356, 363.)

Blanchett was enrolled in TN START in December 2021. TN START was aware of Blanchett's communication needs and communicated with her through interpreters from DeafConnect, VRS telephone calls, eye contact, and written messages. (*Id.* ¶ 367.) Her START plan identifies challenges centered around frustration due to inability to communicate and feeling "unheard," which can lead to a crisis situation, which makes communication even more challenging. (*Id.* ¶ 365.) TN START staff "tried to make sure" that an interpreter from

DeafConnect was there anytime they provided services and that Blanchett was using a video phone. (Doc. No. 158-12, Quintana Dep. 74.) If TN START staff hosted a meeting with Blanchett and others, it would provide an ASL interpreter. (Doc. No. 152 ¶ 58.) When responding to a crisis event, they tried to obtain an interpreter and, if they could not get one, they used alternative means to communicate with Blanchett. (Quintana Dep. 33–34.) TN START did not provide Qualified Mental Health Interpreters ("QMHIs"), sign fluent providers or staff, or assistive technology while Blanchett was enrolled in the program. (Doc. No. 149 ¶ 366.) In some crisis situations, no interpreter was immediately available and alternative communication tools had to be used. (*Id.* ¶¶ 367, 369.) One of Blanchett's facilitators has recommended that the agency hire interpreters. (*Id.* ¶ 372.) The agency recognizes that use of a sign language interpreter is a de-escalation tool for Blanchett. (*Id.* ¶ 373.)

In September 2022, Blanchett left the state to live with her father in Arkansas. (Doc. No. 152 ¶ 60.) Because she no longer resided in Tennessee, she was disenrolled from TN START toward the end of 2022. (*Id.* ¶ 61.) She returned to Tennessee in May 2023 but has not been re-enrolled in TN START and is not receiving services from the program. (*Id.* ¶¶ 62–63.). According to the defendants, Blanchett's conservator did not to re-enroll her. (Doc. No. 124-5, Dhanajaran Decl. ¶ 7.) According to the plaintiffs, Blanchett's conservator (her mother) has not been given the opportunity to re-enroll Blanchett in the TN START program. (Doc. No. 144, Marcia Blanchett Decl. ¶ 7.)

### 7. David Underwood

Underwood is deaf and has both an intellectual disability and a mental illness diagnosis; he prefers to communicate and communicates most effectively in ASL, though he has also developed his own version of sign language that is based on ASL. (Doc. No. 149 ¶¶ 374–78.) He reads and writes English below a first-grade level and has negligible speechreading skills. (Doc.

No. 112-1, Shepard-Kegl Expert Rep. re: Underwood 21–22.) Underwood is enrolled in the Statewide Waiver program, one of the HCBS 1915(c) waivers administered by DDA. (Doc. No. 149 ¶ 381; Doc. No. 152 ¶ 72.)

Underwood lives in a home where he receives community living supports from Reaching Visions Today, LLC ("RVT"), which holds several licenses from DDA, including a license to provide supported living services. (Doc. No. 149 ¶ 382.) RVT provides IDD support services to Underwood. (*Id.* ¶ 383.) Underwood does not have a video phone at his residence (*id.* ¶ 384), but, because his residence is not licensed, DDA does not conduct inspections there (Horn Decl. ¶ 7).

According to the plaintiffs' expert, Dr. Shepard-Kegl, while in his current living situation, Underwood has not had access to sign language interpreters for meetings related to medical, behavioral, adult protective, residential, and habilitative services, and his is communicatively and socially isolated due to his lack of access to interpreter services. (Doc. No. 112-1, Shepard-Kegl Expert Rep. re: Underwood 6, 8.) The defendants object to the cited report as inadmissible hearsay. (Doc. No. 149 ¶¶ 385–86.)

## V.     THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.     Overview

The defendants' motion is premised, generally, on their contention that the plaintiffs are "trying to use the licensing authority of [DMH] and DDA to claim state ownership of all services that the agencies license, with the end goal of having [DMH] and DDA be responsible for the ADA-compliance of all providers of mental health treatment and/or [IDD] services in Tennessee." (Doc. No. 122 at 1.) According to the defendants, "the mental health treatment and I/DD systems in Tennessee are not designed that way, and litigation cannot fundamentally alter those systems." (*Id.*)

For their part, the plaintiffs assert, both in response to the defendants' motion and in support of their own, that the defendants are charged with administering "statewide community mental health . . . and [IDD] service systems" and that their administration duties include "overseeing, planning, funding, licensing, promoting and setting standards for these systems." (Doc. No. 126 at 1.) The plaintiffs maintain that the defendants administer these systems in a discriminatory fashion by failing to ensure that deaf individuals have the opportunity to benefit from the services offered by the defendants in a manner equal to the opportunity afforded non-deaf individuals, insofar as they fail to ensure effective communication and fail to provide services in the most integrated setting appropriate to their needs, all in violation of Title II and Section 504. (*Id.*)

The defendants also argue that they are entitled to judgment based on several non-merits-based grounds, including that (1) plaintiffs Downs, Helton, and Blanchett no longer receive direct services from the defendants, so their claims for prospective injunctive relief are moot; (2) Helton's claims based on the direct services provided during her hospitalization at MBHMI are outside the applicable statute of limitations; and (3) DRT lacks associational standing to bring claims on behalf of any individuals aside from the named plaintiffs.

### B. The Merits of the Plaintiffs' Claims

The defendants construe the SAC as asserting three distinct types of claims under Title II and Section 504. First, all plaintiffs assert disability discrimination claims relating to the defendants' "licensing services." (Doc. No. 122 at 8 (citing SAC ¶¶ 8(b)–(d), 15(b)–(d)).) Second, plaintiffs Helton, Downs, and Blanchett assert disability discrimination claims for services provided directly by the defendants. (*See id.* (citing SAC ¶¶8(a), 15(a)).) And third, DRT states a disability discrimination claim on behalf of unnamed individuals in addition to the named plaintiffs. (*Id.* (citing SAC ¶ 43).) The defendants seek summary judgment on each of these claims. In addition, however, the SAC clearly states a claim for violation of *Olmstead*'s integration

mandate on behalf of Helton, Downs, and DRT's unnamed constituents. (*See* SAC ¶¶ 562–65.) The defendants seek summary judgment on this claim as well. (Doc. No. 122 at 16–17.)

In their Response, the plaintiffs agree in part with the defendants' characterization of their claims, but they also contend that Underwood (in addition to Blanchett) states a discrimination claim based on access to DDA's 1915(c) waiver services; that Wilson (like Blanchett) states a discrimination claim based on his access to the TN START program; that several of the individual plaintiffs state direct discrimination claims based on discrimination in accessing DDA's "other direct services such as abuse and neglect investigation and information and counseling services"; and that DRT asserts claims on behalf of the individual plaintiffs and its other deaf constituents, including a claim based on DDA's discrimination at a DDA-operated Intermediate Care Facility ("IFC",[12] "as experienced by a[] minor deaf constituent identified in the course of this litigation." (Doc. No. 153 at 2.)

### 1. Licensing Services

#### a) Failure to Accommodate in Licensing Program

The defendants' first argument is that the Eleventh Amendment bars the plaintiffs' licensing-based claims, because any exception to Eleventh Amendment immunity requires an actual violation of either Title II or Section 504. (Doc. No. 122 at 9.) This argument is premised upon the Sixth Circuit's analysis in *Babcock v. Michigan*, in which the court dismissed the plaintiff's Title II claim based on her failure to allege "interference with a service, program, or activity" of a public entity. 812 F.3d at 536. In this case, the court has already determined, in ruling

---

[12] DDA provides direct services in DDA-run Intermediate Care Facilities. (Doc. No. 149 ¶ 123; Doc. No. 158-16, Greineder Expert Dep. 12. ) Intermediate Care Facilities are for individuals with IDD who have complex needs and require significant assistance with activities of daily living. (Doc. No. 149 ¶ 124; Greineder Expert Dep. 12.) None of the named plaintiffs has received services at an Intermediate Care Facility.

on the defendants' Motion for Judgment on the Pleadings, that the plaintiffs adequately *alleged* discrimination in the "provision of public services." *Battle I*, 2024 WL 4113531, at *9. At issue now is whether the plaintiffs can prove those allegations, not whether the state is entitled to sovereign immunity.[13]

More substantively, the defendants acknowledge that Helton and Downs reside in group homes licensed by DMH as Adult Supportive Residential Facilities and that Battle, Blanchett, Underwood, and Wilson receive IDD services in their residences by private agencies that have Supported Living Licenses issued by DDA. The defendants contend that their licensing authority is "more limited than Plaintiffs allege" and that, in actuality, the licenses are covered by rules established by the agencies that are intended only to "set minimum standards that protect the health, safety, and wellbeing" of the facility residents and persons supported. (Doc. No. 122 at 11.) The rules, however, "do not provide service definitions or standards" governing the provision of services in the group homes and "do not specify which services are to be provided or monitor the implementation of those services" provided by the private IDD support agencies. (*Id.*)

The caselaw governing claims of the type brought in this case establish that the relevant question is whether the plaintiffs have been excluded from participation in, or been denied the benefits of, the "services, programs, or activities *of a public entity.*" 42 U.S.C. § 12143 (emphasis added). Determining whether a service is the service "of a public entity" is not always easy to discern when the service at issue is not provided directly by a public entity but, instead, by a third party licensed by, or in contract with, a public entity. However, courts have generally held that, when a public entity contracts with a private third party to perform services that the public entity

_____

[13] As noted above, the court has already held that the defendants had sovereign immunity from the plaintiffs' claim for damages under the ADA; that claim has been dismissed. *Battle*, 2024 WL 4113531, at *10, 13.

itself is actually responsible for performing, such that the third party is an agent of the public entity, then the services provided are actually services of the public entity, and liability under Title II may attach. *See, e.g.*, *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015) (finding no liability where the state agency licensed but did not control the driver education schools that allegedly discriminated against disabled students, where the discriminatory practices were not the result of requirements or policies established by the state agency), *vacated as moot sub nom. Ivy v. Morath*, 580 U.S. 956 (2016); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) (holding that the state could be liable under the ADA for inaccessibility of a company it contracted with to provide state inmates with jobs); *Kerr v. Heather Gardens Ass'n*, No. 09-CV-00409-MSK-MJW, 2010 WL 3791484, at *1 (D. Colo. Sept. 22, 2010) ("[A] public entity cannot escape its obligations under Title II by delegating its duties to a private entity." (citation omitted)); *Indep. Hous. Servs. v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993) (holding that "[t]he crucial distinction" that rendered the public entity liable for a private actor's inaccessibility was that the public entity "ha[d] contracted with [the private actor] for [it] to provide aid, benefits, or services to beneficiaries of the [public entity's] redevelopment program"); *Paxton v. State Dep't of Tax*, 451 S.E.2d 779, 785 (W. Va. 1994) ("[T]he lottery is the service provided by the Lottery Commission, and it is this service that makes the Lottery Commission subject to the ADA under 28 C.F.R. § 35.130(b)(1).").

In the absence of such a contractual or agency relationship, however, courts have held that a public entity is not liable for a licensed private actor's behavior. *See, e.g.*, *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 70–73 (2d Cir. 2012) (holding that far-reaching and "pervasive" regulation did not make the private taxi industry a program or service of a public entity and that the Taxi Commission's "failure to use its regulatory authority [did] not amount to discrimination" under Title II); *T.W. v. Jacobo*, No. 4:13cv457-RH/CAS, 2014 WL 129056, at *1 (N.D. Fla. Jan.

13, 2014) ("AHCA does not operate the hospitals. AHCA does license the hospitals, but it is more than a stretch to assert that AHCA has itself violated the ADA by failing to pull the licenses or otherwise take action to compel [a different state agency] to provide community-based services to these class members.").

As one court has explained:

> Title II is limited to the discriminatory conduct of public entities with respect to public services. It does not extend to discrimination in connection with private services, programs or activities that are licensed, certified or permitted by a public entity. There are two exceptions to this rule. First, Title II applies to discrimination where a public entity has a public service, program or activity that is operated by a designated private entity that acts on behalf of the public entity. Second, Title II applies to the licensing, certification, and permitting processes of public entities that discriminate against applicants on the basis of their disabilities.

*S.G. v. City of L.A.*, No. LA CV17-09003, 2020 WL 8837146, at *9 (C.D. Cal. Feb. 21, 2020)

These exceptions are made explicit in the Title II regulations. First:

> A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service . . . .

28 C.F.R. § 35.130(b)(1)(i).

And second:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

*Id.* § 35.130(b)(6). The Appendix to 28 C.F.R. Pt. 35 clarifies that paragraph (b)(6) "prohibits the public entity from discriminating against qualified individuals with disabilities on the basis of disability *in the granting of licenses or certification*." 28 C.F.R. Pt. 35, App. B (emphasis added).

However, "Paragraph (b)(6) does not extend the requirements of the Act or this part directly to the programs or activities of licensees or certified entities themselves. The programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate." *Id.*

The defendants in this case argue, essentially, that they license and regulate the privately run group homes and other services for people with mental illness and IDD, but the services provided are not services of the state, and the entities providing the services are not agents of the state. In response, the plaintiffs do not engage with this issue to argue that, in fact, the private services licensed by the defendants are the defendants' programs. Instead, they affirmatively chose not to dispute, "[f]or the purpose of ruling on Defendants' [Motion for Summary Judgment], Defendants' assertion that the benefits of DMH's and DDA's licensure programs to service recipients and persons supported, respectively, are protection of their physical health, safety, and wellbeing and prevention of abuse and neglect against them." (Doc. No. 153 at 2.) Instead, the plaintiffs argue that the minimum standards set by the defendants include governance standards, policy and procedure requirements, financial management requirements, personnel requirements, and record maintenance requirements and that the governing rules provide generally that persons supported have the right to be fully informed about their rights and their care in a language that they can understand. (*Id.* at 3.) They assert that the defendants have discriminated against the individual plaintiffs and other deaf DRT constituents in administering their licensing of services by "denying them the health, safety, wellbeing, and abuse-and-neglect-prevention benefits of their licensing programs"—in other words, by failing to ensure that licensees comply with these mandates. (*Id.* at 4.)

More specifically, the plaintiffs contend that, for example, DMH and DDA licensure rules require licensees to have a telephone system for emergency use that is capable of meeting the needs of the persons supported or the clients served by the facility. DMH and DDA inspectors check for compliance with this requirement during annual licensure inspections, but they do not routinely check for the presence of video phones, even when a deaf individual is being served by the licensee. (*See* Doc. No. 149 ¶¶ 177–78, 190–91.) The plaintiffs assert that Underwood and Battle do not have video phones "at the residential settings where they receive services" (Doc. No. 153 at 4 (citing Doc. No. 149 ¶ 384)) and that Helton has only obtained them at her last two group homes because of ongoing support and assistance from DRT (*see* Doc. No. 149 ¶¶ 270–71, 285).

In addition, while DMH and DDA licensure rules require service recipients and persons supported to be informed of their rights in a manner and format that promotes understanding, *see* Tenn. Comp. R. & Reg. 0465-02-06-.06(1)(a), 0940-05-06-.06(1)(a), DMH licensure inspectors admittedly check just to make sure signed paperwork in client files documents that service recipients have been informed of their rights, without assessing *how* service recipients were informed of their rights or whether they were made in a language the client understood. (Doc. No. 149 ¶¶ 96–97.)

Similarly, the defendants have the authority to investigate allegations of abuse and neglect of service recipients, and service recipients and persons supported are typically interviewed as part of any abuse and neglect investigation. However, according to the plaintiffs, DDA investigators are not trained in how to use an interpreter for such interviews and, prior to August 2021, DMH did not have in place a procedure for interviewing a deaf service recipient. "In practice," according to the plaintiffs, "investigators have not used interpreters when investigating allegations of abuse or neglect related to Plaintiffs Blanchett and Underwood." (Doc. No. 153 at 5.)

Based on these allegations, the plaintiffs maintain that "[t]he undisputed facts show that Defendants preclude deaf individuals from the admitted benefits of DMH's and DDA's licensure programs—protection of health, safety, and wellbeing and prevention of abuse and neglect—and thus violate Title II and Section 504." (*Id.* at 5.)

The defendants' Reply asserts that the plaintiffs have changed their theory of liability mid-case and that their new claims are premised upon "hypothetical situations that have not occurred." (Doc. No. 154 at 2.) Regarding the absence of video phones at the homes of Battle and Underwood, the defendants point out that these individuals rent their apartments from third parties that have no connection to DDA and are not licensed by DDA; rather, they receive services outside their homes from entities licensed by DDA. (*See* Doc. No. 124-4, Horn Decl. ¶¶ 7–10.) Regarding the other issues, the defendants point out that the plaintiffs have not produced evidence of an actual injury and therefore cannot prove their claims based on the alleged deficiencies in the defendants' licensure programs. (Doc. No. 154 at 2.)

The court finds that the defendants are correct that the plaintiffs either are attempting to impose liability on the defendants for services provided by licensees or based on licensure qualifications issues with respect to which the plaintiffs have not established actual injury. Moreover, the plaintiffs are apparently attempting to assert a hybrid claim that falls outside of either 28 C.F.R. § 35.130(b)(1) or (b)(6). That is, they have effectively waived any argument that the programs and services that DMH and DDA license are in actuality programs and services of the public entities; but they also do not argue that DMH and DDA discriminate against "qualified individuals with disabilities on the basis of disability in the granting of licenses or certification." 28 C.F.R. Pt. 35, App. B. Rather, they argue that the defendants discriminate against individuals with hearing impairments in the administration of the licensing programs by failing to more

stringently enforce their licensure rules or failing to ensure that licensees do not discriminate against them. Similar to the situation in *Noel*, however, the defendants here do not "violate the ADA by licensing and regulating a private . . . industry that fails to afford meaningful access" to individuals with hearing impairments. *Accord Noel*, 687 F.3d at 72.

In short, the plaintiffs do not allege that the defendants discriminate in granting licenses, for purposes of asserting a violation of § 35.130(b)(6). For purposes of the defendants' Motion for Summary Judgment on the plaintiffs' claim for violation of subsection (b)(1), it suffices for the defendants to point out that the plaintiffs bear the burden of proof on this issue and that the plaintiffs lack evidence of an agency relationship between the defendants and the third-party service providers, which is necessary to show that the services and programs at issue are services or programs of a public entity. The plaintiffs have not come forward with sufficient evidence to avoid summary judgment on this issue.

<i>b)</i> <i>Fundamental Alteration</i>

The defendants next argue—in the alternative, though they do not make this clear—that the plaintiffs' proposed changes to their existing licensure programs would expand the substantive scope of their licensure program and constitute a "fundamental alteration" of the existing scheme. (Doc. No. 122 at 14.) The plaintiffs respond that the changes they request—specifically, the imposition of requirements that licensees comply with ADA and Section 504 or providing instruction to licensees on their obligations to ensure effective communication with deaf service recipients—would not fundamentally alter the defendants' licensure programs.

"'Fundamental alteration' is an affirmative defense under the ADA providing that governmental entities need not accommodate disabled individuals if doing so 'would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.'" *Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017) (quoting 28 C.F.R.

§ 35.164). Having found that the plaintiffs cannot establish that they suffered discrimination in a service provided by a governmental entity for purposes of their claim relating to services provided by licensees of the defendants, the court does not reach the defendants' affirmative defense of fundamental alteration. *Accord Tri-Cities Holdings LLC v. Tenn. Admin. Procs. Div.*, 726 F. App'x 298, 315 (6th Cir. 2018) ("[T]hese defendants . . . were not in charge of the CON application program itself. As a matter of law, therefore, they were not responsible for providing a reasonable modification to that program.").

### 2. Direct Services

Downs has been admitted to two DMH-operated RMHIs: MTMHI in 2021 and the MMHI in 2022. (Doc. No. 124-2, Thornton Decl. ¶¶ 5–6.) Helton was housed at MBMHI, another RMHI owned and operated by DMH, from October 2018 to February 28, 2020. (Thornton Decl. ¶ 15.) Blanchett was enrolled in DDA's TN START program from approximately December 2021 through September 2022. (Doc. No. 149 ¶¶ 146. 364.) Necoas Wilson has been enrolled in the TN START program since August 2023. (*Id.* ¶¶ 335, 337.). The RMHIs and TN START are programs or services of the defendants, for purposes of Title II and Section 504.

For purposes of the plaintiffs' claims based on discrimination in the defendants' direct provision of services, the most relevant regulations state:

> (a)(1) A public entity *shall take appropriate steps* to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.
>
> . . . .
>
> (b)(1) A public entity *shall furnish* appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
>
> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication

> used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(a)(1), (b) (emphasis added). Based on these regulations, the plaintiffs assert that the defendants were required to make translation and communication services available to the plaintiffs receiving direct services from programs provided by the defendants. The defendants argue that they are entitled to summary judgment on this issue as well.

　　　　　　a)　　　Downs

Regarding Downs, the defendants argue that the ADA does not require public entities to "employ any and all means" to ensure effective communications at all times (Doc. No. 122 at 14 (quoting *Tennessee v. Lane*, 541 U.S. 509, 511 (2004) (discussing access to courts))) and that they are only required to make reasonable accommodations for deaf individuals. They contend that "[w]hether Defendants provided a reasonable accommodation for deaf individuals requires a fact-specific inquiry into 'the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.'" (Doc. No. 154 at 2 (quoting 35 C.F.R. § 160(b)(2)).) The defendants argue that the plaintiffs have not rebutted the evidence showing that "sign language interpreters were provided whenever required." (*Id.*)

However, regarding Downs' 2021 admission at MTMHI, there is a question of fact as to whether Downs received any translation services during the first seven days of his thirteen-day admission and a question of fact as to what other efforts DMH made to ensure effective communication with Downs during those seven days. The defendants point to evidence that, they claim, shows that Downs received a psychiatric evaluation through a sign language interpreter

upon his admission on November 26, 2021. (Doc. No. 124-2, Thornton Decl. ¶ 9.) According to the plaintiffs, however, Downs was not admitted to the hospital until November 27, 2021, and the defendants admitted in their Answer that a sign language interpreter was not present on November 27, 2021. (Doc. No. 46, Answer ¶ 383; Doc. No. 152 ¶ 25.) The defendants also admit that Downs did not receive any interpretation services from November 27, 2021 through December 3, 2021, though they contend that they made reasonable efforts to obtain interpretation services for Downs for that time period. (Thornton Decl. ¶¶ 10–12.)

The court finds that the question of whether Downs had "meaningful access" to MTMHI's services, programs, and activities during this period creates a question of fact that cannot be reasonably resolved by the court in favor of either party. *See Keller*, 860 F. App'x at 386 ("We have interpreted [§ 12132] to require that covered entities provide 'meaningful access' to their services, programs, and activities." (citing *Ability Ctr.*, 385 F.3d at 909)); *see also Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) ("Consistent with the Supreme Court's interpretation of [Section 504] in *Alexander v. Choate*, 469 U.S. 287, 301 (1985), we construe Title II of the ADA as requiring that qualified persons with disabilities receive 'meaningful access' to a public entity's services, not merely 'limited participation.'"). Neither party is entitled to summary judgment on the question of whether Downs was "excluded from participation in" or "denied the benefits of" DMH's "services, programs, or activities" because of his disability during the first seven days of his 2021 admission. *See id.* at 385–86. To be clear, however, because the claim related to Downs' 2021 admission is for damages for a statutory violation that occurred in the past, the claim proceeds under Section 504 only, not Title II.

Regarding his eight-month admission to MMHI in 2022, the defendants concede that Downs did not have a sign language interpreter for two nurse encounters and nineteen group

therapy sessions. (Doc. No. 149 ¶¶ 309–10.) However, the plaintiffs have not rebutted the defendants' evidence that MMHI made reasonable efforts to have sign language interpreters available to Downs from 8:00 a.m. until 10:00 p.m. every day during that admission and that he had access to a video phone. (*See* Thornton Decl. ¶¶ 8, 14.) He had a sign language interpreter during his admission, for all medical assessments, and for any discussions about his treatment. (*Id.* ¶ 14.) Based on the evidence in the record, the court finds that no reasonable jury could conclude solely from MMHI's failure to procure ASL interpreters for two nurse encounters and nineteen group therapy sessions over the course of more than eight months of daily in-patient treatment services through a variety of modalities (Health and Wellness therapy, Problem-solving therapy, Community Reintegration therapy, Lifestyle/Medication therapy, Art of Leisure therapy, etc. (*see* Doc. No. 149 ¶ 309)) that DMH failed to provide "meaningful access" to MMHI's services, programs, and activities. *Accord Keller*, 860 F. App'x at 386 (6th Cir. 2021) (citing *Ability Ctr.*, 385 F.3d at 909). DMH is entitled to summary judgment on the question of whether DMH violated Title II or Section 504 during Downs' 2022 MMHI admission.

b) *Helton*

Helton was housed at MBMHI from October 2018 until February 2020. (Doc. No. 149 ¶¶ 216, 244.) The defendants assert that DMH has not had any involvement in Helton's care or services since her discharge from MBMHI on February 29, 2020 (other than by licensing the private entities that have provided her services). This lawsuit was filed in January 2022, nearly two years later. The defendants therefore assert that any claim Helton may have related to her care at MBMHI is barred by the one-year statute of limitations that applies to Title II and Section 504 claims in Tennessee. (Doc. No. 122 at 15.)

The plaintiffs do not dispute as a legal matter that a one-year statute of limitations applies to Helton's claims. They argue, instead, that the continuing violation doctrine saves her claims

from being time-barred. (Doc. No. 153 at 10.) But the plaintiffs have not shown that the services Helton received after 2020 were services of a public entity, as discussed above, so the continuing violation doctrine does not apply. Accordingly, Helton's discrimination claims based on her hospital admission that terminated in February 2020 are time-barred. On this basis alone, the defendants are entitled to summary judgment on Helton's claims for discrimination based on the direct services she received at MBMHI.

<em>c)</em>    <em>Blanchett</em>

As set forth above, DDA provides direct services for individuals with IDD through TN START, a collaboration between DDA and the Center for START Services. (Doc. No. 149 ¶ 146.) The program accepts enrollees who receive one of the 1915(c) HCBS waivers. (*Id.* ¶ 147.) TN START is a crisis prevention and intervention program for individuals who have co-occurring intellectual and developmental disabilities as well as mental health disorders. (Doc. No. 152 ¶ 53.). The goal of the program is to "prevent higher levels of care." (Doc. No. 158-4, Dhanarajan Dep. 20.)

Blanchett was enrolled in one of the HCBS 1915(c) waivers administered by DDA, and she was enrolled in TN START from December 2021 through September 2022, when she left the state temporarily to live with her father. (Doc. No. 149 ¶¶ 354, 364; Doc. No. 152 ¶ 60.) The defendants assert that Blanchett received meaningful access to the TN START program, that her communications with TN START staff were always conducted through an ASL interpreter, that TN START provided an ASL interpreter if TN START staff hosted a meeting with Blanchett and others, that TN START staff made reasonable efforts to obtain an interpreter when they responded to a crisis event involving Blanchett, and that, when they could not obtain an in-person interpreter on short notice, they would use alternative means to communicate with Blanchett. (Doc. No. 122 at 15–16 (citing Doc. No. 158-12 at 74, 92–93, 33–34).)

The plaintiffs do not contest the defendants' evidence regarding TN START's efforts to make a sign language interpreter available, but they argue nonetheless that Blanchett suffered discrimination through the TN START program, because the program did not provide a QMHI during crisis events; her facilitator sometimes communicated with her via text message and written messages; and, if no translator was available, TN START staff sometimes used Blanchett's video relay service when they went to Blanchett's home during a crisis event. (Doc. No. 153 at 12.) The plaintiffs contend that, because of these deficiencies, Blanchett did not receive the full benefit of TN START's programs and, further, that TN START's policies "are not sufficient to stop these problems from recurring." (*Id.*)

The court finds that the evidence to which the plaintiffs point, viewed in the light most favorable to the plaintiffs, is not sufficient to permit a reasonable jury to find that DDA failed to ensure that Blanchett had meaningful access to the benefits and services provided by TN START. There is simply no evidence in the record suggesting that, during those times that a sign language interpreter was not available, TN START failed to find other means to communicate with Blanchett effectively, even if not perfectly, and to ensure that she received the full benefits of the program. The defendants are entitled to summary judgment on Blanchett's claims for discrimination and for prospective injunctive relief based on the direct services she received through TN START AST.

> d) *Wilson*

Although the plaintiffs contend that they bring a claim on behalf of Wilson related to his use of TN START services, they do not respond to the defendants' Motion for Summary Judgment relating to direct services by pointing to any evidence regarding Wilson's use of direct services. In support of their own Motion for Summary Judgment, they assert that the evidence is undisputed that Wilson did not have a sign language interpreter during his first meeting with TN START. In

their Reply in support of their Motion for Summary Judgment and their Response to the plaintiffs' motion, the defendants argue that the SAC does not allege any facts stating a claim on behalf of Wilson in connection with his receipt of TN START services. (Doc. No. 154 at 4 (objecting to the plaintiffs' raising this claim for the first time in response to the defendants' Motion for Summary Judgment); Doc. No. 148 at 11 n.1; *see also* SAC ¶¶ 133–59 (no reference to TN START services).) They also argue that the facts in the record do not support this claim.

In fact, both parties rely on a single document in the file relating to Wilson's experience with TN START: a START Contact Note dated July 25, 2023. The Note relates to a "first intake meeting." (Doc. No. 150-13.) It indicates that Wilson may have attended the meeting, but his input was not the primary focus of the meeting. It states in relevant part:

> ASM Krishana Overstreet along with assigned ASF Brittany Reed and ASF Felicia Dutton completed first intake meeting with DSP KJ for Necoas Wilson. . . .
>
> There was no interpreter provided during this visit as KJ was the primary individual to coordinate and initiate review of information for intake.
>
> At start of outreach, Residential Manager Deedria Willis and Crystal Haych arrived to complete tour of home and introduction of Crystal to Necoas and roommate Brandon.
>
> Necoas corresponded with assigned ASF Brittany Reed through written communication (See copies in file) while ASM Krishana completed review of program with KJ as well as gathered additional documentation from home file for Necoas . . . . Review of roommate schedule and daily activities gathered for future outreach planning.
>
> Necoas reported that he preferred in person ASL interpreter versus video interpretation. ASM Krishana/ASF Brittany explained to KJ and Necoas that they will always try to get in person interpreter for scheduled meeting but will have to use video interpretation for any crisis response.

(*Id.*) It is unclear from this Note or the record who "DSP KJ" is. But it is clear that this was a single instance in which an interpreter was not provided and that communication with Wilson was not the focus of the meeting. Otherwise, the record indicates that Wilson's TN START facilitator, Kate

Vogt, is fluent in ASL, is familiar with the deaf community, and communicates with Wilson using ASL. (Doc. No. 149 ¶¶ 339–41.) The record does not reflect complaints by Wilson about his experience with TN START.

The court finds that a single instance of not having a sign language interpreter present for a meeting does not show or even suggest that Wilson was deprived of meaningful access to the TN START program, for purposes of proving a violation Title II or Section 504. The defendants are entitled to summary judgment on Necoas Wilson's claims, to the extent he brings them, related to discrimination in the provision of services by TN START.

      *e)*       *1915(c) Waiver Services: Blanchett and Underwood*

Citing their own Memorandum in support of their Motion for Summary Judgment, the plaintiffs argue that Blanchett and Underwood suffered discrimination through DDA's direct administration of the services provided through their participation in a 1915(c) waiver program. (Doc. No. 153 at 15 (citing Doc. No. 126 at 8.) Indeed, the plaintiffs allege that DDA

> oversees and administers all aspects of the 1915(c) waiver program, including defining services, quality assurance, operating the reportable event management system, the grievance system, the denial of waiver services appeals process, restriction of rights, mandating training of licensees, administering and overseeing programs through DDA's private provider network, and operating an extensive licensing program.

(Doc. No. 126 at 8 (citing Doc. No. 149 ¶¶ 117, 158–61, 166–68, 173).)

As set forth above, DDA concedes that it has "final say on what services get authorized in the PCSP of persons supported by DDA's 1915(c) waivers." (Doc. No. 149 ¶ 117.) It also acknowledges that it provides quality assurance processes for the 1915(c) waiver program and annual quality reviews to some waiver providers and that it administers the waiver programs through DDA's private provider network. (*Id.* ¶¶ 158–59.) DDA's provider agreements require service providers to furnish "meaningful access to services for LEP persons, including interpreters

and/or language appropriate reading material."[14] (*Id.* ¶ 162.) Otherwise, however, as Jordan Allen explained, interpreter services for a person supported are not services authorized under the 1915(c) waivers. (Allen Dep. 72.) Rather, "authorized services are discrete services that are identified from a selectable menu of supports. Those services all have service codes. They come into the plans review unit." (*Id.*) DDA reviews and approves PCSPs, authorizes services, and "provide[s] contracted agencies with a billing system to request reimbursement from Medicaid Managed Care Organizations." (Doc. No. 148 at 14.)

Regarding Blanchett and Underwood specifically, the defendants acknowledge that these two plaintiffs receive community-based services under a 1915(c) waiver program administered by DDA, but they argue that "DDA fulfills its obligation to authorize the services listed in the PCSPs." (Doc. No. 148 at 7.) The defendants then assert that "neither Blanchett's nor Underwood's PCSPs require[s] interpreters or services in ASL." (Doc. No. 148 at 12 (citing Doc. Nos. 134-16 (Underwood PCSP), 134-17 (Blanchett PCSP)).) In their Reply, the plaintiffs assert simply that the defendants' admission that Blanchett's and Underwood's PCSPs do not actually require interpreters or services in ASL "supports Plaintiffs' motion." (Doc. No. 155 at 5.)

While both parties are correct that the PCSPs do not strictly require ASL interpreters, both PCSPs refer to the individuals' hearing impairments and stress the need for support staff who can understand them. For instance, Blanchett's PCSP makes it clear that Blanchett is deaf and may become agitated if she is not understood and that she "does not want any meetings about her without her being present and must have an interpreter available for her to comprehend what is

---

[14] The parties do not define the term, but "LEP person" refers to a person with limited English proficiency.

being said. This is her right, and she wants to execute this right at all times." (Doc. No. 134-17 at

1, 8.) Under the heading "Communication," the PCSP states:

> Racqual speaks using fluent ASL (American Sign Language). ASL is very different from English. ALL Outside providers are responsible for providing an interpreter for visits (BA, Nutrition, ISC, MCO, DIDD, Direct Care Provider, APS, Police, Mobile Crisis, Therapists, etc.).

> Video Remote Interpreting (VRI) is also an acceptable form of interpreter service while face-to-face. Racqual's video phone cannot be used as an interpreter if the visitor is present. . . .

> Racqual is deaf and she gets frustrated communicating to her supporters, she wants her supporters to be American Sign Language (ASL) proficient but knows this isn't always possible.

> ASL should be used, if possible. Supporters should also have a writing utensil and paper with them at all times to ensure proper communication with Racqual. She is able to read written communication. Again, ASL is not English, so may need to have clarification on some items written down.

> Written communication is acceptable for basic conversation. Anything important needing to be discussed must have an interpreter, in order to ensure she understands what's being said. Please see above for interpreting services (on-site or VRI).

> Racqual will write down her thoughts to try and communicate. She does not like to do this, but she will. Also, there are some grammatical differences between ASL and English and this can cause miscommunications between Racqual and others. . . . This will lead to frustrations from Racqual as she does not understand what is being written. . . .

> Racqual is able to teach basic ASL. She doesn't want to have to teach her supporters, although she is willing to do so.

(*Id.* at 9.)

Underwood's PCSP similarly states that it is important to Underwood that staff who "are

not able to sign" must "be willing to learn his form of sign language," that pen and paper should

be available for him to communicate with people who do not sign, and, importantly, that he should

have his IPAD, which has an app that allows him to communicate with others. (Doc. No. 134-16

at 4.) He also needs "staff that knows him well and is familiar with how he communicates to attend all medical appointments with him." (*Id.* at 10.)

It is clear from the record that it is not DDA's responsibility to require services that are not covered by the waiver. Regardless, even accepting as true the plaintiffs' contention that DDA has more power in that department than it acknowledges, the plaintiffs' position is premised upon a logical fallacy: that the defendants' alleged failure to ensure ASL-fluent interpreters at all times establishes a violation of Title II. Even when it provides direct services, a public entity is required only to "take appropriate steps to ensure that communications" with hearing-disabled recipients are "as effective as communications with others" and to provide such "auxiliary aids and services" as necessary to afford recipients of services an equal opportunity to benefit from the program at issue. 28 C.F.R. § 35.160(a), (b). The fact that the PCSPs do not require 24/7 ASL interpreters does not establish, *per se*, that DDA did not fulfill those obligations (again assuming for purposes of the defendants' motion that it actually incurred those obligations in administering the 1915(c) waiver programs). The plaintiffs have pointed to no other evidence in the record that would permit a rational jury to find that either Blanchett or Underwood was deprived of meaningful access to, or otherwise suffered discrimination in, the provision of 1915(c) waiver services. The court finds that DDA's alleged failure to ensure that these plaintiffs' PCSPs included a requirement for sign language interpreters, standing alone, is not sufficient to prove their claims. The defendants are entitled to summary judgment on the claims related to this issue as well.

### 3. *Olmstead's Integration Mandate*

As set forth above, the Supreme Court and the Sixth Circuit recognize that Title II and Section 504 prohibit discrimination against individuals with disabilities through the "unjustified institutional isolation of persons with disabilities." *Waskul*, 979 F.3d at 459 (quoting *Olmstead*, 527 U.S. at 600). To implement Title II, the Attorney General promulgated a regulation known as

the "integration mandate," which provides that public entities "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). A regulation promulgated under Section 504 similarly establishes that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). The "most integrated setting" is one that "enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

In *Waskul*, the Sixth Circuit found that the plaintiffs plausibly pleaded two types of *Olmstead* claims: (1) a claim premised on allegations that the defendants' actions placed the individual plaintiffs "at serious risk of institutionalization"; and (2) a claim premised on allegations that the defendants' actions caused the plaintiffs "to be effectively institutionalized in their own homes." *Waskul*, 979 F.3d at 460. Notably, the court was not called upon to determine what was required to *prove* those claims.

The plaintiffs here similarly allege both that the defendants' failure to provide them ASL interpretation services in conjunction with their administration of community-based services has placed all of the plaintiffs at increased risk of institutionalization and that, because of the defendants' failure to provide them ASL interpretation services, they have been isolated in their own homes.

The plaintiffs have presented ample proof that all of them would function better and manage their mental illness and/or IDD symptoms more effectively if they had greater access to ASL interpreters or service providers who are ASL-fluent. They have presented evidence that the absence of effective and consistent means of communicating with the world around them leads to

frustration and isolation. They have also shown that the two agency defendants license and pervasively regulate the providers of services to individuals with mental illness and IDD in the state. What they have not done, however, is produce evidence that the licensees that provide the services of which the plaintiffs are beneficiaries are actually agents of the state defendants, carrying out services for which the state is ultimately responsible, such that, if the state did not contract out the services to third parties, the state itself would necessarily perform them. With respect to direct services provided by the defendants, the plaintiffs, with one exception, have not shown that the defendants failed to ensure that the plaintiffs had meaningful access to the defendants' programs and services.

As the court has already discussed, a *prima facie* case for discrimination under Title II or Section 504 requires a showing that the defendant public entity in some way provides the service or benefit at issue. *Ivy*, 781 F.3d at 258. In other words, because the integration mandate is part of Title II and Section 504, it does not apply to anything that is not a service, program, or activity of a public entity. Accordingly, the plaintiffs' *Olmstead*-based claims premised on discrimination in the services provided by licensed providers, rather than the defendants themselves, necessarily fail. And the evidence presented in connection with the defendants' direct services—in-patient hospitalization in RMHIs, the TN START program, and the approval of the services identified in Blanchett's and Underwood's PCSPs—is not sufficient to support their *Olmstead* claims.

The defendants are entitled to summary judgment on this claim as well.

### 4. DRT's Unnamed Constituents

As a P&A agency, DRT "lacks standing to challenge a policy, where it is not seeking to do so on behalf of any specific, named individual." *Trivette v. Tenn. Dep't of Corr.*, 739 F. Supp. 3d 663, 689 (M.D. Tenn. 2024) (Trauger, J.) (citing *Tenn. Prot. & Advoc., Inc. v. Bd. of Educ.*, 24 F. Supp. 2d 808, 816 (M.D. Tenn. 1998)). The defendants acknowledge that DRT has standing to

"address the alleged injuries to the Individual Plaintiffs and similarly situated individuals," but they argue that it has not identified any other individuals who have been injured by a service, program or activity of the defendants. (Doc. No. 122 at 18.)

In response, the plaintiffs argue that DRT has standing to bring suit on behalf of "other deaf constituents" who have been "identified prior to and during the course of this litigation." (Doc. No. 153 at 18.) One of these, whom the plaintiffs do not identify, died in 2022 "while being served by a DDA-licensed provider." (*Id.*) In addition, the plaintiffs refer vaguely to "other deaf constituents who have been injured by Defendants' actions" but whom the plaintiffs do not identify, aside from a "minor deaf constituent being served by one of DDA's [Intermediate Care Facilities] and a deaf constituent currently admitted to an RMHI." (*Id.* (citing Doc. No. 158-16, Greineder Expert Dep. 12–13, 31, 36–37; Doc No. 145-16; Doc. No. 147-1 at 2–6 (Sheet 1, Lines 67–300)).)

The plaintiffs have successfully identified two individuals who are not named plaintiffs and who may be receiving services from the defendants—but they have not alleged any injury on behalf of either of these individuals. Article III standing requires an injury. *Trivette*, 739 F. Supp. 3d at 707. The mere fact that DRT has other deaf constituents who may be receiving services from the defendants does not suffice to state a claim on behalf of these individuals.

In short, while DRT retains standing to assert claims on behalf of the named individual defendants (all of whose claims except one will be dismissed on summary judgment), it has not established standing to assert claims on behalf of any other individuals.

## VI. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The plaintiffs' Motion for Summary Judgment will be denied in its entirety. Even if the court were not granting summary judgment to the defendants on nearly every claim, the plaintiffs

have not established that they are entitled to judgment as a matter of law on the undisputed facts on any claim.

## VII.   CONCLUSION

The court fully acknowledges the many difficulties the plaintiffs encounter in making their way in the world while dealing both with hearing impairment and mental illness and/or IDD, but the plaintiffs simply have not established that the defendants fund, operate, or are responsible for providing the community-based services that the plaintiffs' claims primarily target. The defendants are entitled to summary judgment on all claims except plaintiff Patrick Downs' Section 504 claim for discrimination in the provision of services during his 2021 admission at an RMHI operated by DMH. Their Motion for Summary Judgment (Doc. No. 121) will be denied as to that claim (which pertains only to DMH) and granted with respect to all claims against DDA and all other claims against DMH. The plaintiffs' Motion for Summary Judgment (Doc. No. 125) will be denied in its entirety.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge